## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS LIAM MURPHY, ESQ., MARK MIRANDA, GABRIELLE REED, ALEX PERRY, ESQ., CHARLES SUSTAITA, TREVOR PERRY, ESQ., JOY MORGAN, GRAHAM "MICKEY" MURPHY, DR. JAMES MORGAN, WALKER POST, SARA JESSICA-DILKS, CASSIDY HOOPER, TRAVIIS MASSENGALE, and JEFFREY ALLTON, <br><br> Plaintiffs, <br><br> v. <br><br> PHANTOM TECHNOLOGIES, INC. and AUX CAYES FINTECH CO. LTD., d/b/a "OKX," <br><br> Defendants. | Civil Action No. 1:25-cv-3060 <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>

Plaintiff Thomas Liam Murphy, Esq. ("Liam"), representing himself and his family and friends who share his interest and who held Wiener Doge tokens on January 20, 2025: Mark Miranda, Gabrielle Reed, Alex Perry, Esq., Charles Sustaita, Trevor Perry, Esq., Joy Morgan, Graham "Mickey" Murphy, Dr. James Morgan, Walker Post, Sara-Jessica Dilks, Cassidy Hooper, Traviis Massengale, and Jeffrey Allton (together with Liam, "Plaintiffs") file this complaint against Defendants Phantom Technologies, Inc. ("Phantom") and Aux Cayes Fintech Co. Ltd., d/b/a "OKX" ("OKX").

## INTRODUCTION

1.     This case arises from the catastrophic security failures and deliberate regulatory evasion of Phantom Technologies, Inc. ("Phantom")—the fastest-growing consumer cryptocurrency application in the United States.  Phantom's application facilitated $20 billion in cryptocurrency swaps in 2024, generated $130 million in fees in January 2025, and was recently valued at $3 billion—all while operating outside of any federal or state financial regulatory framework.

2.     Though marketed as a secure and user-friendly "wallet," Phantom's application functions in reality as an unregulated cryptocurrency trading platform.  It routes token swaps, matches trades algorithmically, charges fees on execution, and connects users to third-party liquidity pools--performing the core functions of a trading platform without regulatory oversight.

3.     Phantom facilitates millions of anonymous trades and near-infinite token swap combinations, while actively soliciting novice consumers to download its mobile and browser-based application.  Phantom advertises "best-in-class" security and safety—but fails to disclose the true risks associated with its platform.  The platform's architecture enables untraceable liquidation of stolen assets with no oversight, no reversibility, and no accountability.

4.     Phantom has long known that its browser application stores decrypted private keys in volatile memory—an architecture that exposes users to malware and key theft.  Hundreds of online complaints document users being "drained" through this exact exploit.  Despite this, Phantom has never warned consumers of this vulnerability, never disclosed it in user agreements, and never reported related breaches to regulators—violating its obligations under both state cybersecurity regulations and federal commodities law.

5.     Phantom did not merely fail to anticipate cyberattacks—it knew exactly how users were being compromised and made a calculated decision to remain silent.  Instead of trying to protect its users (by employing required security and safety features) or inform its users of the true

risks (by disclosing and reporting known cybersecurity breaches), Phantom simply cloaks the true risk from its users and from regulators. When cybercriminals attack, Phantom blames the victim instead of helping to stop the cybercriminals or help prevent the money laundering of the ill-gotten gains.

6.     Phantom publicly markets its application as a secure, user-first gateway to decentralized finance. It claims to offer "best-in-class security," "industry-leading protections," and "24/7 global support." Internally, however, Phantom's leaders knew that the browser wallet stored users' decrypted keys in active memory. They knew that novice users were routinely targeted by malware, phishing scripts, and rogue extensions. They knew that many victims were losing significant funds. Yet they continued promoting their product as safer than traditional exchanges, deliberately omitting the very risks that were causing users to be financially and reputationally destroyed. This mismatch between public assurances and internal knowledge forms the basis of Plaintiffs' fraud, negligence, and deceptive practices claims. That gap between representation and reality did not just violate consumer trust—it enabled devastating financial losses for users who relied on Phantom's assurances.

7.     On January 20, 2025, Thomas Liam Murphy, Esq. ("Liam") became a victim of cybercrime when a malicious actor stole his decrypted private key from his browser's working memory and, without having to bypass two-factor authentication or any security defense from Phantom's application, obtained unrestricted access to over $500,000 in crypto funds stored inside three of Liam's Phantom wallets. In less than five minutes, the cybercriminal executed a handful of obviously fraudulent transactions and *liquidated half a million dollars' worth of crypto property* from Liam's wallet stored in his Phantom application *for $37,537*, using Phantom's "Swapper"

feature to sell the maximum-possible tokens, as quickly as possible, utilizing Phantom and OKX's smart contract and automatic liquidity routing protocol, in exchange for Solana ("SOL").

8.    The dramatic, unauthorized liquidation of Liam's tokens caused colossal damage. Liam's liquidated tokens represented the majority share of tokens in his "layer two" Solana-based meme coin, Wiener Doge, which was valued at over $1 million at the time of the collapse.  At the height, each of the 1,000,000 Wiener Doge tokens were worth $3.10, but after the breach, the tokens lost all value and are now worth less than $0.01.

9.    Upon further investigation, Liam's case is one of many.  Online, hundreds of victims claim that cybercriminals utilized the exact same exploit to steal their private keys created and stored by Phantom (stored locally in working memory), to take over their Phantom accounts (without having to bypass two-factor authentication or any identity checks), to execute massive, unauthorized transactions utilizing Phantom's "Swapper" (without slippage restrictions), and to "drain" their crypto funds stored inside their Phantom wallets, by sending those funds to the criminal's own crypto wallet (without any risk of retribution or action from Phantom).

10.    Despite its label, Phantom is not merely a crypto wallet.  It is a consumer-facing financial platform that creates, stores, and exposes private cryptographic keys while simultaneously executing token swaps, collecting trading fees, and routing transactions to foreign exchanges under criminal investigation.  In 2024 alone, Phantom facilitated over $20 billion in swaps and collected more than $275 million in fees—without registering as a broker, swap execution facility, or money services business.  This unregulated architecture allows criminals to exploit Phantom's security gaps and conceal their identities during criminal trades, and Phantom profits from each one—whether legitimate or criminal.  The result is an unregistered, unsupervised crypto exchange masquerading as a wallet—at massive cost to its users and the broader financial ecosystem.

Phantom's partner, OKX, has since pleaded guilty to federal money laundering charges for facilitating $5 billion in illicit transactions through anonymous, unvetted trades—just like those routed via Phantom's Swapper. This case exposes the regulatory vacuum that allows cryptocurrency wallets to behave like unregistered trading platforms while avoiding oversight through superficial claims of decentralization.

11.    These facts give rise to the following seven claims:

a.    Claim 1: Operating an unregistered Swap Execution Facility, in violation of 7 U.S.C. § 7b-3.

b.    Claim 2: Acting as an unregistered Introducing Broker, in violation of 7 U.S.C. § 6d.

c.    Claim 3: Violating 7 U.S.C. § 9(1) and CFTC rules by failing to supervise, committing commodities fraud, and willfully evading regulation.

d.    Claim 4: Committing negligence *per se* under 23 NYCRR Part 500 by failing to implement mandatory cybersecurity safeguards.

e.    Claim 5: Acting with gross negligence in designing, promoting, and profiting from an inherently insecure platform.

f.    Claim 6: Engaging in deceptive trade practices and false advertising in violation of N.Y. GBL §§ 349–350 and the Lanham Act.

g.    Claim 7: Aiding and abetting criminal conversion and money laundering through its commercial integration with OKX.

## PARTIES

### A.    Plaintiffs

12.    On January 20, 2025, Thomas Liam Murphy, Esq. ("Liam") resided at 2 Gold Street, Apt. 5105 New York, New York 10038. After the cybercriminal attack, Liam moved back to his hometown and now lives at 8451 Somerset Dr., Prairie Village, KS 66207. Liam graduated from the University of Pennsylvania Law School in 2020 and is admitted to practice law in New York State and the Southern and Eastern Districts of New York. Liam developed the "layer two" Solana cryptocurrency, "Wiener Doge," which reached an all-time-high "market cap" of $3.1

million in January 2025. Liam owned at least 490,000 tokens on January 20, 2025. His tokens were worth as much as $1,517,426.72 in January 2025.

13.    As a result of Phantom's security and regulatory failures, each Plaintiff suffered a direct, individualized financial loss based on their ownership of Wiener Doge tokens as of January 20, 2025. Plaintiffs bring this action jointly in their individual capacities to recover $3.10 per token. A summary of each Plaintiff's location, token ownership, and estimated value is provided below for the Court's convenience.

| Plaintiff | Location | Tokens | Estimated Value |
|---|---|---|---|
| Liam Murphy | New York, NY Prairie Village, KS | 490,000 | $1,519,000 |
| Mark Miranda | Austin, TX | 60,307 | $186,952 |
| Gabrielle Reed | New York, NY Prairie Village, KS | 58,000 | $179,800 |
| Alex Perry | Pittsburgh, PA | 32,613 | $101,100 |
| Charles Sustaita | Denton, TX | 21,619 | $67,019 |
| Trevor Perry | Wexford, PA | 13,088 | $40,573 |
| Joy Morgan | Parkville, MO | 11,000 | $34,100 |
| Mickey Murphy | Parkville, MO | 6,000 | $18,600 |
| Dr. James Morgan | Parkville, MO | 5,000 | $15,500 |
| Walker Post | Brooklyn, NY | 1,132 | $3,509 |
| Cassidy Hooper | Kansas City, MO | 1,111 | $3,444 |
| Sara Jessica-Dilks | Brooklyn, NY | 800 | $2,480 |
| Traviis Massengale | Topeka, KS | 500 | $1,550 |
| Jeffrey Allton | Overland Park, KS | 84 | $260 |

14.    In January 2025, Liam's friends and family purchased and received Wiener Doge tokens.  On January 20, 2025, after the unauthorized liquidation of Liam's Wiener Doge tokens, from his three Phantom wallets, the value of the tokens fell to under $0.01.

15.    Plaintiff Mark Miranda resides at 3302 River Road, Austin, Texas 78703.  He owned at least 60,307 Wiener Doge tokens on January 20, 2025.  Mark Miranda's Wiener Doge tokens were worth as much as $186,952 in January 2025.

16.    Plaintiff Gabrielle Reed resided at 2 Gold St., Apt. 5105 New York, New York 10038, on January 20, 2025.  After the cybercriminal attack, Gabrielle moved back to her hometown and now lives at 8451 Somerset Dr., Prairie Village, KS 66207.  She owned approximately 58,000 Wiener Doge tokens on January 20, 2025.  Gabrielle Reed's Wiener Doge tokens were worth as much as $179,800 in January 2025.

17.    Plaintiff Alex Perry, Esq. resides at 1909 Waterfront Pl., Apt. 258, Pittsburgh, Pennsylvania 15222.  He owned approximately 32,613 Wiener Doge tokens on January 20, 2025.  Alex's Wiener Doge tokens were worth as much as $101,100 in January 2025.

18.    Plaintiff Charles Sustaita resides at 7205 Edwards Road, Denton, Texas 76208.  He owned approximately 21,619 Wiener Doge tokens on January 20, 2025.  Charles's Wiener Doge tokens were worth as much as $67,019 in January 2025.

19.    Plaintiff Trevor Perry, Esq. resides at 12955 Perry Highway, Wexford, Pennsylvania 15090.  He owned approximately 13,088 Wiener Doge tokens on January 20, 2025.  Trevor's Wiener Doge tokens were worth as much as $40,573 in January 2025.

20.    Plaintiff Joy Morgan resides at 6079 Southlake Dr., Parkville, Missouri 64152.  She owned 11,000 Wiener Doge tokens on January 20, 2025.  Joy's Wiener Doge tokens were worth as much as $34,100 in January 2025.

21.    Plaintiff Graham "Mickey" Murphy resides at 6079 Southlake Dr., Parkville, Missouri 64152.  They owned 6,000 Wiener Doge tokens on January 20, 2025.  Mickey's Wiener Doge tokens were worth as much as $18,600 in January 2025.

22.    Plaintiff Dr. James Morgan resides at 6079 Southlake Dr., Parkville, Missouri 64152.  He owned 5,000 Wiener Doge tokens on January 20, 2025.  Dr. Morgan's Wiener Doge tokens were worth as much as $15,500 in January 2025.

23.    Plaintiff Walker Post resides at 130 Diamond St., Apt. 1C, Brooklyn, New York 11222.  He owned 1,132 Wiener Doge tokens on January 20, 2025.  Walker's Wiener Doge tokens were worth as much as $3,509 in January 2025.

24.    Plaintiff Cassidy Hooper resides at 7717 Locust St., Kansas City, Missouri 64131.  She owned 1,111 Wiener Doge tokens on January 20, 2025.  Cassidy's Wiener Doge tokens were worth as much as $3,444 in January 2025.

25.    Plaintiff Sara Jessica-Dilks resides at 130 Diamond St., Apt. 1C, Brooklyn, New York 11222.  She owned 800 Wiener Doge tokens on January 20, 2025.  Sara's Wiener Doge tokens were worth as much as $2,480 in January 2025.

26.    Plaintiff Traviis Massengale resides at 4420 SE Oakview Lane, Topeka, Kansas 66609.  He owned 500 Wiener Doge tokens on January 20, 2025.  Traviis's Wiener Doge tokens were worth as much as $1,550 in January 2025.

27.    Plaintiff Jeffrey Allton resides at 12536 W. 123rd St., Overland Park, Kansas 66213.  He owned approximately 84 Wiener Doge tokens on January 20, 2025.  Jeffrey's Wiener Doge tokens were worth as much as $260 in January 2025.

28.    All Plaintiffs are United States citizens residing in New York, Kansas, Missouri, Pennsylvania, or Texas.

8

### B.    Defendants

#### 1.    Phantom

29.    Defendant Phantom Technologies, Inc. ("Phantom") is a $3 billion-dollar crypto company, with its headquarters at 447 Sutter Street 405, San Francisco, California, 94108.

30.    Phantom owns and operates the fastest-growing consumer crypto application in the world.  Phantom's "all-in-one" consumer crypto trading and storage application allows individuals to create crypto wallets to store cryptocurrency, buy cryptocurrencies from a variety of counter-parties, and trade nearly every cryptocurrency in existence via its Swapper.  Phantom offers its application both on mobile devices and as a web browser extension, which has been downloaded by more than 32 million users.

31.    Phantom's Google extension overview explains that the application (1) allows its users to "buy, store, and trade crypto," (2) is "easy, safe, and fun.  For everyone," (3) provides "No limits on tokens, balances, or transactions," (4) "Swap tokens super fast and at low fees," (5) "Store, stake, and earn rewards with your tokens," (6) "Purchase crypto from over seven sources including card and bank transfer," (7) provides "Best-in-class Security," (8) is "Private by design. No name, email, or phone number required," (9) "flags malicious transactions instantly," and (10) features a "global support team [ ] here for you 24/7."  Phantom's Google Chrome extension over-view also provides images that explain that the application allows users to "Swap every token in one place," and "Trade the hottest coins."

#### 2.    OKX

32.    Defendant Aux Cayes Fintech Co. Ltd., d/b/a "OKX" (hereafter "OKX") is a busi-ness entity incorporated in the Seychelles, which operates one of the highest-volume cryptocur-rency exchange and trading platforms in the world.  Since its founding in or about 2017, OKX has been owned and operated by and through one or more associated companies.  OKX operates its

exchange through employees and offices located in Singapore (since 2022), China, and the United States, among other places.  On February 24, 2025, OKX pled guilty[1] to a one-count criminal Information[2] in this District, admitting that it operated an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.[3]

## JURISDICTION AND VENUE

33.    This Court has original jurisdiction over the subject matter of this case under 28 U.S.C. § 1331, which arises under the Commodity Exchange Act ("CEA"), a federal act enacted in 1936 by the United States.[4]

34.    United States districts have exclusive jurisdiction over private CEA claims under 7 U.S.C. § 25(c).[5]  This Court has supplemental jurisdiction over all state and common law claims that are related to the CEA claims under 28 U.S.C. § 1367.[6]

---

[1] OKX Pleads Guilty to Violating U.S. Anti-Money Laundering Laws And Agrees to Pay Penalties Totaling More Than $500 Million, USAO SDNY Press Release (Feb. 24, 2025).

[2] *United States v. Aux Cayes Fintech Co. Ltd., d/b/a "OKEx," d/b/a "OKX,"* No. 25 Cr. (KPF) (S.D.N.Y.) (Information) (Feb. 16, 2025) (Plea Agreement).

[3] *See* 18 U.S.C § 1960 (Prohibition of unlicensed money transmitting business) ("(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.").

[4] *See* 28 U.S.C. § 1331 (Federal Question) ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

[5] *See* 7 U.S.C. § 25(c) (Jurisdiction; Statute of Limitations; Venue; Process) ("The United States district courts shall have exclusive jurisdiction of actions brought under this section.  Any such action shall be brought not later than two years after the date the cause of action arises.").

[6] *See* 28 U.S.C. § 1367 (Supplemental Jurisdiction) ("… in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

35.     This Court also has jurisdiction over the subject matter here, under 28 U.S.C. § 1332, because the damages exceed $75,000, exclusive of interest and costs and complete diversity exists between the parties.[7]  Plaintiffs are citizens of New York, Texas, Missouri, Pennsylvania, and Kansas.  Defendant Phantom is a Delaware corporation with its principal place of business in California.  Defendant OKX is a foreign corporation incorporated in the Seychelles.

36.     This Court has personal jurisdiction over Phantom by virtue of its continuous and systematic contacts within the State of New York, including marketing to consumers and enabling user transactions in this District.  Phantom systematically markets to consumers in this District, enables transactions by New York users, and routes trading activity through its browser extension and Swapper feature within this District.

37.     This Court has personal jurisdiction over OKX by virtue of its continuous and systematic contacts within the State of New York, including enabling user transactions in this District. OKX engaged in continuous and systematic contacts with this District by enabling Phantom wallet users—including Plaintiff Liam Murphy—to route crypto transactions through its trading infrastructure, thereby purposefully availing itself of the laws and protections of this forum.

38.     Venue is proper in this District, under 7 U.S.C. § 25(c),  because an act or transaction constituting a statutory violation of the CEA transpired in this District.[8]  The cybercriminal

---

[7] *See* 28 U.S.C. § 1332 (Diversity of citizenship; amount in controversy; costs) ("(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—(1) citizens of different States.").

[8] *See* 7 U.S.C. § 25(c) (Jurisdiction; Statute of Limitations; Venue; Process) ("Any action brought under subsection (a) of this section may be brought in any judicial district wherein the defendant is found, resides, or transacts business, or in the judicial district wherein any act or transaction constituting the violation occurs.").

placed these unauthorized transactions utilizing Liam's Phantom wallets, which existed upon Liam's personal computer located in lower Manhattan, blocks away from this Court.

39.    Venue is proper in this District, under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the unauthorized crypto transactions that took place on Plaintiff Liam's computer in Manhattan.[9]

## FACTUAL BACKGROUND

### A.    Phantom's Founding

40.    Brandon Millman, Chris Kalani, and Francesco Agosti founded Phantom in 2021. Phantom soon released a "crypto wallet" application and onboarded one million users. Phantom's founders launched the application to serve as a "friendly crypto wallet" for retail consumers, promoting ease-of-use, speed, and convenience as core features. From the start, Phantom framed itself as a consumer-focused alternative to centralized exchanges, promising a seamless experience for novice users interested in Web3 technologies.

41.    A "crypto wallet" is software that creates and stores your public and private "keys." The public key functions like a mailbox address. Anyone with an individual's public key can send digital assets to that address. Private keys are meant to be secret and safeguarded from outsiders. The main function of a crypto wallet is to secure and safeguard the owner's private key.

---

[9] *See* 28 U.S.C. § 1391(b) (Venue in General) ("A civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.").

42.     From its inception, Phantom designed its application to facilitate anonymous trans-
actions. Phantom marketed itself as "private by design" and explicitly refused to collect identifying
information from its users.  While marketed as a privacy feature, this design choice also eliminated
the ability to implement standard financial security practices—such as identity verification, fraud
prevention, or user-specific risk flags.  This frictionless experience—paired with zero user verifi-
cation—allowed Phantom to onboard over one million users within months of launch, becoming
one of the fastest-growing consumer crypto applications in the world.

> **Private by design. No name, email, or phone number required.**

43.     One of Phantom's mottos is "We believe in security, not surveillance."

> **We believe in 👻 security, not surveillance**

44.     In May 2021, Phantom published a security audit of its crypto wallet software. That
audit, conducted by Kudelski Security, found that saving users' keys in local browser storage
posed a "medium" severity security risk.  Rather than remediating the issue, Phantom explicitly
acknowledged the vulnerability and chose to launch with this design—prioritizing speed and con-
venience over user protection.

45.     In June 2021, Phantom launched an in-application crypto swapper ("Phantom's
Swapper").  Phantom's Swapper enabled those with Phantom wallets to seamlessly place crypto
trades from inside the same application that created and stored the users' public and private keys.
By embedding the Swapper directly inside its wallet, Phantom blurred the line between wallet and

trading platform—functionally operating as an unregistered exchange with no compliance or su-

pervision obligations.

46.    As Phantom's user base grew, so did the security concerns.  Phantom soon recog-

nized that its wallet was susceptible to cyberattacks by malicious users.  On October 6, 2021, Mr.

Kalani and Mr. Agosti published a blog on Phantom's website titled "Staying Safe with Phantom."

The blog explained (1) that a large portion of Phantom's users "are new to crypto and are operating

with blockchain-based applications for the very first time," (2) that the growth of Phantom has

"attracted its fair share of malicious actors that try to scam users out of their hard-earned assets"

and that these attacks often "take the form of phishing attacks," and (3) that "user education can

only go so far in preventing such attacks – especially when considering how many of the users

being targeted are new to crypto."

47.    Phantom's Swapper facilitated over $1 billion in crypto swaps by October 2021.

On October 28, 2021, Mr. Millman published a blog on Phantom's website titled "Swapping To-

kens in Phantom."  Mr. Millman's blog explained that Phantom's Swapper facilitated over $1

billion in crypto swap volume in its first four months and that its application has "helped over 1

million users perform millions of transactions per week while giving them a safe, secure, and pol-

ished tool to store their crypto."  This trading volume rivaled that of regulated platforms like Coin-

base, despite Phantom's lack of oversight, registration, or user vetting.

48.    On June 14, 2022, Phantom published a blog post on Phantom's website titled

"Keeping Phantom safe from the 'Demonic' critical vulnerability."  The blog's subtitle said, "After

some investigation and an official audit, fixes began rolling out in January 2022, and by April,

Phantom users became protected from this critical vulnerability."  The blog clarified that this vul-

nerability impacted Phantom users "who imported their browser extension crypto wallet using a

14

secret recovery phrase" and explained that the attack targeted the device's "running memory" to retrieve the users' "secret recovery phrase" linked to the users' private key. The blog recommends that individuals use a "hardware wallet" to store large sums of crypto and maintain multiple wallets to spread out risk.

49.    On June 7, 2024, Least Authority published the "Phantom Wallet Security Audit Report." Phantom's audit excluded the single most common threat to browser wallets—malware—despite knowing that its users were routinely targeted by phishing and browser-level attacks. The security audit was conducted according to a threat model that Phantom prepared, which explicitly did not assess the security of its application when "malware" or "malicious browser extensions" were present. The security audit explained that Phantom employs "two different approaches" for storing and securing users' private keys. For the mobile application, Phantom utilizes "the React Native library expo-secure-store," and for the web-browser application, utilizes "their own secure storage, which is a wrapper of the underlying extension storage." Phantom's own public blog posts had acknowledged that browser-based wallets were vulnerable to malware and in-memory attacks. Despite this, Phantom continued to store users' decrypted private keys in browser memory, with no ability for users to opt into safer alternatives like hardware wallet integration or encrypted local storage. Phantom's own audits flagged these concerns, but no material architectural improvements were made.

50.    Despite this risk, Phantom's web browser application markets the following features: (1) "Phantom is your *trusted companion* for web3." (2) "Our multichain wallet helps you explore web3, use apps, and buy, store, and *trade crypto* and NFTs across Solana, Ethereum, and Polygon." (3) "It's *easy, safe, and fun. For everyone*." (4) "*Monitor all activity* with detailed transaction history and notifications." (5) "*Store, stake, and earn rewards* with your tokens." (6)

"*Purchase crypto from over 7 sources* including card and bank transfer."  (7) "*Best-in-class Security*."  (8) "*Private by design.  No name, email, or phone number required*."  (9) "Scam detection *flags malicious transactions instantly*."  (10) "Our global *support team* are *here for you 24/7*."

51.    Despite advertising that users could "monitor all activity with detailed transaction history and notifications," Phantom failed to provide real-time alerts or warnings when user accounts were accessed from new devices or when unusually large transactions were executed. Liam received no notification that someone had accessed his Phantom wallets from an unknown device, or that hundreds of thousands of tokens were being liquidated in rapid succession.  Unlike centralized exchanges such as Coinbase, which deploy fraud detection algorithms and multi-factor authentication for high-risk transactions, Phantom lacked any system for transaction velocity checks, geolocation anomalies, or withdrawal limits.  Phantom's consumer-facing wallet provided none of the most basic protections expected from financial platforms with over $25 billion in user assets.

52.    On its website and marketing materials, Phantom repeatedly touts its application as a secure and trustworthy platform for self-custody.  It claims to offer "a suite of industry-leading security features and [a] dedicated support team to help keep users safe," assuring users that Phantom is "working tirelessly to protect our users with best-in-class security features."  In the wake of highly publicized failures of centralized crypto exchanges, Phantom has positioned itself as a safer alternative—declaring that "security has never been more important in crypto" and that the rise in self-custody has "brought an increase in bad actors attempting to steal users' funds in the form of phishing," which is "why we have made security a top priority."  Phantom's public assurances continue: "We've developed industry-leading technology and organizational security practices to help protect you."  Yet these repeated claims of "industry-leading" security were paired with Phantom's decision to (1) store users' decrypted private keys in unencrypted browser memory, (2) offer

no multi-factor authentication, (3) provide no account-level monitoring for unauthorized access, and (4) implement no fraud detection tools or transaction alerts. Phantom's marketing promised protection; its architecture delivered exposure.

53.    Phantom claims "We're always working to make things safer."



54.    Phantom claims "We've got your back, always."



55.    Phantom claims "Our global Support team is here for you 24/7."

Our global Support team is here for you 24/7.

56.    These assurances are misleading. Phantom's internal architecture had not materially changed since its 2021 audit, and critical vulnerabilities persisted—unmitigated and undisclosed. Despite its explosive growth and consumer-facing design, Phantom failed to implement basic transaction safeguards and controls expected of a consumer finance platform.

### B.    Phantom-OKX Partnership

57.    In November 2024, Phantom partnered with OKX to expand the trading capabilities available to Phantom users.  The partnership integrated OKX's exchange and market-making services into Phantom's Swapper.  This partnership was more than technical; it transformed Phantom's wallet into a trading interface integrated directly with one of the world's largest crypto exchanges.

58.    Announcing the partnership, OKX's Chief Innovation Officer, Jason Lau, said: "The sheer trading volume being routed through the OKX DEX from Phantom showcases how OKX OS empowers developers to build and scale applications without limitations."

59.    Phantom's CEO, Mr. Millman, said:

> We're thrilled to integrate OKX DEX into our swapper, unlocking deeper liquidity, more tokens, and better routes when trading in Phantom.  This launch marks a pivotal moment in the evolution of Phantom, allowing our users to access the most competitive rates across DEXs from multiple aggregators—from right inside their wallet.

60.    Phantom and OKX both announced the partnership across social media, including on LinkedIn, directed at consumers in the United States and in New York, like Liam.  Phantom explained: "We've integrated OKX DEX into our swapper."

61.    Undisclosed to the public, however, was that OKX was then being investigated by the Department of Justice ("DOJ") for Bank Secrecy Act ("BSA") violations.  Specifically, OKX was being investigated for evading U.S. regulatory requirements by engaging third-party "non-disclosure" brokers to facilitate anonymous crypto trading between U.S. consumers and its unregulated exchange.  Phantom failed to disclose to users that it had partnered with an exchange under active federal investigation for BSA violations—raising questions about Phantom's own AML compliance obligations and its duty to warn.

62.    In November and December 2024, following the OKX partnership, Phantom's Swapper saw a dramatic uptick in crypto trading volume and in crypto trading fees collected.  In September and October 2024, Phantom's Swapper collected approximately $22 million in fees.  In November and December 2024, Phantom's Swapper collected over $136 million in fees.

63.    In January 2025, Phantom's Swapper collected over $118 million in fees (about $3 million per day).  At this time, Phantom failed to disclose that it received fees from both its users and from its exchange and market maker partners.  Phantom further failed to disclose that it received layer two tokens (tokens layered on Solana, often meme coins) as fees and swapped those layer two tokens to USDC.[10]



64.    Phantom's Solana "fee wallets," which collect fees from each crypto swap trade placed via Phantom's Swapper, are as follows:

---

[10] *See* DeFiLlama, Phantom Protocol, available at https://defillama.com/protocol/phantom#fees-revenue.

a.  (1)  25mYnjJ2MXHZH6NvTTdA63JvjgRVcuiaj6MRiEQNs1Dq  (labeled on SolScan as "Phantom: Swap Fees")

b.  (2) 9yj3zvLS3fDMqi1F8zhkaWfq8TZpZWHe6cz1Sgt7djXf

c.  (3) 8psNvWTrdNTiVRNzAgsou9kETXNJm2SXZyaKuJraVRtf

65.    Since January 2025, the first wallet ("s1Dq") sent over $90 million to a Solana wallet associated with Phantom: 7MNeJP9gi5kBY1DVzJA1kzdeCr6oscXEZW51XMnmByC7. Since January 2025, the second wallet ("djXf") sent over $27 million to the same wallet ("ByC7") and received over $3.4 million from the third wallet ("VRtf").

**C.    U.S. Onboarding Campaign**

66.    Despite knowing that its platform lacked basic security controls and was vulnerable to phishing, malware, and untraceable transactions, Phantom launched an aggressive public campaign to onboard unsophisticated U.S. consumers into high-risk crypto trading.

67.    Phantom's mission is to "onboard the masses" to crypto via its "all-in-one" crypto storage and trading application.  In furtherance of that goal, Phantom posted on social media websites, including LinkedIn, Instagram, and X, to solicit U.S. consumers to download Phantom's application, create crypto wallets, and trade meme coins via Phantom's Swapper.

68.    Phantom publicly referred to November 2024 as "Onboarding Season."  After the United States presidential election, Phantom began a social media campaign aimed at soliciting United States consumers to download Phantom's application and engage in crypto trading.  On Thanksgiving, November 28, 2024, Phantom posted on Instagram, "It's Onboarding SZN," and encouraged users to onboard their families to crypto by downloading Phantom's application.  On LinkedIn, Phantom posted: "Happy Thanksgiving.  Need help onboarding your friends and family? Here's how: (1) Invite them to download Phantom, (2) Get them to create a new wallet, (3) Have them claim their unique username.  Once they do that, you can talk tokens over turkey."  Phantom

posted promotional content encouraging its users to onboard their grandparents to crypto trading via Phantom's application.  In doing so, Phantom encouraged its users to onboard their grandparents—actively targeting novice U.S. consumers to adopt its crypto trading application.



69.     In December 2024, Phantom began to market its crypto trading application as a "social media" application.  Phantom promoted its application as a "social" application where users could customize their profiles and find, follow, and invite their friends.  Phantom posted online that its application was more than just a wallet and that its application was "the future of social." On or about December 18, 2024, for example, Phantom posted on LinkedIn, Instagram, and X: "Crypto is social.  And now, Phantom is too."

70.     In December 2024, Phantom promoted trading meme coins online to U.S. and New York consumers via social media.  On December 11, 2024, Phantom posted online "Swapping in Phantom just got more fun."  "Discover tokens from @pumpdotfun and @moonshotdotcc" and

"Buy memecoins within minutes of launching." On information and belief, Phantom partnered with Pump.Fun and Moonshot cryptocurrency exchanges to enable further combinations of cryptocurrency trading via Phantom's Swapper.

71.     Phantom promoted several meme coins on its social media channels, including Pudgy Penguins ($PENGU). For example, on December 17, 2024, Phantom posted on social media that it partnered with Pudgy Penguins to distribute airdrop tokens. On December 19, 2024, after the Pudgy Penguins tokens were distributed, Phantom received over $17.8 million in fees. After its initial coin offering ("ICO") in December 2024, Pudgy Penguins dropped in value by $2 billion (from its $2.3 billion market cap at release to $245 million as of April 8, 2025). One or more of Phantom's financial partners, including Wintermute, may have been involved in the partnership between Phantom and Pudgy Penguins.

72.     Phantom promoted several meme coins on its social media channels, including ai16z ($AI16Z). In December 2024, ai16z ($AI16Z)—which on information and belief is affiliated with Phantom's venture capital funder, Andreesen Horowitz (a16z)—was among the most swapped cryptocurrencies on Phantom's Swapper. From December 9 to January 12, 2025, ai16z was the most swapped token with Phantom's Swapper. As of April 10, 2025, ai16z is 95% down from its all-time-high price on January 2, 2025, of $2.48 per token, now each ai16z token is worth approximately $0.12.

73.     In December 2024, Phantom added the "auto slippage" feature to its Swapper. The auto-slippage feature enabled Phantom users to place massive swaps without regard to the price impact on the underlying commodity. This feature enabled automatic swaps to be executed without regard to the price impact on the underlying virtual currency and without knowing the exact amount of virtual currency funds users would receive as a result of the swap. On December 10,

22

2024, Phantom posted on X: "Trade smarter, not harder.  When you enable auto slippage, we'll automatically find you the lowest slippage possible for a successful swap."  Phantom thereafter provided instructions on how to turn on its "Auto Slippage" feature.

74.    Phantom's auto-slippage feature enables users to execute "rug pull" transactions, which are fraudulent transactions that aim to drain all value from the underlying commodity at the expense of the remaining token holders.  On information and belief, Phantom's Swapper and its auto-slippage feature were used in connection with multiple "rug pull" transactions.

75.    In January 2025, Phantom promoted its application as a path to quick wealth, encouraging speculative investment without any disclosures of risk—amplifying user exposure to fraud and loss.  For example, on January 13, Phantom reposted the below image on X.



76.     On January 5, 2025, Phantom posted on LinkedIn an X post that said: "if checking your Phantom wallet isn't the first thing you do when waking up, you're not invested enough." Phantom solicited consumers to store large sums of funds in their Phantom wallets.

**D.     $3 Billion Valuation**

77.     On December 31, 2024, Phantom disclosed its 2024 financials.  Phantom reported that in 2024: (1) its Swapper facilitated 120 million total swaps and $20 billion in crypto swap volume, (2) its users stored $25 billion in digital assets inside Phantom wallets, (3) its application facilitated 850 million crypto transactions, and (4) its application hosted 10 million active users. Phantom showcased these milestones across its official Instagram and X accounts, including a celebratory post announcing '120M Total Swaps (+2,138% from 2023),' without disclosing that this explosive growth closely tracked its OKX integration.



78.     Notably, the $3 billion valuation was premised in part on Phantom's revenue-generating capabilities. A substantial portion of that revenue was derived from transaction fees linked

to anonymous trading activity routed through OKX—an unregistered exchange with no KYC or AML compliance.

79.     In January 2025, Phantom raised $150 million at a $3 billion valuation, with participation from Sequoia Capital, Paradigm, Andreessen Horowitz, and Variant.  In the accompanying press release, Mr. Millman stated the funding would help Phantom "create the biggest consumer financial application" in the world.  Around the same time, Phantom promoted metrics like 15 million monthly users, 850 million onchain transactions, and $20 billion in swap volume—without disclosing that much of this growth followed its OKX partnership.

> **Phantom raises $150M Series C to build the world's biggest consumer finance platform**
>
> Jan 15, 2025

80.     In connection with its $150 million fundraising round, Phantom did not publicly disclose any security vulnerabilities, ongoing user complaints regarding wallet "drains," or its financial partnership with OKX—an exchange then under active criminal investigation by the U.S. Department of Justice.  Phantom also did not disclose that its fee revenue surged primarily from anonymous trading activity enabled by the OKX integration.

81.     Following the funding announcement, Phantom actively promoted its $3 billion valuation across its official social media channels, including X, Instagram, and LinkedIn.  These public statements emphasized the application's reach, speed, and trading volume, but omitted material facts about the application's architecture, regulatory exposure, or the legal status of OKX.

82.     On January 17, 2025, Phantom posted on X that the application's mission is "to build the world's biggest and most-trusted consumer finance platform" and that its aim remained the same: "onboard the masses" to crypto trading via its application.

83.     Despite reaching a $3 billion valuation and being backed by some of the most prominent venture capital firms in the cryptocurrency industry, Phantom did not implement basic consumer protections commonly found in traditional financial platforms, such as two-factor authentication, real-time fraud alerts, or user-specific withdrawal limits.  Phantom's growth strategy remained focused on user acquisition and transaction volume, without parallel investment in security, compliance, or incident response infrastructure.

**E.      Wiener Doge's Rise to $3.1 Million**

84.     Thomas Liam Murphy, Esq. ("Liam") developed Wiener Doge on November 28, 2024, for approximately $3,500 worth of SOL.  Wiener Doge is a "layer two" Solana cryptocurrency, which means that all 1,000,000 Wiener Doge tokens exist upon the "layer one" Solana blockchain.

85.     Wiener Doge is identifiable by its Solana contract address ("CA"): GsXENM8WXGYxoBmMKCoLAoAsYX6ZQiU4ry9pQJE62itr.

86.     Wiener Doge utilizes the Raydium Protocol to allow individuals to buy and sell Wiener Doge tokens from a liquidity pool that contains both Wiener Doge tokens and SOL.  To buy Wiener Doge tokens, individuals must add SOL to the pool in exchange for the equivalent value of Wiener Doge tokens.  To sell Wiener Doge tokens, individuals would exchange their Wiener Doge tokens by taking the equivalent value of SOL out of the liquidity pool.

87.     Wiener Doge is a "meme coin," which the SEC explained in its Staff Statement on Meme Coins on February 27, 2025, "is a type of crypto asset inspired by internet memes, characters, current events, or trends for which the promoter seeks to attract an enthusiastic online

26

community."  Liam developed Wiener Doge, which was inspired by his 1-year-old dachshund puppy, named Stellaluna, and was inspired by the first-ever meme coin, Dogecoin.  Dogecoin is valued at approximately $25 billion and is the eighth most valuable cryptocurrency.

88.    Wiener Doge was designed to be a long-term store of wealth, like a collectible with a finite supply and a unique market.  Unlike most meme coins, which have billions of tokens, Wiener Doge's token supply was limited to 1,000,000 tokens and was not meant for "trading."

89.    From January 1, 2025, to January 20, 2025, Wiener Doge's community—named the "Wiener Doge Pack"—grew to over 5,000 members on Telegram, Facebook, Instagram, and X.  The Wiener Doge Pack grew exponentially from January 10 to 20, 2025.  Each day, hundreds of new members joined the thriving online crypto community.

90.    From November 30, 2024, to January 20, 2025, Liam bought Wiener Doge tokens from the Raydium liquidity pool from his main wallet address ending in "BmBVt" on the following dates and in the following quantities:

| Date | Time | Type | | | | | | |
|---|---|---|---|---|---|---|---|---|
| JAN 20 | 09:08:49 PM | SELL | 0.00008459 | $0.02021 | 169.11K | 🐕 $3,418.24 | BmBVt | × |
| JAN 20 | 09:08:37 PM | SELL | 0.0008097 | $0.1935 | 169.11K | 🐕 $32.72K | BmBVt | × |
| JAN 20 | 08:59:30 AM | BUY | 0.003765 | $0.9693 | 26.33 | 🐕 $25.53 | BmBVt | × |
| JAN 19 | 09:34:58 PM | BUY | 0.003758 | $0.9009 | 606.8 | 🐕 $546.67 | BmBVt | × |
| JAN 19 | 07:29:44 PM | BUY | 0.003722 | $0.9027 | 101.21 | 🐕 $91.37 | BmBVt | × |
| JAN 19 | 07:29:28 PM | BUY | 0.003709 | $0.8987 | 267.33 | 🐕 $240.26 | BmBVt | × |
| JAN 19 | 07:28:50 PM | BUY | 0.003644 | $0.8814 | 272.11 | 🐕 $239.84 | BmBVt | × |
| JAN 19 | 07:28:37 PM | BUY | 0.003614 | $0.8737 | 82.31 | 🐕 $71.92 | BmBVt | × |
| JAN 19 | 07:28:15 PM | BUY | 0.003605 | $0.8703 | 27.51 | 🐕 $23.94 | BmBVt | × |
| JAN 19 | 07:27:54 PM | BUY | 0.0036 | $0.869 | 27.54 | 🐕 $23.93 | BmBVt | × |
| JAN 19 | 07:27:28 PM | BUY | 0.003597 | $0.8679 | 2.7562 | 🐕 $2.3922 | BmBVt | × |
| JAN 19 | 07:27:11 PM | BUY | 0.003597 | $0.8678 | 2.7565 | 🐕 $2.3922 | BmBVt | × |
| JAN 19 | 07:26:33 PM | BUY | 0.003596 | $0.8679 | 2.7569 | 🐕 $2.3926 | BmBVt | × |
| JAN 19 | 07:26:18 PM | BUY | 0.003596 | $0.8677 | 2.7572 | 🐕 $2.3926 | BmBVt | × |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| JAN 19 | 07:25:38 PM | BUY | 0.003593 | $0.8667 | 27.59 | ⇄ | $23.91 | BmBVt | × |
| JAN 19 | 07:25:22 PM | BUY | 0.003589 | $0.8656 | 27.63 | ⇄ | $23.91 | BmBVt | × |
| JAN 19 | 07:25:08 PM | BUY | 0.003584 | $0.8641 | 27.66 | ⇄ | $23.90 | BmBVt | × |
| JAN 19 | 07:24:43 PM | BUY | 0.00358 | $0.863 | 27.7 | ⇄ | $23.90 | BmBVt | × |
| JAN 19 | 07:24:00 PM | BUY | 0.003575 | $0.8618 | 27.73 | ⇄ | $23.90 | BmBVt | × |
| JAN 19 | 07:23:41 PM | BUY | 0.003573 | $0.861 | 2.7753 | ⇄ | $2.3897 | BmBVt | × |
| JAN 19 | 07:23:32 PM | BUY | 0.003572 | $0.8605 | 2.7757 | ⇄ | $2.3884 | BmBVt | × |
| JAN 19 | 06:39:23 PM | BUY | 0.003723 | $0.9158 | 13.31 | ⇄ | $12.19 | BmBVt | × |
| JAN 18 | 07:40:59 PM | BUY | 0.00387 | $0.9867 | 768.63 | ⇄ | $758.41 | BmBVt | × |
| JAN 18 | 07:40:45 PM | BUY | 0.003775 | $0.9626 | 260 | ⇄ | $250.27 | BmBVt | × |
| JAN 18 | 07:40:00 PM | BUY | 0.003731 | $0.9506 | 241.85 | ⇄ | $229.92 | BmBVt | × |
| JAN 18 | 07:39:49 PM | BUY | 0.003709 | $0.9452 | 2.6731 | ⇄ | $2.5265 | BmBVt | × |
| JAN 18 | 07:39:41 PM | BUY | 0.003709 | $0.9442 | 2.6735 | ⇄ | $2.5244 | BmBVt | × |
| JAN 18 | 07:39:31 PM | BUY | 0.003708 | $0.9441 | 2.6738 | ⇄ | $2.5244 | BmBVt | × |
| JAN 18 | 07:39:23 PM | BUY | 0.003708 | $0.9433 | 2.6741 | ⇄ | $2.5225 | BmBVt | × |
| JAN 18 | 07:39:13 PM | BUY | 0.003707 | $0.9432 | 2.6745 | ⇄ | $2.5225 | BmBVt | × |
| JAN 18 | 07:39:04 PM | BUY | 0.003707 | $0.943 | 2.6748 | ⇄ | $2.5225 | BmBVt | × |
| JAN 18 | 07:38:54 PM | BUY | 0.003706 | $0.943 | 2.6752 | ⇄ | $2.5228 | BmBVt | × |
| JAN 18 | 07:38:42 PM | BUY | 0.003706 | $0.9429 | 2.6755 | ⇄ | $2.5228 | BmBVt | × |
| JAN 18 | 07:35:05 PM | BUY | 0.003694 | $0.9433 | 134.21 | ⇄ | $126.60 | BmBVt | × |
| JAN 18 | 07:34:54 PM | BUY | 0.003689 | $0.942 | 134.38 | ⇄ | $126.59 | BmBVt | × |
| JAN 18 | 07:34:44 PM | BUY | 0.003651 | $0.9323 | 95.05 | ⇄ | $88.61 | BmBVt | × |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| JAN 18 | 07:34:34 PM | BUY | 0.003643 | $0.9303 | 2.722 | ⇄ | $2.5324 | BmBVt | × |
| JAN 18 | 07:34:20 PM | BUY | 0.003642 | $0.9302 | 2.7223 | ⇄ | $2.5324 | BmBVt | × |
| JAN 18 | 07:34:12 PM | BUY | 0.003642 | $0.9303 | 2.7227 | ⇄ | $2.533 | BmBVt | × |
| JAN 18 | 07:34:00 PM | BUY | 0.003639 | $0.9297 | 27.25 | ⇄ | $25.33 | BmBVt | × |
| JAN 18 | 07:33:48 PM | BUY | 0.003637 | $0.9293 | 2.7265 | ⇄ | $2.5337 | BmBVt | × |
| JAN 18 | 07:33:38 PM | BUY | 0.003634 | $0.9286 | 27.28 | ⇄ | $25.34 | BmBVt | × |
| JAN 18 | 07:33:30 PM | BUY | 0.003629 | $0.9274 | 27.32 | ⇄ | $25.34 | BmBVt | × |
| JAN 18 | 07:33:13 PM | BUY | 0.003625 | $0.9268 | 27.35 | ⇄ | $25.35 | BmBVt | × |
| JAN 18 | 07:33:02 PM | BUY | 0.003622 | $0.9262 | 2.7373 | ⇄ | $2.5353 | BmBVt | × |
| JAN 18 | 07:32:51 PM | BUY | 0.003623 | $0.9267 | 2.737 | ⇄ | $2.5365 | BmBVt | × |
| JAN 18 | 07:32:43 PM | BUY | 0.003622 | $0.9266 | 2.7373 | ⇄ | $2.5365 | BmBVt | × |
| JAN 18 | 07:32:34 PM | BUY | 0.003622 | $0.9265 | 2.7377 | ⇄ | $2.5365 | BmBVt | × |
| JAN 18 | 04:30:25 PM | BUY | 0.003941 | $1.0055 | 12.58 | ⇄ | $12.65 | BmBVt | × |
| JAN 18 | 04:28:50 PM | BUY | 0.003935 | $1.0025 | 50.39 | ⇄ | $50.52 | BmBVt | × |
| JAN 18 | 02:53:09 PM | BUY | 0.003891 | $0.9755 | 764.52 | ⇄ | $745.77 | BmBVt | × |
| JAN 18 | 02:24:03 PM | BUY | 0.003786 | $0.9658 | 26.19 | ⇄ | $25.29 | BmBVt | × |
| JAN 18 | 02:23:52 PM | BUY | 0.003708 | $0.9458 | 26.74 | ⇄ | $25.29 | BmBVt | × |
| JAN 18 | 02:23:39 PM | BUY | 0.003702 | $0.9442 | 42.86 | ⇄ | $40.47 | BmBVt | × |
| JAN 18 | 02:23:21 PM | BUY | 0.003698 | $0.9434 | 2.6813 | ⇄ | $2.5296 | BmBVt | × |
| JAN 18 | 02:23:08 PM | BUY | 0.003697 | $0.9435 | 2.6817 | ⇄ | $2.5302 | BmBVt | × |
| JAN 18 | 02:22:54 PM | BUY | 0.003697 | $0.9434 | 2.682 | ⇄ | $2.5302 | BmBVt | × |
| JAN 18 | 02:22:42 PM | BUY | 0.003696 | $0.9436 | 2.6824 | ⇄ | $2.531 | BmBVt | × |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| JAN 18 | 02:22:29 PM | BUY | 0.003696 | $0.9435 | 2.6827 | ⬦ | $2.531 | BmBVt | × | ⬈ |
| JAN 18 | 02:22:00 PM | BUY | 0.003695 | $0.9436 | 2.683 | ⬦ | $2.5316 | BmBVt | × | ⬈ |
| JAN 18 | 02:21:49 PM | BUY | 0.003695 | $0.9434 | 2.6834 | ⬦ | $2.5316 | BmBVt | × | ⬈ |
| JAN 18 | 02:21:37 PM | BUY | 0.003695 | $0.943 | 2.6837 | ⬦ | $2.5308 | BmBVt | × | ⬈ |
| JAN 18 | 02:21:24 PM | BUY | 0.003694 | $0.9429 | 2.6841 | ⬦ | $2.5308 | BmBVt | × | ⬈ |
| JAN 18 | 02:21:09 PM | BUY | 0.003694 | $0.9426 | 2.6844 | ⬦ | $2.5302 | BmBVt | × | ⬈ |
| JAN 18 | 02:20:50 PM | BUY | 0.003693 | $0.9423 | 2.6847 | ⬦ | $2.5297 | BmBVt | × | ⬈ |
| JAN 18 | 02:20:23 PM | BUY | 0.003693 | $0.9421 | 2.6851 | ⬦ | $2.5296 | BmBVt | × | ⬈ |
| JAN 18 | 02:20:10 PM | BUY | 0.003692 | $0.942 | 2.6854 | ⬦ | $2.5296 | BmBVt | × | ⬈ |
| JAN 18 | 02:20:00 PM | BUY | 0.003692 | $0.9418 | 2.6858 | ⬦ | $2.5295 | BmBVt | × | ⬈ |
| JAN 18 | 02:19:44 PM | BUY | 0.003691 | $0.9417 | 2.6861 | ⬦ | $2.5295 | BmBVt | × | ⬈ |
| JAN 18 | 02:19:29 PM | BUY | 0.003691 | $0.9414 | 2.6864 | ⬦ | $2.5291 | BmBVt | × | ⬈ |
| JAN 18 | 02:19:18 PM | BUY | 0.00369 | $0.9413 | 2.6868 | ⬦ | $2.5291 | BmBVt | × | ⬈ |
| JAN 18 | 02:19:03 PM | BUY | 0.00369 | $0.9417 | 2.6871 | ⬦ | $2.5304 | BmBVt | × | ⬈ |
| JAN 18 | 02:18:48 PM | BUY | 0.003689 | $0.9416 | 2.6875 | ⬦ | $2.5304 | BmBVt | × | ⬈ |
| JAN 18 | 02:18:35 PM | BUY | 0.003689 | $0.9417 | 2.6878 | ⬦ | $2.5311 | BmBVt | × | ⬈ |
| JAN 18 | 02:18:29 PM | BUY | 0.003688 | $0.9416 | 2.6881 | ⬦ | $2.5311 | BmBVt | × | ⬈ |
| JAN 18 | 02:14:27 PM | BUY | 0.003467 | $0.8873 | 857.93 | ⬦ | $761.20 | BmBVt | × | ⬈ |
| JAN 18 | 02:05:47 PM | BUY | 0.003306 | $0.8442 | 1,499.73 | ● | $1,266.10 | BmBVt | × | ⬈ |
| JAN 14 | 01:22:05 PM | BUY | 0.01055 | $1.9667 | 620.25 | ● | $1,219.85 | BmBVt | × | ⬈ |
| JAN 14 | 01:09:52 PM | BUY | 0.009929 | $1.8509 | 798.88 | ● | $1,478.68 | BmBVt | × | ⬈ |
| JAN 14 | 01:09:39 PM | BUY | 0.009588 | $1.7874 | 103.41 | ⬦ | $184.84 | BmBVt | × | ⬈ |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| JAN 14 | 01:09:29 PM | BUY | 0.009512 | $1.7733 | 104.23 | ⬦ | $184.84 | BmBVt | × | ⬈ |
| JAN 14 | 01:09:20 PM | BUY | 0.00939 | $1.7505 | 105.59 | ⬦ | $184.84 | BmBVt | × | ⬈ |
| JAN 14 | 01:09:11 PM | BUY | 0.009315 | $1.7366 | 106.44 | ⬦ | $184.84 | BmBVt | × | ⬈ |
| JAN 14 | 01:08:57 PM | BUY | 0.009241 | $1.7226 | 107.29 | ⬦ | $184.83 | BmBVt | × | ⬈ |
| JAN 14 | 01:08:47 PM | BUY | 0.009167 | $1.7088 | 108.16 | ⬦ | $184.83 | BmBVt | × | ⬈ |
| JAN 14 | 01:08:36 PM | BUY | 0.009093 | $1.6951 | 109.04 | ⬦ | $184.83 | BmBVt | × | ⬈ |
| JAN 14 | 01:08:26 PM | BUY | 0.00902 | $1.6814 | 109.92 | ⬦ | $184.83 | BmBVt | × | ⬈ |
| JAN 13 | 05:18:08 PM | BUY | 0.01611 | $2.9525 | 1,169.49 | ● | $3,452.91 | BmBVt | × | ⬈ |
| JAN 13 | 03:33:30 PM | BUY | 0.01676 | $3.0413 | 532.27 | ● | $1,618.81 | BmBVt | × | ⬈ |
| JAN 13 | 03:33:19 PM | BUY | 0.01607 | $2.9153 | 308.49 | ⬦ | $899.34 | BmBVt | × | ⬈ |
| JAN 13 | 03:33:09 PM | BUY | 0.01566 | $2.843 | 316.48 | ⬦ | $899.74 | BmBVt | × | ⬈ |
| JAN 13 | 03:32:57 PM | BUY | 0.01519 | $2.7561 | 326.46 | ⬦ | $899.74 | BmBVt | × | ⬈ |
| JAN 13 | 03:32:37 PM | BUY | 0.01464 | $2.6616 | 338.66 | ⬦ | $901.37 | BmBVt | × | ⬈ |
| JAN 13 | 12:38:10 PM | BUY | 0.01199 | $2.1131 | 1,819 | ● | $3,843.67 | BmBVt | × | ⬈ |
| JAN 13 | 04:33:36 AM | BUY | 0.01063 | $1.8939 | 466.2 | ⬦ | $882.93 | BmBVt | × | ⬈ |
| JAN 13 | 04:14:14 AM | BUY | 0.01046 | $1.8792 | 473.78 | ⬦ | $890.32 | BmBVt | × | ⬈ |
| JAN 13 | 04:14:00 AM | BUY | 0.01007 | $1.8089 | 492.18 | ⬦ | $890.32 | BmBVt | × | ⬈ |
| JAN 13 | 04:13:43 AM | BUY | 0.009639 | $1.731 | 514.33 | ⬦ | $890.32 | BmBVt | × | ⬈ |
| JAN 13 | 04:12:47 AM | BUY | 0.00945 | $1.6972 | 104.92 | ⬦ | $178.06 | BmBVt | × | ⬈ |
| JAN 13 | 04:12:36 AM | BUY | 0.009328 | $1.6754 | 106.29 | ⬦ | $178.08 | BmBVt | × | ⬈ |
| JAN 13 | 04:12:27 AM | BUY | 0.009254 | $1.6621 | 107.15 | ⬦ | $178.08 | BmBVt | × | ⬈ |
| JAN 13 | 04:12:18 AM | BUY | 0.009179 | $1.6478 | 108.01 | ⬦ | $177.98 | BmBVt | × | ⬈ |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| JAN 13 | 04:12:06 AM | BUY | 0.009105 | $1.6345 | 108.89 | ❯ | $177.98 | BmBVt | × |
| JAN 13 | 04:11:53 AM | BUY | 0.009077 | $1.6293 | 109.23 | ❯ | $177.96 | BmBVt | × |
| JAN 13 | 04:11:15 AM | BUY | 0.008959 | $1.6071 | 110.67 | ❯ | $177.87 | BmBVt | × |
| JAN 13 | 04:11:02 AM | BUY | 0.008886 | $1.594 | 111.59 | ❯ | $177.87 | BmBVt | × |
| JAN 13 | 12:22:36 AM | BUY | 0.01061 | $1.948 | 934.69 | ● | $1,820.79 | BmBVt | × |
| JAN 13 | 12:21:45 AM | BUY | 0.009944 | $1.8268 | 697.96 | ● | $1,275.04 | BmBVt | × |
| JAN 13 | 12:21:02 AM | BUY | 0.009299 | $1.7089 | 1,066.24 | ❯ | $1,822.08 | BmBVt | × |
| JAN 12 | 11:56:18 PM | BUY | 0.008789 | $1.6179 | 564.08 | ❯ | $912.63 | BmBVt | × |
| JAN 12 | 11:55:10 PM | BUY | 0.007938 | $1.4599 | 2,498.26 | ● | $3,647.13 | BmBVt | × |
| JAN 12 | 11:54:51 PM | BUY | 0.006948 | $1.2779 | 1,426.95 | ● | $1,823.57 | BmBVt | × |
| JAN 12 | 11:45:48 PM | BUY | 0.006514 | $1.1994 | 456.62 | ❯ | $547.66 | BmBVt | × |
| JAN 12 | 11:45:32 PM | BUY | 0.00639 | $1.1771 | 155.16 | ❯ | $182.63 | BmBVt | × |
| JAN 12 | 11:45:21 PM | BUY | 0.006361 | $1.1718 | 155.88 | ❯ | $182.66 | BmBVt | × |
| JAN 12 | 11:44:45 PM | BUY | 0.006206 | $1.1435 | 639.07 | ❯ | $730.78 | BmBVt | × |
| JAN 12 | 11:44:32 PM | BUY | 0.006025 | $1.1102 | 164.57 | ❯ | $182.71 | BmBVt | × |
| JAN 12 | 11:44:20 PM | BUY | 0.005992 | $1.1042 | 16.55 | ❯ | $18.27 | BmBVt | × |
| JAN 12 | 12:29:51 PM | BUY | 0.004571 | $0.8684 | 2,385.88 | ● | $2,071.80 | BmBVt | × |
| JAN 12 | 12:29:23 PM | BUY | 0.004165 | $0.7912 | 1,190.2 | ❯ | $941.73 | BmBVt | × |
| JAN 12 | 11:58:22 AM | BUY | 0.003631 | $0.69 | 2,730.93 | ❯ | $1,884.25 | BmBVt | × |
| JAN 12 | 07:01:59 AM | BUY | 0.003273 | $0.6118 | 1,696.64 | ● | $1,038.02 | BmBVt | × |
| JAN 12 | 06:54:28 AM | BUY | 0.003032 | $0.5677 | 981.09 | ❯ | $556.98 | BmBVt | × |
| JAN 12 | 06:53:45 AM | BUY | 0.002879 | $0.5393 | 1,721.81 | ❯ | $928.54 | BmBVt | × |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| JAN 12 | 06:35:29 AM | BUY | 0.00264 | $0.4937 | 2,253.26 | ● | $1,112.40 | BmBVt | × |
| JAN 12 | 06:35:11 AM | BUY | 0.002504 | $0.4681 | 395.98 | ❯ | $185.35 | BmBVt | × |
| JAN 12 | 06:35:03 AM | BUY | 0.00249 | $0.4656 | 398.13 | ❯ | $185.35 | BmBVt | × |
| JAN 12 | 06:34:55 AM | BUY | 0.002452 | $0.4584 | 404.37 | ❯ | $185.35 | BmBVt | × |
| JAN 12 | 06:27:49 AM | BUY | 0.002406 | $0.4503 | 412.09 | ❯ | $185.57 | BmBVt | × |
| JAN 12 | 06:27:32 AM | BUY | 0.002369 | $0.4433 | 41.86 | ❯ | $18.56 | BmBVt | × |
| JAN 12 | 06:27:23 AM | BUY | 0.002365 | $0.4426 | 41.92 | ❯ | $18.56 | BmBVt | × |
| JAN 12 | 06:27:14 AM | BUY | 0.002361 | $0.4417 | 41.99 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:27:06 AM | BUY | 0.002357 | $0.441 | 42.06 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:26:57 AM | BUY | 0.002352 | $0.44 | 80.09 | ❯ | $35.24 | BmBVt | × |
| JAN 12 | 06:26:45 AM | BUY | 0.002347 | $0.439 | 42.25 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:26:36 AM | BUY | 0.002343 | $0.4382 | 42.32 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:26:28 AM | BUY | 0.002339 | $0.4375 | 42.39 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:26:21 AM | BUY | 0.002335 | $0.4368 | 42.46 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:26:12 AM | BUY | 0.002332 | $0.4361 | 42.53 | ❯ | $18.55 | BmBVt | × |
| JAN 12 | 06:26:02 AM | BUY | 0.002328 | $0.4353 | 42.59 | ❯ | $18.54 | BmBVt | × |
| JAN 12 | 06:25:53 AM | BUY | 0.002324 | $0.4346 | 42.66 | ❯ | $18.54 | BmBVt | × |
| JAN 12 | 06:25:45 AM | BUY | 0.00232 | $0.4339 | 42.73 | ❯ | $18.54 | BmBVt | × |
| JAN 12 | 01:00:39 AM | BUY | 0.002251 | $0.4189 | 2,202.56 | ❯ | $922.74 | BmBVt | × |
| JAN 12 | 01:00:26 AM | BUY | 0.002071 | $0.3855 | 2,393.37 | ❯ | $922.74 | BmBVt | × |
| JAN 12 | 01:00:08 AM | BUY | 0.001879 | $0.3497 | 2,638.82 | ❯ | $922.84 | BmBVt | × |
| JAN 12 | 12:59:23 AM | BUY | 0.001714 | $0.3191 | 2,892 | ❯ | $922.94 | BmBVt | × |

30

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| JAN 12 | 12:51:14 AM | BUY | 0.001581 | $0.2945 | 1,818.7 | → | $535.59 | BmBVt |
| JAN 12 | 12:51:03 AM | BUY | 0.001522 | $0.2834 | 651.58 | → | $184.69 | BmBVt |
| JAN 11 | 01:00:35 PM | BUY | 0.001397 | $0.262 | 3,548.06 | → | $929.63 | BmBVt |
| JAN 11 | 12:57:27 PM | BUY | 0.001319 | $0.2473 | 751.61 | → | $185.86 | BmBVt |
| JAN 11 | 12:21:29 PM | BUY | 0.001304 | $0.2439 | 372.5 | → | $90.85 | BmBVt |
| JAN 11 | 12:00:17 PM | BUY | 0.001343 | $0.2504 | 738.09 | → | $184.81 | BmBVt |
| JAN 11 | 12:00:05 PM | BUY | 0.001315 | $0.2451 | 753.98 | → | $184.78 | BmBVt |
| JAN 11 | 11:59:50 AM | BUY | 0.001287 | $0.2398 | 770.39 | → | $184.78 | BmBVt |
| JAN 10 | 09:36:42 PM | BUY | 0.001063 | $0.1978 | 93.25 | → | $18.45 | BmBVt |
| JAN 10 | 09:36:31 PM | BUY | 0.001061 | $0.1974 | 93.47 | → | $18.45 | BmBVt |
| JAN 10 | 09:35:37 PM | BUY | 0.001034 | $0.1924 | 1,917.44 | → | $368.96 | BmBVt |
| JAN 10 | 09:31:34 PM | BUY | 0.0009966 | $0.1851 | 994.84 | → | $184.17 | BmBVt |
| JAN 10 | 09:30:17 PM | BUY | 0.0009686 | $0.1799 | 1,023.59 | → | $184.17 | BmBVt |
| JAN 10 | 09:30:08 PM | BUY | 0.0009554 | $0.1775 | 103.77 | → | $18.42 | BmBVt |
| JAN 10 | 09:29:55 PM | BUY | 0.000953 | $0.1769 | 104.04 | → | $18.41 | BmBVt |
| JAN 10 | 09:29:45 PM | BUY | 0.0009506 | $0.1765 | 104.3 | → | $18.41 | BmBVt |
| JAN 10 | 09:29:33 PM | BUY | 0.0009482 | $0.1761 | 104.56 | → | $18.41 | BmBVt |
| JAN 10 | 09:28:22 PM | BUY | 0.0009399 | $0.1745 | 1,054.92 | → | $184.06 | BmBVt |
| JAN 10 | 09:28:10 PM | BUY | 0.0009116 | $0.1692 | 1,087.67 | → | $184.06 | BmBVt |
| JAN 10 | 09:28:00 PM | BUY | 0.000894 | $0.166 | 110.91 | → | $18.41 | BmBVt |
| JAN 10 | 09:27:34 PM | BUY | 0.0008917 | $0.1656 | 111.2 | → | $18.42 | BmBVt |
| JAN 10 | 09:26:51 PM | BUY | 0.0008893 | $0.1652 | 111.49 | → | $18.42 | BmBVt |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| JAN 10 | 09:26:35 PM | BUY | 0.000887 | $0.1648 | 111.78 | → | $18.42 | BmBVt |
| JAN 10 | 09:26:05 PM | BUY | 0.0008788 | $0.1632 | 1,128.27 | → | $184.16 | BmBVt |
| JAN 10 | 09:24:29 PM | BUY | 0.000849 | $0.1579 | 1,167.78 | → | $184.34 | BmBVt |
| JAN 10 | 09:24:07 PM | BUY | 0.0008266 | $0.1537 | 1,199.56 | → | $184.34 | BmBVt |
| JAN 10 | 09:23:56 PM | BUY | 0.0008044 | $0.1496 | 1,232.65 | → | $184.38 | BmBVt |
| JAN 10 | 09:23:32 PM | BUY | 0.0007831 | $0.1456 | 1,266.15 | → | $184.38 | BmBVt |
| JAN 10 | 09:23:03 PM | BUY | 0.00076654 | $0.1423 | 1,295.39 | → | $184.39 | BmBVt |
| JAN 10 | 08:05:08 PM | BUY | 0.0007279 | $0.1359 | 197.51 | → | $26.85 | BmBVt |
| JAN 10 | 07:44:00 PM | BUY | 0.0006865 | $0.128 | 1,444.22 | → | $184.92 | BmBVt |
| JAN 10 | 07:43:39 PM | BUY | 0.0006663 | $0.1243 | 1,488.03 | → | $184.92 | BmBVt |
| JAN 10 | 07:42:49 PM | BUY | 0.0006464 | $0.1206 | 1,533.87 | → | $184.99 | BmBVt |
| JAN 10 | 07:42:37 PM | BUY | 0.0006268 | $0.117 | 1,581.86 | → | $185.03 | BmBVt |
| JAN 10 | 07:42:27 PM | BUY | 0.0006075 | $0.1134 | 1,632.14 | → | $185.03 | BmBVt |
| JAN 10 | 04:57:50 PM | BUY | 0.00076648 | $0.1439 | 2,592.69 | → | $373.18 | BmBVt |
| JAN 10 | 02:47:12 PM | BUY | 0.000888 | $0.1663 | 1,116.6 | → | $185.70 | BmBVt |
| JAN 10 | 02:46:57 PM | BUY | 0.0008693 | $0.1628 | 1,140.58 | → | $185.70 | BmBVt |
| JAN 10 | 01:02:46 PM | BUY | 0.0005405 | $0.1027 | 733.81 | → | $75.35 | BmBVt |
| JAN 10 | 01:02:34 PM | BUY | 0.0005342 | $0.1015 | 185.61 | → | $18.84 | BmBVt |
| JAN 10 | 01:02:25 PM | BUY | 0.0005305 | $0.1008 | 186.91 | → | $18.84 | BmBVt |
| JAN 10 | 01:02:11 PM | BUY | 0.0005287 | $0.1005 | 187.54 | → | $18.84 | BmBVt |
| JAN 10 | 01:00:51 PM | BUY | 0.0005247 | $0.09976 | 188.97 | → | $18.85 | BmBVt |
| JAN 10 | 01:00:43 PM | BUY | 0.0005229 | $0.09942 | 189.61 | → | $18.85 | BmBVt |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| JAN 10 | 01:00:33 PM | BUY | 0.0005185 | $0.09862 | 1,912.42 | → | $188.60 | BmBVt × ⤢ |
| JAN 10 | 01:00:24 PM | BUY | 0.0005008 | $0.09525 | 1,979.98 | → | $188.60 | BmBVt × ⤢ |
| JAN 10 | 01:00:15 PM | BUY | 0.0004786 | $0.09103 | 2,071.8 | → | $188.60 | BmBVt × ⤢ |
| JAN 10 | 01:00:03 PM | BUY | 0.0004693 | $0.08927 | 211.28 | → | $18.86 | BmBVt × ⤢ |
| JAN 10 | 12:59:52 PM | BUY | 0.0004646 | $0.08839 | 2,134.05 | → | $188.62 | BmBVt × ⤢ |
| JAN 10 | 12:45:28 PM | BUY | 0.0004298 | $0.08152 | 461.38 | → | $37.61 | BmBVt × ⤢ |
| JAN 10 | 12:20:29 PM | BUY | 0.0003668 | $0.07014 | 135.16 | → | $9.4797 | BmBVt × ⤢ |
| JAN 10 | 12:20:17 PM | BUY | 0.0003657 | $0.06985 | 271.14 | → | $18.94 | BmBVt × ⤢ |
| JAN 10 | 12:09:08 PM | BUY | 0.0003639 | $0.06962 | 272.46 | → | $18.97 | BmBVt × ⤢ |
| JAN 10 | 12:03:47 PM | BUY | 0.000333 | $0.0635 | 297.73 | → | $18.90 | BmBVt × ⤢ |
| JAN 10 | 12:01:49 PM | BUY | 0.0003302 | $0.0632 | 300.31 | → | $18.98 | BmBVt × ⤢ |
| JAN 10 | 12:01:24 PM | BUY | 0.0003287 | $0.06293 | 301.61 | → | $18.98 | BmBVt × ⤢ |
| JAN 10 | 11:44:49 AM | BUY | 0.0003179 | $0.05975 | 3,118.84 | → | $186.35 | BmBVt × ⤢ |
| JAN 10 | 11:32:49 AM | BUY | 0.0003075 | $0.05758 | 3,224.35 | → | $185.67 | BmBVt × ⤢ |
| JAN 10 | 11:32:41 AM | BUY | 0.000294 | $0.05505 | 3,372.68 | → | $185.67 | BmBVt × ⤢ |
| JAN 10 | 11:32:25 AM | BUY | 0.0002808 | $0.05253 | 3,531.49 | → | $185.52 | BmBVt × ⤢ |
| JAN 10 | 11:17:15 AM | BUY | 0.0002574 | $0.04745 | 963.09 | → | $45.70 | BmBVt × ⤢ |
| JAN 10 | 11:05:10 AM | BUY | 0.0002417 | $0.04471 | 410.14 | → | $18.34 | BmBVt × ⤢ |
| JAN 10 | 11:04:51 AM | BUY | 0.0002405 | $0.04448 | 412.2 | → | $18.34 | BmBVt × ⤢ |
| JAN 10 | 11:02:46 AM | BUY | 0.0002392 | $0.04422 | 414.51 | → | $18.33 | BmBVt × ⤢ |
| JAN 10 | 10:54:32 AM | BUY | 0.000238 | $0.04414 | 416.61 | → | $18.39 | BmBVt × ⤢ |
| JAN 10 | 10:54:19 AM | BUY | 0.0002368 | $0.04391 | 418.72 | → | $18.39 | BmBVt × ⤢ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| JAN 10 | 10:14:35 AM | BUY | 0.0001692 | $0.03156 | 586.05 | → | $18.50 | BmBVt × ⤢ |
| JAN 10 | 10:14:13 AM | BUY | 0.0001682 | $0.03138 | 589.58 | → | $18.50 | BmBVt × ⤢ |
| JAN 10 | 09:33:55 AM | BUY | 0.0001528 | $0.02824 | 6,489 | → | $183.25 | BmBVt × ⤢ |
| JAN 10 | 09:15:57 AM | BUY | 0.0001478 | $0.02713 | 670.89 | → | $18.20 | BmBVt × ⤢ |
| JAN 10 | 09:15:22 AM | BUY | 0.0001459 | $0.02677 | 2,038.83 | → | $54.57 | BmBVt × ⤢ |
| JAN 09 | 08:50:30 PM | BUY | 0.00009526 | $0.018 | 10.41K | → | $187.34 | BmBVt × ⤢ |
| JAN 09 | 06:11:58 PM | BUY | 0.00008284 | $0.01537 | 969.49 | → | $14.90 | BmBVt × ⤢ |
| JAN 09 | 10:41:39 AM | BUY | 0.00007967 | $0.01522 | 299.77 | → | $4.5631 | BmBVt × ⤢ |
| JAN 09 | 12:58:13 AM | BUY | 0.00007276 | $0.01407 | 136.27 | → | $1.9168 | BmBVt × ⤢ |
| JAN 09 | 12:58:04 AM | BUY | 0.00007269 | $0.01405 | 136.39 | → | $1.9168 | BmBVt × ⤢ |
| JAN 09 | 12:57:47 AM | BUY | 0.00007249 | $0.01402 | 683.85 | → | $9.5863 | BmBVt × ⤢ |
| JAN 08 | 09:15:50 PM | BUY | 0.00007166 | $0.014 | 2,767.08 | → | $38.75 | BmBVt × ⤢ |
| JAN 08 | 05:42:25 PM | BUY | 0.000073 | $0.01443 | 679.13 | → | $9.802 | BmBVt × ⤢ |
| JAN 08 | 03:40:35 PM | BUY | 0.00007071 | $0.01378 | 1,402.13 | → | $19.32 | BmBVt × ⤢ |
| JAN 08 | 11:25:59 AM | BUY | 0.00006847 | $0.01303 | 7,240.78 | → | $94.38 | BmBVt × ⤢ |
| JAN 08 | 11:15:18 AM | BUY | 0.00006655 | $0.0128 | 1,489.8 | → | $19.07 | BmBVt × ⤢ |
| JAN 08 | 09:41:41 AM | BUY | 0.00006546 | $0.01291 | 1,514.71 | → | $19.56 | BmBVt × ⤢ |
| JAN 07 | 10:22:20 PM | BUY | 0.00006544 | $0.01299 | 1,515.13 | → | $19.69 | BmBVt × ⤢ |
| JAN 07 | 05:59:12 PM | BUY | 0.00006481 | $0.01311 | 1,529.86 | → | $20.06 | BmBVt × ⤢ |
| JAN 07 | 05:08:58 PM | BUY | 0.00005927 | $0.01203 | 3,345.45 | → | $40.25 | BmBVt × ⤢ |
| JAN 07 | 06:41:00 AM | BUY | 0.00005931 | $0.01264 | 3,343.59 | → | $42.26 | BmBVt × ⤢ |
| JAN 07 | 06:07:08 AM | BUY | 0.0000584 | $0.01251 | 1,697.73 | → | $21.24 | BmBVt × ⤢ |

| Date | Time | Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| JAN 06 | 06:51:16 PM | BUY | 0.00005709 | $0.01248 | 1,736.87 | ⇄ | $21.67 | BmBVt | ⤢ |
| JAN 06 | 02:36:57 PM | BUY | 0.00005112 | $0.01125 | 3,879.16 | ⇄ | $43.65 | BmBVt | ⤢ |
| JAN 06 | 08:55:44 AM | BUY | 0.00005119 | $0.01136 | 1,936.73 | ⇄ | $22.00 | BmBVt | ⤢ |
| JAN 06 | 08:55:30 AM | BUY | 0.00005064 | $0.01124 | 1,958.04 | ⇄ | $22.00 | BmBVt | ⤢ |
| JAN 05 | 12:29:09 PM | BUY | 0.00004934 | $0.01046 | 4,621.95 | ⇄ | $48.36 | BmBVt | ⤢ |
| JAN 05 | 10:01:25 AM | BUY | 0.00004843 | $0.01034 | 2,047.27 | ⇄ | $21.16 | BmBVt | ⤢ |
| JAN 04 | 01:57:11 PM | BUY | 0.00004833 | $0.01042 | 10.26K | ⇄ | $106.84 | BmBVt | ⤢ |
| JAN 03 | 04:00:16 PM | BUY | 0.00004885 | $0.01056 | 2,638.76 | ⇄ | $27.86 | BmBVt | ⤢ |
| JAN 03 | 08:36:40 AM | BUY | 0.00004847 | $0.01044 | 148.57 | ⇄ | $1.5506 | BmBVt | ⤢ |
| JAN 02 | 02:54:08 PM | BUY | 0.00004704 | $0.009761 | 937.91 | ⇄ | $9.1549 | BmBVt | ⤢ |
| JAN 02 | 01:09:55 PM | BUY | 0.00004644 | $0.009609 | 948.67 | ⇄ | $9.1159 | BmBVt | ⤢ |
| JAN 02 | 01:09:14 PM | BUY | 0.0000462 | $0.00956 | 952.26 | ⇄ | $9.1034 | BmBVt | ⤢ |
| DEC 31 | 09:03:15 AM | BUY | 0.00004844 | $0.009572 | 2,046.81 | ⇄ | $19.59 | BmBVt | ⤢ |
| DEC 30 | 08:58:51 AM | BUY | 0.0000467 | $0.008762 | 2,123.28 | ⇄ | $18.60 | BmBVt | ⤢ |
| DEC 18 | 12:50:18 PM | BUY | 0.00004657 | $0.01007 | 3,832.48 | ⇄ | $38.60 | BmBVt | ⤢ |
| DEC 18 | 12:50:04 PM | BUY | 0.00004583 | $0.009915 | 2,163.65 | ⇄ | $21.45 | BmBVt | ⤢ |
| DEC 14 | 07:04:58 PM | BUY | 0.00004558 | $0.01003 | 10.39K | ⇄ | $104.23 | BmBVt | ⤢ |
| DEC 14 | 07:00:43 PM | BUY | 0.00004382 | $0.009634 | 4,525.39 | ⇄ | $43.60 | BmBVt | ⤢ |
| DEC 14 | 06:54:51 PM | BUY | 0.00004264 | $0.009359 | 6,046.23 | ⇄ | $56.59 | BmBVt | ⤢ |
| DEC 14 | 06:54:04 PM | BUY | 0.00004083 | $0.008959 | 10.97K | ⇄ | $98.29 | BmBVt | ⤢ |
| DEC 08 | 01:50:22 PM | BUY | 0.00004028 | $0.009506 | 24.83K | ⇄ | $236.01 | BmBVt | ⤢ |
| DEC 08 | 08:40:47 AM | BUY | 0.00004039 | $0.009576 | 24.76K | ⇄ | $237.06 | BmBVt | ⤢ |

| Date | Time | Type | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DEC 07 | 02:14:06 PM | BUY | 0.0000518 | $0.01256 | 7,239.64 | ⇄ | $90.94 | BmBVt | ⤢ |
| DEC 07 | 01:00:25 PM | BUY | 0.00003298 | $0.007994 | 30.32K | ⇄ | $242.37 | BmBVt | ⤢ |
| DEC 07 | 10:26:30 AM | BUY | 0.00002827 | $0.006789 | 35.38K | ⇄ | $240.17 | BmBVt | ⤢ |
| DEC 06 | 10:48:25 PM | BUY | 0.00002659 | $0.006272 | 26.32K | ⇄ | $165.09 | BmBVt | ⤢ |
| DEC 06 | 03:32:47 PM | BUY | 0.00002272 | $0.005433 | 4,401.85 | ⇄ | $23.91 | BmBVt | ⤢ |
| DEC 06 | 03:31:54 PM | BUY | 0.00002234 | $0.005346 | 4,475.67 | ⇄ | $23.93 | BmBVt | ⤢ |
| DEC 06 | 03:31:20 PM | BUY | 0.00002197 | $0.005256 | 4,551.37 | ⇄ | $23.92 | BmBVt | ⤢ |
| DEC 06 | 03:30:39 PM | BUY | 0.0000216 | $0.005169 | 4,629.01 | ⇄ | $23.93 | BmBVt | ⤢ |
| DEC 06 | 03:29:36 PM | BUY | 0.00002124 | $0.005082 | 4,708.66 | ⇄ | $23.93 | BmBVt | ⤢ |
| DEC 06 | 11:41:32 AM | BUY | 0.00002055 | $0.004924 | 4,867.15 | ⇄ | $23.97 | BmBVt | ⤢ |
| DEC 05 | 11:04:28 PM | BUY | 0.00002019 | $0.004861 | 4,953.05 | ⇄ | $24.08 | BmBVt | ⤢ |
| DEC 05 | 08:32:36 PM | BUY | 0.00001895 | $0.004598 | 10.56K | ⇄ | $48.53 | BmBVt | ⤢ |
| DEC 05 | 08:31:12 PM | BUY | 0.00001844 | $0.004476 | 5,423.82 | ⇄ | $24.28 | BmBVt | ⤢ |
| DEC 05 | 04:52:47 PM | BUY | 0.0000181 | $0.00423 | 5,524.95 | ⇄ | $23.37 | BmBVt | ⤢ |
| DEC 05 | 04:52:21 PM | BUY | 0.0000176 | $0.004128 | 11.36K | ⇄ | $46.92 | BmBVt | ⤢ |
| DEC 03 | 07:46:48 PM | BUY | 0.00001711 | $0.004092 | 5,845.91 | ⇄ | $23.92 | BmBVt | ⤢ |
| DEC 03 | 07:46:01 PM | BUY | 0.00001629 | $0.003897 | 24.55K | ⇄ | $95.66 | BmBVt | ⤢ |
| DEC 03 | 07:44:44 PM | BUY | 0.00001536 | $0.003672 | 13.02K | ⇄ | $47.83 | BmBVt | ⤢ |
| DEC 03 | 07:41:57 PM | BUY | 0.00001459 | $0.003486 | 20.56K | ⇄ | $71.68 | BmBVt | ⤢ |
| DEC 03 | 07:01:04 PM | BUY | 0.00001407 | $0.003344 | 3,351.77 | ⇄ | $11.21 | BmBVt | ⤢ |
| DEC 01 | 03:52:21 PM | BUY | 0.00001449 | $0.003436 | 27.61K | ⇄ | $94.86 | BmBVt | ⤢ |
| NOV 30 | 02:13:24 PM | BUY | 0.00001317 | $0.00316 | 37.82K | ⇄ | $119.51 | BmBVt | ⤢ |

33

91.     Liam swapped over $66,000 worth of SOL for Wiener Doge because he believed that his purchases of Wiener Doge would generate a profit over the long term and that the value of Wiener Doge and SOL would grow in value over the next decade.  Liam also bought Wiener Doge tokens and gave them as gifts to his friends, family, and community, including many of the Plaintiffs.  In addition to the funds spent developing Wiener Doge and the over $66,000 spent purchasing Wiener Doge tokens, Liam spent approximately $10,000 on advertising and marketing expenses to promote the Wiener Doge community online.

92.     From January 10 to 20, 2025, Wiener Doge grew exponentially.  On January 10, 2025, the market cap (value) of all Wiener Doge tokens grew from approximately $25,000 to over $100,000.  On January 11, 2025, the market cap (value) of all Wiener Doge tokens grew from approximately $100,000 to over $400,000.

93.     On January 12, 2025, the market cap (value) of all Wiener Doge tokens grew from approximately $400,000 to over $1,300,000:



94.     On January 13, 2025, the market cap (value) of all Wiener Doge tokens grew from approximately $1,300,000 to over $3,000,000.  On this day, 98% of all Wiener Doge tokens were owned, and the value of each of the 1,000,000 Wiener Doge tokens soared to $3.10.



95.     At that time, Liam owned 474,063 Wiener Doge tokens worth $1,517,426.72, which he stored within his Phantom wallet:



96.    After the dramatic rise in Wiener Doge's value, Liam split his share of Wiener Doge tokens into three different Phantom wallets.  Liam did so to improve security and to mitigate harm caused by having one of his Phantom wallets compromised.

**F.    $TRUMP & $MELANIA**

97.    Three days before Donald Trump was inaugurated as president of the United States, on January 17, 2025, Trump launched his own "layer two" Solana crypto ($TRUMP).

98.    On January 17, 2025, Phantom reposted a post on X about a fake $TRUMP meme coin, which was not related to the real $TRUMP.



99.    The next day, on January 18, 2025, Phantom received $11.2 million in fees from crypto swaps.  Phantom reposted on X that this was the perfect "script" for Phantom.



100.    On January 19, 2025, Melania Trump launched her own layer two Solana meme coin ($MELANIA).  United States consumers raced to download Phantom and trade $TRUMP and $MELANIA tokens.  On January 19, Phantom was the second most downloaded IOS utility application in the United States, even above Google Chrome.

101.    On January 19, 2025, Phantom experienced "a massive surge of 8,000,000+ requests per minute" and reported that its users swapped over $1.25 billion worth of crypto and made 10 million crypto transactions *that day*.



102.    On January 19, 2025, Phantom provided a crypto-trading "Protip" to its users promoting the "auto-slippage" feature to increase the likelihood of volatile swaps being processed.

103.    On January 19, 2025, Phantom received $7 million in fees from crypto trades placed via its Swapper.  On January 20, 2025, Phantom received $15.7 million in fees from crypto trades placed via its swapper.  On January 27, 2025, Phantom posted on Instagram that the top tokens swapped on its application from January 20 to 26 were $TRUMP and $MELANIA.

### G.    Cyberattack & Criminal Conversion

104.    On January 20, 2025, a cybercriminal hacked into Liam's personal computer and exported Liam's private key to his Phantom wallets from his web browser's working memory.

105.    On information and belief, Liam's Phantom wallet private key was decrypted at the time the cybercriminal stole Liam's private key. By design, Phantom's application decrypts users' private keys and stores the users' private keys in their web browser's working memory.

106.    Next, the cybercriminal imported Liam's private key into his own Phantom application, which was downloaded on the criminal's own device. Without having to bypass multi-factor authentication, identity checks, or a password, the cybercriminal had unrestricted access to all of the funds in Liam's three co-linked Phantom wallets:

  a. 63Ye8GisKop9DAwvXHyA5JLTkMjp7fJBmFPsXYkBmBVt

  b. 2dBLxNV1dwBFAUGhRKs1mYtLqCpK1XW3XFYe2tKzLnFN

  c. 3iyeUkhLyWDs2jLaTS8K47eEtDxE6WnLw4ZXWVH1nrBx

107.    Then, the cybercriminal utilized Phantom's Swapper, and its "auto slippage" feature, to execute a series of unauthorized transactions. The cybercriminal did so without having to bypass any multi-factor authentication or identity checks and without fear that Phantom's application would monitor and reject the obviously fraudulent transactions.

108.    The first unauthorized transaction was massive and automatically approved by Phantom's Swapper. At 10:08:37 pm EST, the cybercriminal utilized Phantom's Swapper to swap approximately 169,110 Wiener Doge tokens (then valued at approximately $170,000) for only 136.9 SOL (then valued at approximately $32,720).[11] This was the first sale of _any_ Wiener Doge tokens from Liam's Phantom wallet, and it had an irreparable impact on the price of all of the

---

[11] Unauthorized Transaction 1: https://solscan.io/tx/5T3hArVKCGs9iavTTEdAAK-fRjqha2coCc8pKiRjT2dZaoeroc4SQkGhApvrSJHb17eTZfnxpa7UKXZtru9Rzs8S5

remaining Wiener Doge tokens that were owned. Phantom was the "provider" of the swap facilitated through Phantom's Swapper, and Phantom received a fee from this criminal transaction. Twelve seconds later, at 10:08:49 pm EST, the cybercriminal utilized Phantom's Swapper to swap approximately 169,110 Wiener Doge tokens (then valued at approximately $170,000) for 14.3 SOL (then valued at approximately $3,418).[12] Phantom was the "provider" of the swap facilitated through Phantom's Swapper, and Phantom received a fee from this criminal transaction.



109.    At 10:10:09 pm EST, the cybercriminal utilized Phantom's Swapper to swap approximately 144,050 Wiener Doge tokens (then valued at approximately $145,000) for 5.2 SOL (then valued at approximately $1,247) from Liam's second wallet.[13] At 10:12:12 pm EST, the cybercriminal utilized Phantom's Swapper to swap over 6,973 Wiener Doge tokens (then valued

---

[12] Unauthorized Transaction 2: https://sols-can.io/tx/KnUwS4yZ2AWXLrRF4xtKykUyPQ7oGLbajcdt9AD2KMrwKVDWtu-uBbsSf4PFgzYBQinhJscvSLDXojhgrd76U4pu

[13] Unauthorized Transaction 3: https://solscan.io/tx/2r23oBWhMzpPgCpVtSjE-QpBLw3JUyoC65mHeSNvnkMYi6SMVqmnu-FRq9YuExhktf9VJH3yQQAES4rdeEX6ZsMwNv

at approximately $7,000) for approximately .3 SOL (then valued at approximately $70).[14]  Phantom was the "provider" of these swaps, which were facilitated through Phantom's Swapper, and Phantom received fees from these criminal transactions.  OKX also facilitated one or more of these transactions.  For each swap facilitated, Phantom received "Phantom: Swap Fees."



110.    Phantom's Swapper, powered by OKX, automatically matched and executed these unauthorized, criminal transactions using integrated routing and liquidity services, collecting fees and executing trades without user verification or fraud prevention checks.

111.    The unauthorized criminal transactions caused irreparable harm and permanently destroyed the value of the underlying virtual currency.  Wiener Doge tokens lost 99% of their value immediately following the cyberattack, which eroded over $1 million in value.



112.    Finally, the cybercriminal utilized Phantom's "send crypto" feature to send 149.92 SOL (then valued at approximately $37,537) to the cybercriminal's wallet.[15]

---

[14] Unauthorized Transaction 4: https://solscan.io/tx/5WKJK9iKrVZnpPhGVcRf-bLZuNhmEdm73JpPyZRuKsz6AC6ukk7LggVf2b2F8UQWmk52y86jYnCu7WPYh2VQ6Z6AS
[15] Unauthorized Transaction 5:

| Address | | Balance Before | Balance After | Change (SOL) | Change Value |
|---|---|---|---|---|---|
| ♪ 63Ye8GisKop9DAwvXHyA5JLTkMjp7fJBmFPsXYkBmBVt ⎘ | WRITABLE SIGNER FEE PAYER | 149.955868766 | 0.035863766 | - 149.920005 ⚏ | $37,536.97 |
| G3qWpjwmx96NQPpp8rwrw4Q1pDgxLqP2t9p9GAPFSm3u ⎘ | WRITABLE | 1,167.715145098 | 1,317.635145098 | + 149.92 ⚏ | $37,536.96 |

113.    Following these unauthorized transactions, which looked like a "rug pull," Liam received a barrage of hate mail and death threats, which caused him emotional harm and trauma.

114.    The design of Phantom's wallet and Swapper permitted the execution of unauthorized transactions with no fraud detection, user warnings, or safeguards.  Phantom's architecture not only allowed this attack to occur—it facilitated it, monetized it, and then charged a fee for the criminal activity that destroyed the value of Plaintiff's token.

### H.    Law Enforcement & Criminal Money Laundering

115.    Immediately after the hacking, Liam traced the cybercriminal hacker's wallet and identified the unauthorized transactions.  He was able to identify the cybercriminal's Solana wallet because all transactions conducted via the Solana blockchain are public and traceable.  The cybercriminal's Phantom wallet: G3qWpjwmx96NQPpp8rwrw4Q1pDgxLqP2t9p9GAPFSm3u.  Analyzing the criminal's wallet uncovered that the criminal was utilizing a Phantom wallet.

116.    Less than one hour after the cybercriminal attack, on January 20, 2025, Liam called the New York Police Department ("NYPD") and filed a police report (2024-001-00535).  After explaining the incident fully to the NYPD, Liam listed his total loss amount as $1,000,000 on the police report.  Liam alerted Phantom of this cyberattack, including Mr. Jacobs.

117.    The next day, on January 21, 2025, Liam spoke to both federal and state law enforcement authorities and blockchain investigators, fully informing them of the facts.  Liam also filed an Internet Crime Complaint Center ("IC3") report and submitted multiple forms and reports

---

https://solscan.io/tx/5BA72XGUzfFhRXWS2RWZWTzZECie3oAQVMfJPa1nc6RFXy-hxAACTBugHzYGZULUA9Z62K9T7okwKzV9DUK3NYVWX

to TRM Labs.  Liam also filed a formal report with Phantom and directly messaged Phantom's General Counsel, Mr. Jacobs, asking for emergency support.  For three days, Phantom refused to provide contact information for Phantom's legal department.  Phantom never offered any support.

118.    Phantom refused to offer any help or even a substantive response to Liam's credible allegation that a criminal was exploiting Phantom's application and victimizing Phantom users.

119.    On January 22, 2025, Phantom's customer "happiness" employee responded to my formal report by stating: "Phantom is a noncustodial wallet, meaning you bear sole responsibility for any loss of your cryptocurrency."  On January 23, 2025, Liam responded by asking whether Phantom had insurance coverage covering losses on its platform due to theft or cybercrime.  Phantom's employee responded, "At this time, Phantom does not offer insurance."

120.    On January 23, 2025, Liam emailed Phantom's legal department and customer support department an email that stated:

> As your team knows, on January 20th, my Phantom wallet was hacked.  The hacker downloaded malware onto my computer and retrieved my private wallet keys, which were held inside my Phantom wallet [application].  The hacker then uploaded my keys to their own Phantom wallet, and then proceeded to liquidate my three Phantom wallets, which contained 49% of my million-dollar project.

> Because Phantom failed to protect the security of my private keys, my entire $1-3 million project tanked immediately.  I have filed a police report and have already conducted an investigation.  I now know exactly what happened and have documented everything.

> I have yet to receive sufficient support from Phantom.  I alerted Phantom o[n] LinkedIn & X and messaged many people on your team asking for support.  In addition to the many emails to this address asking for help.  But I have received no support.

> I demand that Phantom makes this right.  And you are on notice that I am contemplating potential litigation against Phantom for the harm caused here.

121.    On January 24, 2025, Liam emailed Phantom's legal department: "Your legal office is on notice of my claim against Phantom for its security failures.  They have been copied on all emails.  I have received no help from Phantom throughout this process.  I plan to commence litigation soon if I continue to receive no other way forward from Phantom."

122.    Phantom never provided any material support nor made any effort to identify the cybercriminal that was repeatedly exploiting Phantom's users.  Based on the results of a blockchain investigation, the cybercriminal's scheme depends on Phantom's wallet to facilitate its criminal conversion of Phantom users' wallets.  The cybercriminals have continuously exploited Phantom's application and victimized Phantom's users, and to this very day, Phantom has refused to help.

123.    Phantom also offered no cooperation to the law enforcement efforts to track the ill-gotten gains and to prevent the cybercriminal's money laundering.  The cybercriminal has laundered money undetected using Phantom wallets and has withdrawn the ill-gotten gains from Stake.com and MEXC.  Ever since the cyberattack, Liam and the NYPD have both been working to track the stolen funds to a centralized exchange to identify and catch the cybercriminal.

124.    To this day, the same attacker continues using Phantom to exploit users.  Phantom has taken no action to stop these ongoing attacks, despite public evidence showing repeat use of traceable wallet addresses.  This cybercriminal, and others, are continuously exploiting Phantom's application to victimize Phantom users.  But Phantom publicly claimed that "Security is our number one priority" and that "no user funds are at risk."

125.    From December 2024 to today, hundreds of individuals have posted complaints online explaining that their crypto funds were "drained" from Phantom wallets by cybercriminals.  To this day, the cybercriminal that hacked Liam's wallets and swapped his Wiener Doge tokens for SOL is still performing the same scheme to attack Phantom users' wallets.



**Kev Hedderwick**
@GoonerKev83

So my phantom wallet has been compromised and drained. According to Phantom my seed phrase has been used beyond my control. Not sure how considering I wrote it down on paper and stored it in lock box in my cupboard? Safe to say that's fucked my Christmas. Time to start again 😡😡

5:04 AM · Dec 20, 2024 · **1,463** Views

💬 84          ♻ 4          ♡ 20          🔖          ↥



shahid rasheed ★ ☆ ☆ ☆ ☆ Jan 2, 2025

My funds was stolen by from this waller immediately they just received - that is phantom waller responsible - they are responsible & they are doing it by itself - there are thousands of cases like me on yorube complaining abut funds loss from phantom waller - they don,t have support to talk with - Please dont, install it ...

5 out of 6 found this helpful 👍 👎



### Kip LeGate ★ ☆ ☆ ☆ ☆ Jan 19, 2025

Wallet drained within an hour of opening// believe this wallet is complete scam

6 out of 10 found this helpful 👍 👎



**Cloakd** 🧢 ✓
@CloakdDev

I've been waiting for over 28 days for a large vulnerability to be fixed in one of the largest apps on SOL

At this point, it's becoming a joke - I can't even get a response from their security team at this point in terms of update.

6:47 AM · Jan 21, 2025 · **496.2K** Views

💬 123          ♻ 134          ♡ 2.9K          🔖 109          ↥



Justin Egbufoama ★ ☆ ☆ ☆ ☆ Jan 23, 2025

Wallet got drained. Asked for help from customer service if there's anything that can be done. No response, nothing. Wish there was a better wallet than phantom

3 out of 4 found this helpful 👍 👎



**David Byrd** @Da_Byrd11 · Jan 23

Yeah too bad someone got 3500 from my phantom.
I have the address that took it too.

💬 57          ♻ 13          ♡ 4          ᵢₗᵢ 681          🔖 ↥



**Omar Osman** 🇺🇸⭐✓ @OmarOsman96 · Jan 23
We literally watched a Streamer lose 900 sol from his wallet due to being hacked.

💬 10     🔁 1     ♡ 6     📊 240



**Milan BK** @milan_benzema · Jan 23
I also got drained 3 days ago. I didn't gave away my seed phrase. I didn't participate in any airdrops. I wrote to phantom but of course they can't do anything and point out the mistake on my behalf! It's not a lot to most people but for me 1k-2k is alot. My coins were so good😭

💬 49     🔁 8     ♡ 10     📊 727



**jack** @ArorHarsh · Jan 24
NO I HAVE BEEN STOLEN I NEVER SHARED MY SECRET PHRASE OR PASSWORD SOME HACKER I DONT KNOW HOW STOLE MY WALLET HE WAS ABLE TO TRANSFER ALL THE TOKENS I HAD IN MY WALLET I LEFT ME $0 AND IN HIS WALLET HE HAS OVER $ 150k. HOW IS THIS EVEN FAIR @phantom i TRIED CUSTOMERHELP ALSO NO R

💬 37     🔁 7     ♡ 10     📊 380



**Nick Jevric** ★☆☆☆☆ Jan 24, 2025
Same here. My Wallet got drained today for some reason. I lost all of my XRP. I didn't click anything and no one has my private keys. This is so strange. I am waiting for customer support. So far, no response. I CAN'T BELIEVE THIS.
2 out of 2 found this helpful 👍 👎



**snowie** @deitaman · Jan 25
my wallet is drained and all funds were sent to a wallet holding 2.4m usd. any fix?

GqmXN85RcmuWVTXsZEMK3sEqZEnGb7ZX4rW8YFPcLxap

13d4xBN9CvZGaBGeJyw3Wm79xJn5LV8SzLegqkWeCY9N

8mowmVCEewZ9W2cEaQyQeQEeSxhGr1hvRviLwozwNtBt

💬 101     🔁 8     ♡ 11     📊 508



**Aram Adil** ★☆☆☆☆ Jan 26, 2025
❗❗⚠️⚠️⚠️⚠️⚠️❗❗⚠️⚠️⚠️⚠️⚠️❗❗⚠️⚠️⚠️⚠️⚠️❗❗⚠️⚠️⚠️⚠️⚠️DON'T EVEN THINK ABOUT USING THIS. MY WALLET DRAINED/STOLEN WITHIN MINUTES❗❗⚠️⚠️⚠️⚠️⚠️❗❗⚠️⚠️⚠️⚠️⚠️PLEASE STAY AWAY FROM THIS SCAM.
5 out of 6 found this helpful 👍 👎

 **Brain Zone** ★☆☆☆☆ Jan 31, 2025

this app is a complete SCAM !!! i lost my money two times because of it, it's easy to hack !!

2 out of 3 found this helpful 👍 👎



**Stinky Steve** @SteveStinkd

Bro my wallet was just wiped in phantom wallet

1:29 AM · Feb 9, 2025 · **1,589** Views

💬 109    🔁 7    ♡ 16

 Spencer Frey ★☆☆☆☆ Feb 10, 2025

I used Phantom with no issues for a while. But when I downloaded it on chrome in continually wouldn't let me sign in, and when I did sign in, I lost ALL of my SOL. So frustrating.

Was this helpful? 👍 👎

 Asif Nadeem ★☆☆☆☆ Feb 10, 2025

Most vulnerable and most insecure solana wallet... no security.. no support... easy to hack... main target for hackers... never use this wallet...

1 person found this review to be helpful 👍 👎



**RetroBits#1207** 🥉 @_WayneRSA

yo @phantom uhm whats going on ???? i got drained and i've never sent anyone my wallet or anything so can you please tell me whats going on ??????????

3:50 PM · Feb 14, 2025 · **974** Views

💬 207    🔁 13    ♡ 22



**Able** @Lee__little · 16 Feb
Replying to @phantom

@phantom
my **phantom wallet was hacked** and all of my money drained. I didnt click on a link or anything, it **was** just poor security....   I want my money back

💬 145    🔁 7    ♡ 18    📊 1.3K

46



**Zik** 🎓 🐾 ✓
@MarkZik

I lost 55k on a Phantom hack a couole weeks ago that I couldn't find the source of. Always practiced strict wallet security and never gave out seeds / keys 🙁

I had to wipe both my hard drives and start again to be safe.

8LJWhFAu2cq6t99p9VxVwUBXKWPARPvqJmvz3mt5B5VF

5:19 PM · Feb 18, 2025 · **406** Views

💬 70          ⇄ 3          ♡ 11          🔖          ⬆️

**Jon H (Sakura)** ★☆☆☆☆ Feb 18, 2025

Right after I downloaded this chrome extension and sent SOL to it, somehow within 45 minutes my SOL was sent out from the wallet to who knows where and poof it's gone, I was trying to use it to connect to RAYDIUM but didn't even get a chance. AVOID the Phantom Chrome Extension like the plague, many other userses I notice report the same problems..... Either the extension is easy to exploit for hackers or Phantom doesn't care or it's an inside job, either way how can they allow apps like this on google, I lost 4 SOL. Show less

Was this helpful? 👍 👎



**Adam** ✓
@ADAMJW137

Follow

Replying to @nobrainflip

My wallet got "hacked" on February 3rd.Phantom has been useless. Just so happened on the day they had the glitch.Wallet compromised.Instead of just transferring the coins, the "hacker" swapped all the coins on JUP to SOL,sent SOL and USDC to a wallet and it's still sitting there

3:38 PM · 19 Feb 25 · **598** Views

**2** Quotes   **11** Likes

💬          ⇄          ♡          🔖          ⤳

47















**Dxrk Knight**
@DKnightSol    Follow

PLEASE TELL ME I DID NOT JUST GET ROBBED ON MY BIRTHDAY. Like legitimately somehow got into both my @TradeonNova wallet and my @phantom wallet and drained both. ABOUT 200$ BUT THAT'S NOT THE POINT. YO WHY PEOPLE ALWAYS GOTTA RUIN A GOOD THING, IT'S MY BDAY AND IM PISSED ABOUT MONEY, ITS BULLSHIT. Fuck scammers and hackers

6:59 PM · 05 Mar 25 · **1,364** Views

**1** Repost **7** Quotes **28** Likes



**praise.** ✔
@onerandomguyyyy

my second phantom wallet got drained.
what a way to start the day💔💔

1:04 AM · Mar 7, 2025 · **4,253** Views

43    ⟲ 15    ♡ 65    🔖 1

**Artley chandice**
@Chandice90

No not at all…. My phantom wallet was hacked about months back, lost about 6k sol & usdt…

8:04 AM · Mar 10, 2025 · **3,922** Views

228    ⟲ 22    ♡ 48    🔖



**Man_Like_Vincentino** 📈 🎰 🟩
@AlalejikeV

My phantom wallet was hacked 4 days ago, and all my funds has been successfully transferred by the hacker.

8:43 AM · Mar 10, 2025 · **664** Views

💬 84          🔁 3          ♡ 11          🔖          ⬆️



**UN. TOFU WAS HER!?**
@murkynights

My Phantom wallet got wiped—$36K gone. What did I do wrong.

4:17 AM · Mar 11, 2025 · **858** Views

💬 130          🔁 7          ♡ 30          🔖          ⬆️



**Spirit (Ghostwriting arc)** ✍️
@Spirit0x_

I'm so tired of this fr

I don't know if this is worth doing or fighting for

Created a new phantom wallet on a new device with no connection to any dApps, just to realize it was wiped totally

The hakcer sent the funds to multiple wallets, then to cex

This is not life tbh 😭

7:56 PM · Mar 13, 2025 · **7,442** Views

💬 162          🔁 12          ♡ 117          🔖 3          ⬆️

51



**bitcoon**
@bitcoontycoon

So that's how my phantom wallet got drained of 87k

4:51 PM · Mar 18, 2025 · **17.3K** Views

💬 266          ↻ 23          ♡ 45          🔖 1                    ⬆

Post your reply                                              **Reply**

**mojobrand** @moremojomineral · Mar 19
mine was drained on 21 January.. half of your amount...

💬 21          ↻ 2          ♡ 5          �ili 163          🔖 ⬆



**Ledger.Cartel** ✔
@my20022cents

Do not ever use Phantom wallet again or you will wake up broke!  There is a backdoor that drained mine.

Last edited 8:48 AM · Mar 21, 2025 · **1,497** Views

💬 151          ↻ 10          ♡ 27          🔖                    ⬆



**Angel** ✔
@Atsac979

Be careful guys got drained from my phantom wallet from starting to grow again to 0 in a blink

1:13 PM · Mar 22, 2025 · **121** Views

💬 10          ↻ 1          ♡ 2          🔖                    ⬆



**LADY WITH A PHANTOM WALLET** 🎀🎀 @0xlady01 · Mar 23

Everyone should be careful out there o.

> **Richard** ✔ @boionchain · Mar 23
>
> Turns out this is not the first time.  x.com/boionchain/sta...
>
> > Hey guys, i just got drained by this wallet for 1.9 sol. Idk who that guy is but why do people do that? I cant explain to myself, how this could happen again... i saw that a lot of people got drained by this wallet
> >
> > EAiuvaCjoc2wVy2PzULQnKefxzA1ZnjDnbfQ8zn9ujZS
> >
> > 💬 74    ⟲ 13    ♡ 22    📊 806    🔖    ⤴
>
> > **Dre66828** @dre82866 · 3d
> >
> > i just got fucking stolen from by this wallet
> > EAiuvaCjoc2wVy2PzULQnKefxzA1ZnjDnbfQ8zn9ujZS
> > who tf does this nigga think he is
> >
> > 💬 12    ⟲ 2    ♡ 5    📊 161    🔖    ⤴
>
> > **Pemulung ✗** @pemulungX · 24 Feb
> >
> > MY PHANTOM WALLET WAS STOLEN
> > Stay cautious with Phantom!
> >
> > Yesterday at 10:34 PM (Berlin time), someone transferred all my Solana and other coins to this address:
> > EAiuvaCjoc2wVy2PzULQnKefxzA1ZnjDnbfQ8zn9ujZS
> >
> > I use two-factor authentication and all the recommended security measure
> >
> > ## Neueste Aktivität        ...
> >
> > Gestern

💬 2    ⟲ 1    ♡ 5    📊 372    🔖    ⤴

**Abdulkaboom St.Franklin** 🌱🧧
@espiritual_01

I remember when I got drained too last year
Everything in my phantom wallet
I was really heartbroken

4:41 PM · Mar 23, 2025 · **1,000** Views

💬 75    ⟲ 7    ♡ 26    🔖    ⤴

53



**Bluesirguy** ✔ @Bluesirguy

Woke up to my phantom wallet being drained 🙃🙃🙃 fml

4:10 PM · Mar 23, 2025 · **1,372** Views

💬 162          🔁 19          ♡ 31          🔖          ⬆️



**Phantom** ✔ @phantom · Mar 25
_____ and a Phantom wallet is all you need

💬 2K          🔁 348          ♡ 3.5K          📊 332K          🔖 ⬆️

**TΔN** @wemb_

Someone stole my crypto from my Phantom wallet, do you guys think your security is strong enough?

10:02 PM · Mar 25, 2025 · **1,142** Views

💬 211          🔁 7          ♡ 30          🔖          ⬆️



**Clear** @clearisadegen

Just got fully drained, not even sure how it happened haven't clicked on anything to connect in a few days and wallets show no connections. It drained every wallet that didn't have explicit passwords on them. Devastated is saying it lightly. I know we are all trying to make money but this is just low frequency shit

2:28 AM · Mar 26, 2025 · **904** Views



**Thurman** @web3_Thurman

Got my first  wallet drain...
Thank you phantom @phantom

12:22 PM · Mar 26, 2025 · **339** Views

💬 48          🔁 2          ♡ 14          🔖          ⬆️

126.    Phantom continued to market its wallet as safe for crypto novices—even after being repeatedly notified by users of massive wallet-draining incidents enabled by its architecture.

127.    Upon receiving notice of hundreds of Phantom users reporting account takeovers and wallet "drains," Phantom failed to act to identify and stop the cybercriminal from exploiting Phantom's security infrastructure, lack of transactional safeguards, and without any identification checks.  A review of the cybercriminal's Solana wallet shows that he is still attacking Phantom users to this day, using the exact scheme they employed to take over Liam's Phantom account.  Phantom also failed to notify its users of these cybersecurity risks.

128.    Upon information and belief, Phantom has failed to report cybersecurity incidents to the required regulatory bodies.  Phantom does all of this while actively misleading users into believing its crypto trading platform provides "best-in-class" security features and while actively misleading users into believing that its "friendly crypto wallet" is "safe, easy, and fun."

129.    To this day, Phantom has failed to take any steps to catch the criminal.  Phantom's silence and inaction, even in the face of mounting evidence and direct user pleas for help, illustrates not only a failure to supervise, but a willful refusal to act.

## I.    OKX's Guilty Plea

130.    On February 24, 2025, Phantom's exchange partner, OKX, pleaded guilty to federal criminal money laundering claims and admitted to facilitating over $5 billion in unlawful criminal transactions.  In doing so, OKX pleaded guilty to partnering with third-party "non-disclosure" brokers—like Phantom—to facilitate anonymous crypto trades between U.S. consumers and OKX.  In the DOJ's accompanying press release, acting U.S. Attorney Matthew Podolsky said:

> For over seven years, OKX knowingly violated anti-money launder-
> ing laws and avoided implementing required policies to prevent
> criminals from abusing our financial system. As a result, _OKX was
> used to facilitate over five billion dollars' worth of suspicious trans-
> actions and criminal proceeds_. Today's guilty plea and penalties

emphasize that there will be consequences for financial institutions that avail themselves of U.S. markets but violate the law by allowing criminal activity to continue.[16]

131.    OKX's DOJ Information explained:

a.    "OKX operates its exchange through employees and offices located in Singapore (since 2022), China, and the United States."

b.    "OKX has never registered with FinCEN as a money services business."

c.    "Since its founding, OKX has become one of the largest global cryptocurrency trading platforms."

d.    "OKX charges its customers fees on transactions, which vary based on a customer's trading volume, with higher-volume traders generally paying relatively lower fees."

e.    "OKX also allowed customer to place trades on the exchange through third-party entities, without the third-party entity disclosing any identifying information to OKX about the customers on whose behalf the trades were placed.  OKX internally referred to these third-party entities as 'non-disclosure brokers.'"

f.    "OKX did not adequately or consistently use commercially available software to monitor and detect suspicious activity, including money laundering."

g.    "OKX did not have adequate controls to determine whether either party to transactions on the exchange was potentially subject to sanctions imposed by the U.S. Treasury Department."

h.    "OKX was used by numerous customers as a vehicle for laundering the proceeds of suspicious and criminal activities, including more than five billion dollars of suspicious transactions and illicit proceeds."

i.    "OKX allowed non-disclosure brokers to place trades for their customers on OKX without providing KYC information to the exchange for the customers on whose behalf the trades were placed."

132.    OKX pleaded guilty to operating an unlicensed money transmitting business and, in doing so, agreed that its acts and omissions met each element of the offense:

---

[16] DOJ, OKX Pleads Guilty To Violating U.S. Anti-Money Laundering Laws And Agrees To Pay Penalties Totaling More Than $500 Million (Feb. 24, 2025).

a.   "the Defendant knowingly conducted, controlled, managed, supervised, directed, or owned all or part of an unlicensed money transmitting business,"

b.   "the business affected interstate or foreign commerce in some manner or degree," and

c.   "the business was unlicensed, that is, it failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder."

133.   The plea agreement was conditioned on OKX's agreement "to prevent persons it knows or consciously avoids knowing to be United States persons from engaging in transactions on its exchange during the Term unless in compliance with applicable U.S. laws and regulations, including, but not limited to, the Bank Secrecy Act ("BSA"), and any and all registration and licensing requirements."

134.   Through Phantom's Swapper, OKX continues to violate U.S. anti-money laundering laws by allowing anonymous Phantom users (who are intentionally unidentified by Phantom) to transact via OKX's exchange.  In return for its non-disclosure service to OKX, Phantom receives fees from OKX.

## FIRST CAUSE OF ACTION

**Unregistered Swap Execution Facility**
**7 U.S.C §§ 7b-3, 25**
**(Against Phantom & OKX)**

135.   Plaintiffs incorporate the preceding paragraphs.

136.   Plaintiffs generally allege that Phantom violated the Commodity Exchange Act ("CEA") by operating an unregistered commodity trading platform for virtual currency swaps.

A.      **Statutory Framework**

137.      The Commodity Exchange Act ("CEA"), codified at 7 U.S.C. § 1 et seq., estab-lishes the statutory framework governing the regulation of commodities, swaps, and commodity trading platforms in the United States.

138.      Virtual currencies, like Bitcoin ("BTC"), Ethereum ("ETH"), Solana ("SOL"), and Wiener Doge, are "commodities," as defined by the CEA, *see* 7 U.S.C. § 1a(9), because virtual currencies function as stores of value, mediums of exchange, or investment vehicles, which can later be redeemed for cash.

139.      The CEA mandates that no person may operate a swap execution facility ("SEF") unless such facility is registered with the Commodity Futures Trading Commission ("CFTC").[17] The CFTC's rules also explicitly require SEFs to register.[18]  SEFs must comply with the CEA's core principles,[19] which include obligations regarding impartial access, trading integrity, anti-ma-nipulation protocols, market surveillance, and recordkeeping.

140.      The CEA defines "swap" broadly to encompass a wide range of risk-shifting finan-cial arrangements involving commodities and currencies.[20]  The CEA defines "swap" to include

---

[17] *See* 7 U.S.C. § 7b-3(a)(1) (Swap Execution Facilities, Registration Requirement) ("No person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market under this section.").

[18] *See* 17 C.F.R. § 37.3(a) (Requirements for Registration) ("(1) Any person operating a facility that offers a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform shall register the facility as a swap execution facility under this part.").

[19] *See* 7 U.S.C. § 7b-3(f) (Core Principles for Swap Execution Facilities).

[20] *See* 7 U.S.C. § 1a(47)(A) (Swap Definition) ("the term 'swap' means any agreement, contract, or transaction … (iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, cur-rencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on

all transactions "commonly known as" or referred to as a "currency swap" or "commodity swap"[21] and all transactions that become "commonly known to the trade as a swap."[22]  Virtual currency swaps routed through Phantom's "Swapper" are modern digital commodity or currency swaps, executed on an intermediated, risk-transferring basis, and fit squarely under the CEA's expansive "swap" definition.

141.    Phantom users' wallets are automatically linked to Phantom's Swapper.  They have the ability to swap between near-infinite combinations of layer-one and layer-two cryptocurrencies.  The user selects one cryptocurrency to trade for another.  But unlike spot trades that involve cash execution or direct exchange, these virtual currency swaps are executed automatically through a series of smart contracts.  Users are not swapping digital assets peer-to-peer; they are paying Phantom a fee to route their swap from the user's Phantom wallet through multiple Solana-based decentralized exchanges to find a liquidity provider match.  Phantom facilitates these multi-step virtual currency swaps using smart contracts—pricing the trade, routing it, executing it, and returning the result to the user's wallet.

142.    Under 7 U.S.C. § 1a(47)(A)(iii), a "swap" includes any executory contract that provides for the exchange, on a fixed or contingent basis, of payments based on the value of commodities or other financial interests, and that transfers financial risk without conveying ownership in the underlying asset.  The statute includes within the definition any contract "commonly known to

---

[21] *Id.* ("(iii) … including any agreement, contract, or transaction commonly known as … (VII) a currency swap … [or] (XXII) a commodity swap").

[22] *Id.* ("(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap").

the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred").

the trade" as a swap, including commodity swaps, currency swaps, and mixed swaps. Phantom's token-for-token exchange functionality—routinely used to swap virtual currencies like Solana for Layer 2 tokens such as Wiener Doge—squarely fits this definition. These transactions involve the contingent exchange of digital assets whose prices fluctuate in real-time, and they transfer financial exposure between parties without conveying ownership in any underlying enterprise. While Phantom attempts to rebrand these swaps as "spot" trades, the existence of embedded routing logic, hidden spreads, execution delays, and absence of user-selected counterparties reveals the truth: Phantom's Swapper facilitates structured, risk-shifting, contingent transactions that fall directly within the statutory definition of "swap."

143. The CEA defines a "swap dealer" as any person who holds itself out as a dealer in swaps, makes a market in swaps, enters into swaps with counterparties in the ordinary course of business, or is commonly known in the trade as a dealer or market maker in swaps.[23]

144. The CEA defines an SEF as "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants."[24] The CEA includes within the definition "any trading" platform that "facilitates the execution of swaps between persons."[25]

---

[23] *See* 7 U.S.C. § 1a(49) (Swap Dealer Definition) ("The term 'swap dealer' means any person who—(i) holds itself out as a dealer in swaps; (ii) makes a market in swaps; (iii) regularly enters into swaps with counterparties as an ordinary course of business for its own account; or (iv) engages in any activity causing the person to be commonly known in the trade as a dealer or market maker in swaps.").

[24] 7 U.S.C. § 1a(50) (Swap Execution Facility Definition) ("The term 'swap execution facility' means a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system, through any means of interstate commerce.").

[25] *Id*. ("including any trading facility, that—(A) facilitates the execution of swaps between persons; and (B) is not a designated contract market"); *see also* 7 U.S.C. § 1a(51)(A) (Trading Facility

145.    Under the CEA, a private right of action exists against any unregistered person "who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter."[26]  This private right provides certain plaintiffs standing to sue any person who violates the CEA for actual damages resulting from certain transactions.[27]

146.    Under 7 U.S.C. § 25(a)(1)(B), a private litigant has standing if (1) they made a swap or commodity futures contract through the defendant or deposited funds with the defendant for such a transaction, (2) the defendant violated the CEA, and (3) they suffered actual damages

---

Definition) ("The term 'trading facility' means a person or group of persons that constitutes, maintains, or provides a physical or electronic facility or system in which multiple participants have the ability to execute or trade agreements, contracts, or transactions—(i) by accepting bids or offers made by other participants that are open to multiple participants in the facility or system; or (ii) through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discriminatory automated trade matching and execution algorithm."); 7 U.S.C. § 1(a)(16) ("The term 'electronic trading facility' means a trading facility that—(A) operates by means of an electronic or telecommunications network; and (B) maintains an automated audit trail of bids, offers, and the matching of orders or the execution of transactions on the facility.").

[26] 7 U.S.C. § 25(a)(1) (Private Rights of Action) ("Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter …").

[27] *See id.* ("… shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraph (A) through (D) of this paragraph and caused by such violation to any other person—(A) who received trading advice from such person for a fee; (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap; (C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—(i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade); (ii) a contract subject to section 23 of this title; or (iii) an interest or participation in a commodity pool; or (iv) a swap; or (D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes—(i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap").

caused by that violation.[28]  Therefore, anyone who executed a swap through a violator and/or deposited money in connection with such a trade has standing to sue the violator for damages caused by the CEA violation(s).

147.    Under 7 U.S.C. § 25(a)(1)(C), a private litigant has standing if (1) they placed an order with defendant for any commodity pool interest or swap, (2) the defendant violated the CEA, and (3) they suffered actual damages caused by that violation.[29]  Therefore, anyone who bought or sold a swap from a violator has standing to sue the violator for damages caused by the CEA violation(s).

148.    Under 7 U.S.C. § 25(a)(1)(D), a private litigant has standing if (1) they purchased or sold a swap, (2) the defendant violated the CEA, (3) the defendant's violation involved the use of a manipulative device or contrivance or the manipulation of price of the contract, swap, or underlying commodity, and (4) they suffered actual damages caused by the violation.[30]  Therefore, anyone who bought or sold a swap from a violator has standing to sue the violator for damages caused by the CEA violation, when the violation involves fraud or manipulation.

---

[28] *See id.* ("(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap").

[29] *See id.* ("(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—(i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade); (ii) a contract subject to section 23 of this title; or (iii) an interest or participation in a commodity pool; or (iv) a swap").

[30] *See id.* ("(D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes—(i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap").

**B.    Phantom's Swapper is an Unregistered Swap Execution Facility**

149.    Phantom's Swapper is an SEF and a trading facility within the meaning of the CEA. It allows multiple participants to execute swaps by accepting price offers from market makers, liquidity providers, and unknown counterparties from inside Phantom's application, routed through a series of automatic smart contracts, via Phantom's Swapper.  Phantom's application is far more than just a wallet; it is an integrated, self-contained marketplace for virtual currency swaps that operates within Phantom's user interface and application logic.

150.    Under 7 U.S.C. § 1a(50), a "swap execution facility" is defined as a trading system or platform in which multiple participants can execute or trade swaps by accepting bids and offers from multiple participants through any means of interstate commerce.  Phantom's Swapper satisfies this definition by permitting its users to execute swaps against dynamic offers supplied by market makers and DEX aggregators and does so through a standardized interface that handles order routing, price quoting, and execution—all behind Phantom's user-interface.  Phantom's Swapper enables end-users to trade with multiple liquidity sources without selecting a specific counterparty and without understanding the exact risk or logic of the trade.  Phantom handles all of that for the user.  Phantom's Swapper dynamically routes trades to multiple market makers and DEX aggregators, making the platform functionally identical to an SEF.

151.    Phantom's Swapper enables users to execute transactions that constitute "swaps," under 7 U.S.C. § 1a(47).  These transactions are executory, contingent, and involve the exchange of digital assets whose values are volatile and fluctuate in real time.  The user's decision to swap one token for another is fundamentally a risk-based economic decision involving exposure to price movement—a hallmark of swap activity.  The digital assets exchanged through Swapper, including SOL and Wiener Doge, are all financial interests and commodities under the CEA.  These are not simple cash or delivery transactions—they are structured virtual asset conversions that implicate

63

the core policy concerns of the CEA.  Although Phantom claims these are spot trades, the reality is that Swapper transactions introduce execution delay, hidden spreads, and pricing slippage that are borne by the user.  These transactions are executed via Phantom's internal logic, rather than in real-time, bilateral exchanges.  The lack of control over timing, price, or counterparty transforms these token conversions into contingent, risk-bearing transactions—qualifying them as swaps.

152.    Phantom operates Swapper without registering as a SEF with the CFTC, in violation of 7 U.S.C. § 7b-3(f)(1) and 17 C.F.R. § 37.3(a)(1).  The CEA prohibits the operation of any SEF unless it is registered with the CFTC.  Phantom's decision to operate Swapper outside this regulatory regime places it in direct and ongoing violation of the CEA.

153.    Phantom's Swapper processes high-volume virtual currency swaps between U.S. retail users and Phantom's market maker and exchange partners, including OKX.  These swaps are executed through Phantom's internal algorithms, which automatically match users with liquidity sources and route trades without transparency or oversight.  Users are not choosing counterparties manually; they are placing trust in Phantom's automated routing system, which is functionally no different from that of a centralized trading platform.  Phantom exerts direct control over trade execution.  It integrates pricing feeds, imposes its own routing logic, and imposes spreads and fees on trade conducted through its Swapper.  This operational control and routing of each trade showcases why Phantom's Swapper is an SEF.  Although Phantom brands Swapper as a decentralized or user-driven tool, in reality, Swapper functions as a centralized counterparty-matching engine.  Users do not choose their trading counterparties, set price terms, or negotiate execution timing.  Phantom exercises discretion over all core elements of the trade—including the selection of liquidity provider, price quote, route, and timing—making the platform indistinguishable from a

centralized trading facility. This centralized control is the hallmark of swap execution under the CEA and eliminates any functional distinction between Swapper and a registered SEF.

154.    Phantom's decision to embed execution logic, pricing control, and liquidity routing into a "wallet" application does not shield it from SEF obligations. The CEA and CFTC regulations are functional—based on what an entity does, not how it is labeled. Phantom's deliberate evasion of SEF registration, while continuing to act as a centralized execution venue, constitutes a willful attempt to operate outside the CEA's reach in violation of 17 C.F.R. § 1.6(a).

155.    As a result of its unregistered operation, Phantom's Swapper lacks the critical safeguards required of SEFs under 7 U.S.C. § 7b-3(f), including: impartial access; real-time trade surveillance; anti-manipulation enforcement; financial integrity protocols; and recordkeeping obligations. Phantom operates in regulatory darkness while exposing its users to the full spectrum of counterparty and systemic risk that the CEA and CFTC rules are designed to prevent. These protections are not formalities—they were implemented to safeguard U.S. retail users from opaque, unregulated swap execution platforms like Swapper. The SEF regime was enacted to ensure fair access, transparent pricing, surveillance, and regulatory oversight, particularly when complex financial instruments are offered to consumers with limited visibility into risk, counterparty behavior, or systemic exposure.

156.    Phantom's Swapper fails to comply with core principles required of SEFs, under 7 U.S.C. § 7b-3(f), including:

      a.    <u>Failure to deter abusive trading</u> (§ 7b-3(f)(2)[31]): Phantom does not enforce trading rules or access limitations.

---

[31] 7 U.S.C. § 7b-3(f)(2) ("A swap execution facility shall—(A) establish and enforce compliance with any rule of the swap execution facility, including—(i) the terms and conditions of the swaps traded or processed on or through the swap execution facility; and (ii) any limitation on access to the swap execution facility; (B) establish and enforce trading, trade processing, and participation

b.   Trading in products susceptible to manipulation (§ 7b-3(f)(3)[32]): Swapper facilitates swaps in thinly traded, illiquid meme coins—including Wiener Doge—which are highly susceptible to price manipulation and distortion.

c.   Failure to monitor trading activity (§ 7b-3(f)(4)[33]): Phantom conducts no real-time trade surveillance, audit trail analysis, or compliance review. This permits large-scale unauthorized transactions to occur without triggering any review or intervention.

d.   Failure to collect essential trading data (§ 7b-3(f)(5)[34]): Phantom collects no personally identifiable information and does not track user trading behavior or transactional history sufficient to comply with SEF recordkeeping or regulatory reporting obligations.

e.   Lack of position limits or accountability (§ 7b-3(f)(6)[35]): Swapper does not enforce position limits or track open interest by user or token, allowing

---

rules that will deter abuses and have the capacity to detect, investigate, and enforce those rules, including means—(i) to provide market participants with impartial access to the market; and (ii) to capture information that may be used in establishing whether rule violations have occurred; (C) establish rules governing the operation of the facility, including rules specifying trading procedures to be used in entering and executing orders traded or posted on the facility, including block trades; and (D) provide by its rules that when a swap dealer or major swap participant enters into or facilitates a swap that is subject to the mandatory clearing requirement of section 2(h) of this title, the swap dealer or major swap participant shall be responsible for compliance with the mandatory trading requirement under section 2(h)(8) of this title.").

[32] 7 U.S.C. § 7b-3(f)(3) ("The swap execution facility shall permit trading only in swaps that are not readily susceptible to manipulation.").

[33] 7 U.S.C. § 7b-3(f)(4) ("The swap execution facility shall—(A) establish and enforce rules or terms and conditions defining, or specifications detailing—(i) trading procedures to be used in entering and executing orders traded on or through the facilities of the swap execution facility; and (ii) procedures for trade processing of swaps on or through the facilities of the swap execution facility; and (B) monitor trading in swaps to prevent manipulation, price distortion, and disruptions of the delivery or cash settlement process through surveillance, compliance, and disciplinary practices and procedures, including methods for conducting real-time monitoring of trading and comprehensive and accurate trade reconstructions.").

[34] 7 U.S.C. § 7b-3(f)(5) ("The swap execution facility shall—(A) establish and enforce rules that will allow the facility to obtain any necessary information to perform any of the functions described in this section; (B) provide the information to the Commission on request; and (C) have the capacity to carry out such international information-sharing agreements as the Commission may require.").

[35] 7 U.S.C. § 7b-3(f)(6) ("(A) In general: To reduce the potential threat of market manipulation or congestion, especially during trading in the delivery month, a swap execution facility that is a trading facility shall adopt for each of the contracts of the facility, as is necessary and appropriate,

accumulation of potentially abusive market positions that could influence prices.

f.   <u>Failure to ensure financial integrity of swaps</u> (§ 7b-3(f)(7)[36]): Phantom does not conduct counterparty risk assessment, does not guarantee trade finality, and offers no clearinghouse protections—placing users at financial risk.

g.   <u>Failure to maintain accurate records</u> (§ 7b-3(f)(10)[37]): Phantom does not retain sufficient records of transactions, order flow, user balances, or system decisions—impeding regulatory oversight and forensic investigation.

h.   <u>Conflicts of interest not mitigated</u> (§ 7b-3(f)(12)[38]): Phantom profits from user trades via spread markups and undisclosed partnerships with market makers like OKX.  It has no procedures to mitigate these financial conflicts.

i.   <u>Lack of transaction safeguards and risk oversight</u> (§ 7b-3(f)(14)[39]): Phantom lacks automated risk management systems, redundancy protocols, and

---

position limitations or position accountability for speculators.  (B) Position limits: For any contract that is subject to a position limitation established by the Commission pursuant to section 6a(a) of this title, the swap execution facility shall—(i) set its position limitation at a level no higher than the Commission limitation; and (ii) monitor positions established on or through the swap execution facility for compliance with the limit set by the Commission and the limit, if any, set by the swap execution facility.").

[36] 7 U.S.C. § 7b-3(f)(7) ("The swap execution facility shall establish and enforce rules and procedures for ensuring the financial integrity of swaps entered on or through the facilities of the swap execution facility, including the clearance and settlement of the swaps pursuant to section 2(h)(1) of this title.").

[37] 7 U.S.C. § 7b-3(f)(10) ("(A) In general: A swap execution facility shall—(i) maintain records of all activities relating to the business of the facility, including a complete audit trail, in a form and manner acceptable to the Commission for a period of 5 years; (ii) report to the Commission, in a form and manner acceptable to the Commission, such information as the Commission determines to be necessary or appropriate for the Commission to perform the duties of the Commission under this chapter; and (iii) shall keep any such records relating to swaps defined in section 1a(47)(A)(v) of this title open to inspection and examination by the Securities and Exchange Commission. (B) Requirements: The Commission shall adopt data collection and reporting requirements for swap execution facilities that are comparable to corresponding requirements for derivatives clearing organizations and swap data repositories.").

[38] 7 U.S.C. § 7b-3(f)(12) ("The swap execution facility shall—(A) establish and enforce rules to minimize conflicts of interest in its decision-making process; and (B) establish a process for resolving the conflicts of interest.").

[39] 7 U.S.C. § 7b-3(f)(14) ("The swap execution facility shall—(A) establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk, through the development of appropriate controls and procedures, and automated systems, that—(i) are

operational audit trails to monitor platform integrity. The absence of internal controls creates vulnerability to service outages, manipulation, and cybersecurity breaches.

157.    These failures created a platform vulnerable to cybercriminal exploitation, untraceable order routing, and price manipulation. Phantom's lack of surveillance, user verification, or counterparty accountability made it impossible to detect or respond to unauthorized activity. This deficient structure directly enabled the liquidation of Liam's tokens and destroyed the value of Wiener Doge, demonstrating precisely why SEF safeguards are mandatory. Phantom's noncompliance was not incidental—it was inherent to its design. By avoiding registration, Phantom eliminated all legal obligations to monitor, report, supervise, or safeguard trading activity, prioritizing growth and profits over user protection.

158.    By evading registration, Phantom also avoided all external oversight mechanisms built into the SEF framework, including CFTC examinations, independent audits, market surveillance reviews, and enforcement inquiries. This lack of regulatory visibility allowed Phantom to operate in a state of functional impunity, with no obligation to detect fraud, deter manipulation, or report suspicious activity to federal authorities. The absence of external accountability made Swapper particularly attractive to bad actors seeking a platform to exploit without detection or recourse.

159.    In addition to violating statutory provisions of the CEA, Phantom's Swapper violated multiple regulatory requirements promulgated by the CFTC.

---

reliable and secure; and (ii) have adequate scalable capacity; (B) establish and maintain emergency procedures, backup facilities, and a plan for disaster recovery that allow for—(i) the timely recovery and resumption of operations; and (ii) the fulfillment of the responsibilities and obligations of the swap execution facility; and (C) periodically conduct tests to verify that the backup resources of the swap execution facility are sufficient to ensure continued—(i) order processing and trade matching; (ii) price reporting; (iii) market surveillance and (iv) maintenance of a comprehensive and accurate audit trail.").

160.    *First*, Phantom violated 17 C.F.R. § 37.3(a)(1)[40], which provides that any person operating a facility that enables more than one market participant to trade or execute swaps with more than one other participant must register the facility as an SEF.  Phantom has never registered Swapper as an SEF despite the fact that it facilitates such trading activity.

161.    *Second*, Phantom failed to meet the abuse-prevention, compliance, monitoring, and supervisory obligations imposed under 17 C.F.R. § 37.203,[41] including by:

    a.    Failing to prohibit abusive trading practices.[42]

    b.    Failing to detect and investigate rule violations.[43]

---

[40] *See* 17 C.F.R. § 37.3(a)(1) ("Any person operating facility that offers a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform shall register the facility as a swap execution facility under this part or as a designated contract market under part 38 of this chapter.").

[41] *See* 17 CFR § 37.203 ("A swap execution facility shall establish and enforce trading, trade processing, and participation rules that will deter abuses and it shall have the capacity to detect, investigate, and enforce those rules.").

[42] *See* 17 CFR § 37.203(a) ("*Abusive trading practices prohibited.*  A swap execution facility shall prohibit abusive trading practices on its markets by members and market participants. Swap execution facilities that permit intermediation shall prohibit customer-related abuses including, but not limited to, trading ahead of customer orders, trading against customer orders, accommodation trading, and improper cross trading. Specific trading practices that shall be prohibited include front-running, wash trading, pre-arranged trading (except for block trades permitted by part 43 of this chapter or other types of transactions certified to or approved by the Commission pursuant to the procedures under part 40 of this chapter), fraudulent trading, money passes, and any other trading practices that a swap execution facility deems to be abusive. A swap execution facility shall also prohibit any other manipulative or disruptive trading practices prohibited by the Act or by the Commission pursuant to Commission regulation.").

[43] *See* 17 CFR § 37.203(b) ("*Capacity to detect and investigate rule violations.*  A swap execution facility shall have arrangements and resources for effective enforcement of its rules.  Such arrangements shall include the authority to collect information and documents on both a routine and non-routine basis, including the authority to examine books and records kept by the swap execution facility's members and by persons under investigation. A swap execution facility's arrangements and resources shall also facilitate the direct supervision of the market and the analysis of data collected to determine whether a rule violation has occurred.").

      c.      Failing to conduct effective audits, trade surveillance, real-time monitoring, or recordkeeping.[44]

      d.      Failing to maintain an automated trade surveillance system capable of detecting trade practice violations.[45]

      e.      Failing to conduct real-time market monitoring.[46]

162.    *Third*, Phantom violated 17 C.F.R. § 37.404[47] by failing to ensure it had access to sufficient information to assess whether trading in its market was being used to manipulate prices.

---

[44] *See* 17 CFR § 37.203(c) ("*Compliance staff and resources*. A swap execution facility shall establish and maintain sufficient compliance staff and resources to ensure that it can conduct effective audit trail reviews, trade practice surveillance, market surveillance, and real-time market monitoring. The swap execution facility's compliance staff shall also be sufficient to address unusual market or trading events as they arise and to conduct and complete investigations in a timely manner, as set forth in § 37.203(f).").

[45] *See* 17 CFR § 37.203(d) ("*Automated trade surveillance system*. A swap execution facility shall maintain an automated trade surveillance system capable of detecting potential trade practice violations. The automated trade surveillance system shall load and process daily orders and trades no later than 24 hours after the completion of the trading day. The automated trade surveillance system shall have the capability to detect and flag specific trade execution patterns and trade anomalies; compute, retain, and compare trading statistics; compute trade gains, losses, and swap-equivalent positions; reconstruct the sequence of market activity; perform market analyses; and support system users to perform in-depth analyses and ad hoc queries of trade-related data.").

[46] *See* 17 CFR § 37.203(e) ("*Real-time market monitoring*. A swap execution facility shall conduct real-time market monitoring of all trading activity on its system(s) or platform(s) to identify disorderly trading and any market or system anomalies. A swap execution facility shall have the authority to adjust trade prices or cancel trades when necessary to mitigate market disrupting events caused by malfunctions in its system(s) or platform(s) or errors in orders submitted by members and market participants.").

[47] *See* 17 CFR § 37.404 ("(a) A swap execution facility shall demonstrate that it has access to sufficient information to assess whether trading in swaps listed on its market, in the index or instrument used as a reference price, or in the underlying commodity for its listed swaps is being used to affect prices on its market. (b) A swap execution facility shall have rules that requires its market participants to keep records of their trading, including records of their activity in the index or instrument used as a reference price, the underlying commodity, and related derivatives markets, and make such records available, upon request, to the swap execution facility or, if applicable, to its regulatory service provider, and the Commission.").

Phantom also failed to adopt rules requiring market participants to maintain records of their activity and to disclose those records when requested.

163.    Phantom's failure to register Swapper as an SEF, coupled with its decision to operate outside every core principle required of SEFs, created the conditions under which a cybercriminal was able to exploit Phantom's infrastructure to conduct a devastating unauthorized sale of over $500,000 worth of Liam's Wiener Doge tokens.  Phantom's registration violations are not procedural—they are the root cause of the catastrophic loss suffered by Plaintiffs.

164.    Plaintiffs seek redress under 7 U.S.C. § 25(a), which provides a private right of action against any person who operates in violation of the CEA and causes actual damages.  Phantom's actions squarely fall within the scope of this provision.  Phantom's conduct—unregistered, unsupervised, and in deliberate evasion of the CEA—makes it liable for the loss of value and destruction of token holdings experienced by Plaintiffs.

165.    The unauthorized swap effectuated by Phantom enabled a cybercriminal to swap $500,000 worth of Liam's Wiener Doge tokens for SOL without Liam's consent.  Phantom's platform lacked fundamental safeguards, including KYC checks, transaction surveillance, identity authentication protocols, or any form of anomaly detection.  These compliance failures created a system that was both exploitable and opaque, allowing unauthorized access to high-value token holdings.

166.    The unauthorized liquidation caused Liam a direct loss of $500,000 in virtual assets.  Following the exploit, the value of Wiener Doge collapsed to $0.01 due to the sale's impact on market supply.  This near-total devaluation affected over 300 token holders.  Had Phantom complied with the CEA's SEF registration requirement and implemented the mandatory safeguards, the cybercriminal would have been prevented or deterred from executing the unauthorized

trades.  Phantom's decision to operate in violation of these core regulatory duties is not a distant or indirect cause—it is the proximate cause of Plaintiffs' injuries.  The harm suffered by Plaintiffs flows directly from Phantom's unlawful operation of an unregistered SEF.

### C.    OKX Aided & Abetted Phantom's CEA Violations

167.    Under 7 U.S.C. § 13c(a), any person who "willfully aids, abets, counsels, commands, induces, or procures the commission of" a violation of the CEA, or who "acts in combination or concert with any other person in any such violation," is liable as a principal for such violation.

168.    OKX partnered with Phantom to power the backend of the Swapper.  OKX's decentralized exchange infrastructure was embedded directly into the Phantom wallet through API-level integration, enabling users to execute token swaps within the Phantom application's user interface using OKX's trading engine, liquidity, and pricing.  OKX's DEX became the default execution layer for many swaps performed through Phantom's Swapper.

169.    The partnership between Phantom and OKX was announced publicly on November 27, 2024.  In a joint press release, Phantom's CEO described the partnership as a major expansion of the application's trading capabilities.  OKX's Chief Innovation Officer called the volume routed from Phantom "a showcase of how OKX's infrastructure enables scaled, embedded applications."  Phantom's CEO emphasized that the integration gave Phantom users access to "the most competitive rates across DEXs" from inside the wallet, "marking a pivotal moment in Phantom's evolution."  This was not a passive connection to open-source protocols.  OKX and Phantom built a commercial integration.  Phantom actively routed user trades to OKX's infrastructure, and both parties financially benefited from transaction-based fees.  This was a profit-driven partnership, not mere software interoperability.  This was not passive interoperability—it was a commercially

integrated execution stack, jointly operated by Phantom and OKX, designed to maximize user swap flow without triggering registration obligations under U.S. law.

170.    OKX knew that Phantom had not registered its Swapper as an SEF with the CFTC. As a large, sophisticated global trading operation, OKX is well aware of U.S. regulatory requirements. OKX also knew that Phantom had failed to implement any of the core compliance mechanisms mandated under 7 U.S.C. § 7b-3(f), including surveillance systems, access controls, KYC/AML screening, recordkeeping, and audit trails. Yet it enabled Phantom to continue operating and expanding its illicit platform.

171.    In partnering with Phantom, OKX willfully chose to facilitate unregistered virtual currency swaps for U.S. users without implementing basic protections required by law. OKX provided the technical capability to execute the swaps, profited from the transactions, and actively promoted the integration. These facts establish that OKX aided and abetted Phantom's unlawful operation of an SEF with full knowledge and direct participation.

172.    OKX's actions meet the legal standard for aiding and abetting under the CEA. It (1) had actual knowledge of Phantom's CEA violations, (2) materially assisted in the execution of illicit swaps, and (3) did so with the intent to profit from the partnership. This liability attaches regardless of OKX's lack of registration, corporate structure, or overseas location. U.S. law applies where, as here, illegal swaps were offered to U.S. consumers.

173.    OKX's integration was the direct enabler of the unauthorized liquidation of Liam's assets. Without OKX's routing, pricing, and execution services, the cybercriminal would not have been able to convert Liam's $500,000 in Wiener Doge tokens to SOL using Phantom's app. Phantom did not independently facilitate the swaps—it relied on OKX's decentralized exchange infrastructure.

174.    The attack on Liam's tokens was only possible because OKX allowed anonymous Phantom users to access its decentralized exchange infrastructure without any KYC, AML, or identity protocols.  The criminal who drained Liam's assets exploited this exact design.  OKX's participation in that system makes it jointly and severally liable.  OKX's unlawful conduct materially contributed to Plaintiffs' harm.  Its partnership with Phantom, its willful disregard for the CEA, and its role in enabling anonymous, unregistered swaps through Phantom's Swapper were not incidental.  They were central to the chain of events that resulted in the unauthorized liquidation of Liam's tokens and the collapse in value experienced by hundreds of holders.

175.    As a result of Phantom's CEA violations and OKX's knowing facilitation, Plaintiffs suffered substantial economic harm, including a $500,000 unauthorized liquidation and an overall collapse in the value of Wiener Doge tokens.  These losses are actionable under the CEA's private right of action.  Plaintiffs seek to hold Phantom and OKX accountable for these violations and to recover full compensatory damages as permitted by law.  Phantom's Swapper is precisely the type of trading platform that Congress and the CFTC intended to bring within the scope of the CEA.

## SECOND CAUSE OF ACTION

### Unregistered Introducing Broker & Intermediary
### 7 U.S.C. §§ 6d, 25
### (Against Phantom & OKX)

176.    Plaintiffs incorporate the preceding paragraphs.

177.    Phantom violated the CEA by acting as an unregistered Introducing Broker ("IB") under 7 U.S.C. § 6d, as it actively solicited and facilitated virtual currency swaps through its "Swapper" feature, earning fees from both users and exchange partners like OKX for each virtual currency swap.

A.    **Statutory Framework**

178.    This claim arises under 7 U.S.C. § 6d(g),[48] which governs the registration and conduct of IBs.  The CEA requires that any person or entity acting as an IB must register with the CFTC and adhere to the regulatory obligations that ensure operational integrity and customer protection.  Registration is the entry point into a framework of regulatory oversight that aims to prevent precisely the type of harm suffered in this case.

179.    An IB is defined under 7 U.S.C. § 1a(31)[49] as a person who solicits or accepts orders for the purchase or sale of any commodity futures, swaps, or other covered instruments, but does not accept customer money, securities, or property for margin or settlement.  While IBs do not directly handle customer funds, they serve a critical gatekeeping role by soliciting trades and routing them to executing platforms—functions that carry significant responsibilities under the law.

---

[48] 7 U.S.C. § 6d(g) (Introducing Broker Registration Requirements) ("It shall be unlawful for any person to be an introducing broker unless such person shall have registered under this chapter with the Commission as an introducing broker and such registration shall not have expired nor been suspended nor revoked.").

[49] 7 U.S.C. § 1a(31) (Introducing Broker Definition) ("(A) In general: The term 'introducing broker' means any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant)—(i) who—(I) is engaged in soliciting or in accepting orders for—(aa) the purchase or sale of any commodity for future delivery, security futures product, or swap; (bb) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title; (cc) any commodity option authorized under section 6c of this title; or (dd) any leverage transaction authorized under section 23 of this title; and (II) does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or (ii) who is registered with the Commission as an introducing broker.  (B) Further definition: The Commission, by rule or regulation, may include within, or exclude from, the term 'introducing broker' any person who engages in soliciting or accepting orders for any agreement, contract, or transaction subject to this chapter, and who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom, if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.").

180.    7 U.S.C. § 6d(g) makes it unlawful for any person to act as an IB unless that person is properly registered with the CFTC.  The statute further prohibits unregistered entities from performing any of the activities enumerated in the definitions of IB.  These requirements apply irrespective of the medium used—whether traditional platforms, mobile apps, decentralized protocols, or crypto wallets integrated with trading functions.

181.    In addition to registration obligations, IBs must adhere to a variety of continuing duties imposed by the CEA and CFTC regulations.  These include risk controls, cybersecurity protections, supervisory systems, transaction monitoring, and compliance with anti-money laundering obligations under the Bank Secrecy Act ("BSA").  These requirements are not optional— they are foundational to preventing fraud, manipulation, customer abuse, and financial crimes.

182.    7 U.S.C. § 25(a)(1)[50] authorizes private litigants to bring actions for damages caused by violations of the CEA or CFTC regulations.  This provision empowers investors and consumers to hold violators accountable in federal court when regulatory breaches cause concrete economic harm.  Plaintiffs seek actual damages from Defendants based on the actual damages resulting from a series of unauthorized virtual currency swaps facilitated via Phantom's Swapper and have standing because Plaintiffs "deposited" property (Wiener Doge tokens) on Phantom's application.[51]

---

[50] 7 U.S.C. § 25(a)(1) (Actual Damages; Actionable Transactions; Exclusive Remedy) ("Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person.").

[51] *Id.* ("…caused by such violation to any other person … (B) who made through such person any contract of sale of any commodity for future delivery … or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap").

183.    Under 7 U.S.C. § 13c(a),[52] any person or entity that willfully aids, abets, counsels, commands, induces, or procures the commission of a violation of the CEA is liable as a principal. This includes any party that substantially assists in the commission of unlawful trading, registration failures, or other statutory breaches—regardless of whether the party was directly engaged in customer-facing activity.  As such, OKX is liable under the CEA for knowingly facilitating and enabling Phantom's unlawful activities by powering the backend of the Swapper and routing trades that were executed in violation of the registration and compliance obligations imposed on IBs.

### B.    Phantom Acts as an Unregistered Introducing Broker

184.    Phantom functions as an IB under the CEA, 7 U.S.C. § 1a(31), by soliciting users and facilitating orders for swaps and other digital commodity transactions through its Swapper interface.  The statutory definition of an IB includes any person who "is engaged in soliciting or in accepting orders for" the purchase or sale of swaps or retail commodity transactions, regardless of whether that person accepts customer funds.  Phantom's conduct falls within this definition.

185.    Phantom's mobile application and browser extension are designed and marketed to onboard retail users—particularly non-institutional investors—into crypto trading.  The platform simplifies the swap process, offering users a sleek, gamified interface that masks the complexity and risk of the underlying virtual currency commodity trades.  Phantom's user interface is structured to actively invite and encourage token swapping, using terminology like "trade," "swap now," "best price found," and "low slippage" to communicate a frictionless trading experience.

---

[52] 7 U.S.C. § 13c(a) (Responsibility as Principal) ("Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which is directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.").

186.    Phantom's public marketing efforts reflect a deliberate strategy to target the general public and especially inexperienced or first-time crypto participants.  On its website and on social media platforms, Phantom positions its product as the safest and most user-friendly method for exploring the world of token swaps.  It promotes slogans like "Trade any token instantly" and emphasizes that no identity verification (KYC) is required—a fact that further underscores its solicitation role while also reflecting a regulatory gap.

187.    Phantom is not merely passively displaying prices or linking to third-party exchanges. Instead, it is actively engaging with retail users by highlighting meme coins, promoting newly listed tokens, and creating dedicated in-app banners to steer user behavior toward meme coin trading.  These campaigns not only inform users about the availability of swaps but also implicitly recommend certain trades.

188.    Through this solicitation, Phantom captures, processes, and routes user orders for virtual currency swaps.  Phantom routes the trades to integrated third-party DEX aggregators like OKX, Jupiter, and others—completing the transactions and presenting the final trade result to the user within Phantom's native interface.

189.    Phantom has never registered as an Introducing Broker, nor has it taken any steps to comply with the compliance, supervisory, and reporting requirements that come with that registration. Its continued operation as an unregistered IB is a violation of federal law and a breach of the duties imposed by the CEA.

190.    As an IB, Phantom is required to establish and enforce systems to prevent conflicts of interest between its internal compliance personnel and revenue-generating business functions.  Phantom has not implemented any such structures.  Its team—including marketing, engineering,

and executive leadership—oversees both the business development of trading tools and the customer onboarding funnel, without any separation between compliance and promotion.

191.    Moreover, Phantom's unregistered IB activity enables it to profit from routing trades to specific DEX liquidity providers like OKX, receiving kickbacks for steering user flow. This creates financial incentives that would, in a regulated environment, require conflict-of-interest disclosures, surveillance, and mitigation protocols.

192.    Phantom's role as an IB is especially dangerous because it operates under the pretense of being "just a wallet."  In truth, Phantom is a trading interface that directly facilitates commodity swaps while sidestepping all the guardrails that regulated IBs must follow—such as identity verification, trade surveillance, recordkeeping, and suspicious activity reporting.

193.    By failing to register as an IB, Phantom has created a legally unregulated channel through which retail users are solicited to enter swap transactions involving volatile and illiquid digital assets.  These trades are routed through an opaque infrastructure with no public reporting, no disclosed trade counterparties, and no oversight from federal or state regulators.

194.    Phantom's unregistered IB activity directly contributed to the unauthorized liquidation of Plaintiff's tokens. Phantom's "Swapper" was the instrument through which the trade was initiated and executed, with no identity verification, no alert system for anomalous behavior, and no ability for Plaintiff to intervene once the unauthorized trade was underway.

195.    The regulatory framework governing IBs exists to prevent precisely this type of exploitation.  By ignoring it, Phantom not only violated federal commodities law but also stripped its users of any meaningful protections against fraud, manipulation, or misrouting.

196.    The harm caused to Plaintiffs is not speculative.   The unauthorized swap of $500,000 in Wiener Doge tokens occurred through the very infrastructure Phantom operates as an

unregistered Introducing Broker.  Phantom's misconduct enabled this cybercriminal activity to occur without detection or delay.

197.    Accordingly, Phantom is liable under the CEA, and Plaintiffs seek to recover for all actual damages arising from these unlawful.

C.    **Regulatory Violations**

198.    By operating as an unregistered IB, Phantom evaded a comprehensive set of statutory and regulatory obligations imposed by the CEA and CFTC regulations—obligations designed to protect market integrity, prevent abuse, and ensure the safety of customer funds.  These core duties include, but are not limited to:

a.    Know-Your-Customer (KYC) Requirements:  Registered IBs must implement robust procedures to verify the identity of each customer before allowing them to place trades.  These safeguards are the first line of defense against fraud, terrorism financing, sanctions evasion, and other illicit activity.  Phantom refused to implement any identity verification protocols and publicly touted its "no KYC" design as a feature rather than a flaw.  By enabling anonymous trading through its Swapper, Phantom removed the ability to identify bad actors or trace illicit transactions—contravening the most basic principles of modern financial regulation.

b.    Anti-Money Laundering (AML) Protocols:  Entities registered with the CFTC must maintain AML programs that include internal policies, employee training, compliance testing, and coordination with law enforcement.  AML requirements are grounded in the Bank Secrecy Act and enforced through 17 C.F.R. § 42.2[53] and 31 C.F.R. Chapter X.[54]  Phantom ignored all of these obligations.  It failed to implement any form of AML

---

[53] 17 C.F.R. § 42.2 (Compliance with Bank Secrecy Act) ("Every futures commission merchant and introducing broker shall comply with the applicable provisions of the Bank Secrecy Act and the regulations promulgated by the Department of the Treasury under that Act at 31 CFR chapter X, and with the requirements of 31 U.S.C. 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 CFR 1026.220, which require that a customer identification program be adopted as part of the firm's Bank Secrecy Act compliance program.").

[54] 31 C.F.R. Chapter X (Financial Crimes Enforcement Network, Department of the Treasury).

program, failed to designate a compliance officer, and operated a high-volume swap platform without even rudimentary internal controls.

c.  <u>Suspicious Activity Report (SAR) Obligations</u>:  Registered intermediaries must monitor transactions for unusual patterns or behavior and file Suspicious Activity Reports (SARs) with the Financial Crimes Enforcement Network (FinCEN) when they detect red flags.  Swapper's design not only failed to monitor suspicious activity—it affirmatively disabled the ability to do so by anonymizing counterparties and transactions.  Phantom has never filed a single SAR, nor could it have, because its infrastructure was intentionally built to bypass reporting and visibility requirements.

d.  <u>Supervisory Procedures (17 C.F.R. § 166.3)</u>[55]:  All IBs must establish, maintain, and enforce systems to diligently supervise all activities relating to their business as an intermediary.  This includes surveillance systems, supervisory personnel, compliance training, and audit trails. Phantom failed to implement any supervisory structure.  It employed no trade surveillance software, no compliance personnel, and no enforcement mechanisms for detecting abnormal behavior or intervening during cyber events.  This failure made the app a prime target for criminals seeking to exploit its regulatory blind spots.

e.  <u>Registration and Reporting Requirements (7 U.S.C. §§ 6g, 6f)</u>:  CEA registrants must maintain and report extensive records of transaction histories, counterparties, asset flows, position limits, and market exposure.  These disclosures allow the CFTC and law enforcement agencies to investigate wrongdoing, identify systemic threats, and ensure that intermediaries operate safely.  Phantom avoided these requirements by never registering.  It does not report user trades, does not track position exposures, and cannot produce any of the documentation required of lawful IBs.

199.  Phantom's failure to adopt or enforce these essential protections made its application—and especially its Swapper feature—uniquely vulnerable to abuse by cybercriminals, anonymous actors, and unregulated liquidity providers.  By intentionally operating outside the legal framework, Phantom created a high-volume trading platform that lacked the most fundamental

---

[55] 17 C.F.R. § 166.3 (Supervision) ("Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant.").

guardrails of a lawful financial intermediary. Its refusal to implement these protections was not merely negligent—it was strategic, deliberate, and profit-driven. This regulatory evasion made the $500,000 unauthorized liquidation of Plaintiff's assets not only foreseeable but inevitable.

### D.    OKX Aided & Abetted Phantom's CEA Violations

200.    In November 2024, OKX entered into a publicized, commercial partnership with Phantom for the purpose of powering and expanding Phantom's crypto trading functionality via its "Swapper" platform. This collaboration was not passive or peripheral. It was a strategic integration between one of the largest global decentralized exchange operators and a U.S.-based wallet application serving millions of users. OKX promoted the partnership as a milestone in expanding its access to U.S. retail crypto traders, leveraging Phantom's user base to significantly increase trading volumes routed through its exchange infrastructure.

201.    As part of the partnership, OKX provided Phantom with direct access to its decentralized exchange (DEX) API, which was embedded inside the Phantom application. OKX's backend executed trades, routed orders across its liquidity pools, and returned completed transactions to users—all under the seamless, Phantom-branded user experience. OKX thus became an invisible counterparty and execution engine for Phantom's unregistered swap activity.

202.    The integration was far from incidental or technical. OKX routed substantial liquidity into Phantom's Swapper, executed virtual currency swaps on behalf of Phantom's retail users, and earned trading revenues from each transaction. These revenues were shared with Phantom as part of a commercial arrangement. OKX and Phantom publicly touted this relationship in blog posts, press releases, and social media campaigns, highlighting the performance benefits, low-latency execution, and superior liquidity depth that their integration delivered. Together, they created a vertically integrated trading stack that enabled retail users to execute virtual currency swaps with one click, in-app, without regulatory oversight or customer protections.

203.    OKX knew that Phantom was operating the Swapper as an unregistered commodity trading platform.  OKX was aware that entities conducting retail swaps of digital commodities for United States customers must be registered with the CFTC as either an FCM or IB.  Phantom's website, user interface, and press materials made clear that Phantom was not a registered entity. OKX nevertheless entered into and maintained the partnership, reaping economic benefit while enabling Phantom to operate unlawfully.

204.    OKX also knew that Phantom had no Know-Your-Customer (KYC), Anti-Money Laundering (AML), or Suspicious Activity Reporting (SAR) protocols in place.  OKX knew that Phantom allowed users to engage in token swaps without any user identity verification, without monitoring transaction volumes or risk indicators, and without escalation or audit processes.  These omissions are violations of the most basic legal requirements for IBs.  OKX further knew that facilitating anonymous swaps for U.S. retail users violated CEA obligations and exposed Phantom's Swapper to abuse by criminals, hackers, and sanctions-evading actors.

205.    Despite this knowledge, OKX willfully and substantially assisted Phantom's operation of the Swapper by acting as its primary liquidity source and trade execution partner.  OKX's infrastructure was essential to the Swapper's functionality.  Without OKX, Phantom could not have routed trades, executed crypto swaps, or earned transaction fees from its users.  OKX enabled the backend logic, processed the trades, and returned pricing and transaction results to Phantom users—knowing full well that those users were executing unregistered commodity swaps through an unregulated intermediary.  In doing so, OKX played a central and indispensable role in facilitating Phantom's unlawful trading operations involving commodity tokens such as Wiener Doge.

### E.    Causation & Liability

206.    On or around January 20, 2025, a cybercriminal exploited vulnerabilities in Phantom's trading infrastructure and used the Swapper feature to execute a series of unauthorized

virtual currency swaps involving Plaintiff Liam Murphy's Wiener Doge tokens. Without Liam's knowledge or consent, the attacker accessed his Phantom wallet and initiated swaps that exchanged over $500,000 worth of Wiener Doge for Solana (SOL). These trades were initiated and completed within minutes, using the automated infrastructure provided by Phantom and the liquidity routing powered by OKX's DEX aggregator.

207.    The unauthorized nature of these transactions was made possible by Phantom's systemic failure to implement basic consumer protections and compliance protocols. Phantom lacked any form of user identity verification or Know-Your-Customer (KYC) screening. There were no real-time trade surveillance systems to detect anomalous activity or suspicious order patterns. There were no multi-factor authentication (MFA) systems, trade alerts, or human review layers to stop or freeze large-scale, high-risk token transfers. Nor did Phantom have any mechanism to verify the true origin of the trade or confirm that it was authorized by the account holder.

208.    This breach of security and trust was not an accident—it was the foreseeable consequence of Phantom's decision to operate its Swapper as an unregistered, unmonitored trading platform outside of the CEA's protective framework. Phantom's refusal to register as an IB allowed it to evade mandatory requirements such as customer verification, trade monitoring, and supervisory controls. OKX's active role in executing the unauthorized swaps made the attack possible. But for Phantom's illegal registration evasion and OKX's willing facilitation of the transactions through its DEX infrastructure, the cybercriminal would not have been able to liquidate Liam's tokens or exploit the platform to conduct this attack.

209.    The consequences of these unauthorized trades were devastating. The large-scale liquidation of Liam's holdings caused an immediate and catastrophic price collapse in the Wiener Doge token. The token's value dropped from $1 per token to $0.01, wiping out over 99% of its

total market capitalization. This market shock triggered cascading losses across all holders of the token. These losses were directly and proximately caused by the illegal and unregulated conduct of Phantom and OKX.

210.    Phantom has violated Section 4d of the Commodity Exchange Act, 7 U.S.C. § 6d, by acting as an unregistered Introducing Broker. It solicited and accepted swap orders from retail users, routed those trades through market makers and decentralized exchanges, and accepted transaction-based compensation for its role in executing such orders. Despite performing the core functions of an IB, Phantom never registered with the CFTC, nor did it adopt any of the regulatory safeguards required of registered intermediaries.

211.    OKX is equally liable under 7 U.S.C. § 13c(a) for aiding and abetting Phantom's regulatory violations. OKX knowingly provided the infrastructure, liquidity routing, and execution backend that powered the trades on Phantom's Swapper. It shared transaction revenue with Phantom, facilitated swaps involving U.S. consumers, and did so knowing that Phantom had failed to register or comply with any of the core protections imposed by the CEA.

212.    Plaintiffs are entitled to actual damages under 7 U.S.C. § 25(a), which creates a private right of action for any person who suffers financial harm as a result of violations of the CEA or its rules. The loss of over $500,000 in unauthorized swaps, coupled with the collapse of the token project that followed, satisfies both the statutory requirement of harm and the causal connection to the defendants' unlawful conduct.

213.    The ongoing refusal of both Phantom and OKX to register with the CFTC or to adopt the statutory safeguards that protect U.S. customers reveals a willful, calculated evasion of legal responsibilities. This is not a case of ambiguous rules or borderline compliance. Defendants

have openly built and operated a retail trading platform that replicates the functions of a regulated IB while intentionally operating outside the CEA's jurisdictional guardrails.

214.    These violations are not minor technicalities.  They go to the heart of the CEA's statutory mission: protecting consumers, ensuring market transparency, preventing fraud and manipulation, and establishing trust in the financial system.  When entities that facilitate commodity trading for millions of users refuse to register, they remove the very protections Congress and the CFTC deemed essential to modern commodity markets.

215.    Phantom's conduct reflects reckless disregard for the safety of its users' digital assets.  It built a powerful trading platform with no identity verification, no transaction surveillance, no escalation protocol for suspicious activity, and no recourse for users when their accounts are compromised.  It designed this infrastructure deliberately to avoid compliance and did so while profiting from the very trading activity that placed users at risk.

216.    OKX enabled and profited from this illegal infrastructure.  It used Phantom as a gateway to U.S. retail users, supplying liquidity, executing swaps, and monetizing user flow through backend incentives.  OKX's global infrastructure was the linchpin that made the unregistered Swapper functional.  In doing so, OKX acted as both a participant and a beneficiary of the unlawful conduct alleged herein.

217.    The partnership between Phantom and OKX was not incidental or passive.  It was commercial, coordinated, and carried out with mutual knowledge that Phantom was operating without registration or regulatory compliance.  Both parties saw financial opportunity in regulatory evasion. Both built business models that depended on circumventing the CEA.  Both must be held jointly and severally liable for the damage caused to Plaintiffs and the broader investing public.

### THIRD CAUSE OF ACTION

**Failure to Supervise, Commodities Fraud, & Regulatory Evasion
7 U.S.C. §§ 9(1), 25 & CFTC Rules 1.6(a), 42.2, 166.3, & 180.1
(Against Phantom & OKX)**

218.    Plaintiffs incorporate the preceding paragraphs.

219.    This claim arises under multiple provisions of the CEA and its implementing regulations.  Plaintiffs allege that Defendant Phantom engaged in (1) a persistent failure to supervise and monitor swap transactions in violation of 17 C.F.R. § 166.3 and 17 C.F.R. § 42.2, (2) fraudulent and deceptive conduct in violation of 7 U.S.C. § 9(1)[56] and 17 C.F.R. § 180.1,[57] and (3) willful

---

[56] 7 U.S.C. § 9(1) (Prohibition Regarding Manipulation and False Information) ("It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010, provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.").

[57] 17 C.F.R. § 180.1 (Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices) ("(a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or, (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate. Notwithstanding the foregoing, no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.").

evasion of the CEA's regulatory requirements in violation of 17 C.F.R. § 1.6(a).[58] Defendant OKX is jointly liable under 7 U.S.C. § 13c(a) for aiding and abetting these violations by materially assisting and profiting from Phantom's unlawful trading infrastructure.

220.    This claim seeks to hold Phantom and OKX accountable for their deliberate circumvention of core CEA protections and their reckless facilitation of criminal activity on an unregulated virtual commodity trading platform.  Through this claim, Plaintiffs seek actual damages under 7 U.S.C. § 25(a) for the theft and devaluation of their tokens, as well as an award of costs and any further relief the Court deems just and proper.

### A.    Failure to Supervise or Monitor Trading Platform (17 C.F.R. §§ 166.3 & 42.2)

221.    Phantom violated its legal duty to diligently supervise all activities relating to its business as a crypto trading intermediary. Specifically, Phantom failed to implement, maintain, or enforce any supervisory systems over the trading activity it facilitated through its Swapper feature. In doing so, Phantom operated in violation of its obligations under 17 C.F.R. § 166.3 and 17 C.F.R. § 42.2, both of which impose mandatory duties on firms that facilitate commodity swaps.

222.    17 C.F.R. § 166.3 requires all entities engaged in swap-related activities to "diligently supervise the handling by its partners, officers, employees, and agents" of all activities relating to their business.  This includes, but is not limited to, maintaining adequate internal controls, surveillance systems, designated compliance officers, and escalation procedures for suspect behavior.  Phantom failed to satisfy any of these requirements.  It had no supervisory structure, no

---

[58] 17 C.F.R. § 1.6(a) (Anti-evasion) ("It shall be unlawful to conduct activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade any provision of the Commodity Exchange Act as enacted by Subtitle A of the Wall Street Transparency and Accountability Act of 2010 or the rules, regulations, and orders of the Commission promulgated thereunder.").

compliance personnel, and no review processes to detect or respond to fraud, market manipulation, or unauthorized access.

223.    In parallel, 17 C.F.R. § 42.2 requires registered IBs to comply with all applicable provisions of the BSA and its implementing regulations.  These provisions mandate that all registrants implement a written CIP, KYC policies, AML protocols, and the ability to file SARs when illicit or unusual activity is detected. Phantom's app offered no such protections.  It allowed retail users to conduct high-value token swaps anonymously and without scrutiny.

224.    Phantom's willful failure to implement a CIP meant that it did not verify or record the identities of users executing swaps through its app.  Users could enter into substantial financial transactions—including conversions of hundreds of thousands of dollars in tokens—without providing any information beyond the possession of a private key.  This omission enabled impersonation, identity fraud, and the complete absence of accountability when unauthorized trades occurred.

225.    Phantom also willfully failed to adopt KYC controls.  KYC protocols serve as a cornerstone of financial regulation, ensuring that intermediaries can assess user risk, prevent fraud, and avoid onboarding sanctioned individuals or entities.  Phantom publicly advertised its refusal to conduct KYC as a feature, even celebrating it in marketing materials and user tweets, including its January 2025 repost stating that Phantom was "the most important consumer product in crypto this cycle" because it required "No KYC."  This public embrace of noncompliance underscores Phantom's willful disregard of its regulatory responsibilities.

226.    Additionally, Phantom lacked any internal AML policy or risk-control program.  AML requirements are designed to detect patterns of unusual or illegal trading activity, including layering, wash trading, and funds flowing from or to sanctioned jurisdictions.  Without these

controls, Phantom's Swapper operated as a black box—blind to the origin of funds, trade intent, and user behavior.

227.    Phantom also had no mechanism for detecting or filing SARs.  SARs are a crucial safeguard under the BSA regime, used to report red-flag transactions to the Financial Crimes Enforcement Network (FinCEN).  Phantom's systems were not equipped to detect suspicious behavior, much less escalate it to FinCEN or the CFTC.

228.    As a result of these failures, Phantom's Swapper allowed fully anonymous trading activity between unvetted users and global market makers.  It provided no protection to users whose wallets were compromised, and no safeguards to detect or block large-scale unauthorized trades.  This makes the platform a magnet for cybercriminals and a high-risk venue for asset swaps.

229.    Phantom's app did not maintain or employ any form of transaction surveillance or fraud prevention software.  The company did not monitor trading activity for manipulation, pricing anomalies, velocity spikes, or order spoofing—despite facilitating hundreds of millions of dollars in swap volume.  There was no real-time alerting, no trade review, and no flagging system to identify when a user's account was compromised or being accessed by an unauthorized party.

230.    These deficiencies constituted a clear violation of the CFTC's rules, which mandates that entities engaging in trading activity must diligently supervise all staff and systems under their control.  Phantom had no effective means to oversee the trading it facilitated or detect risks that could harm users like Plaintiffs.

231.    Likewise, Phantom's noncompliance with the CFTC's rules removed every statutory safeguard designed to prevent financial misconduct and consumer harm.  By refusing to implement KYC, AML, and CIP protocols, and by failing to prepare for SAR obligations, Phantom placed United States retail consumers in substantial danger of loss.

232.    These failures are not theoretical.  They led directly to the unauthorized $500,000 liquidation of Plaintiff Liam's Wiener Doge tokens.  The cybercriminal exploited Phantom's complete lack of supervision, impersonated Liam, executed trades through the Swapper, and exited without triggering a single alert, freeze, or review.

233.    But for Phantom's refusal to implement even the most basic supervisory controls, the unauthorized swap would have been detected and blocked.  Phantom's failures were not just negligent—they were the very conditions that enabled the theft, devaluation, and irreversible harm to Plaintiff and over 300 token holders.

### B.    Commodities Fraud (7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a))

234.    The Swapper itself was a "deceptive device" used to route unregistered, unsupervised swap transactions.

235.    Phantom made materially misleading public statements about the safety and reliability of its application, including explicit representations that it offered "best-in-class" security for user assets.  These statements appeared on Phantom's website, user documentation, promotional materials, and social media channels.  Phantom made these claims knowing they were false or misleading, intending to instill a false sense of safety and trust among users transacting through Phantom's Swapper.

236.    In reality, Phantom's browser-based wallet architecture relied on insecure local key storage systems, which cybersecurity experts have long considered vulnerable to phishing, remote access malware, and malicious browser extensions.  Phantom knew about these vulnerabilities— users had repeatedly reported stolen funds and unauthorized access over the prior year, and numerous researchers flagged design flaws in Phantom's browser extension.  Despite this, Phantom failed to disclose the full extent of these risks and continued to promote its browser extension as secure and enterprise-grade.

237.    At the same time, Phantom marketed its application primarily as a "wallet"—a term that evokes the image of a secure, self-custodied storage tool—when in fact the app functioned as a retail-facing crypto trading platform.  The app's Swapper feature embedded execution logic, pricing algorithms, order routing, and liquidity sourcing—all of which mirror the functionality of a regulated exchange.  By calling Swapper a "wallet feature" and not a trading venue, Phantom misrepresented the scope and nature of its operations to users and regulators alike.

238.    Phantom also failed to disclose a number of material facts regarding how its Swapper operated and how Phantom profited from user trades:

239.    _First_, Phantom concealed its commercial relationship with OKX, which provided execution, pricing, and liquidity routing to the Swapper platform.  Users believed they were executing swaps through a neutral protocol interface, but in fact, Phantom had integrated OKX's infrastructure and relied on it to facilitate all major trading pairs.

240.    _Second_, Phantom failed to disclose that it received compensation for each swap routed through its integrated exchange partners, including OKX.  These payments incentivized Phantom to promote certain tokens, drive trading volume, and extract spread-based revenue—all without regulatory disclosure or user consent.

241.    _Third_, Phantom did not inform users that swaps conducted via the app were non-reversible and final, even in cases of hacking or unauthorized access.  There was no legitimate dispute resolution process, no customer support escalation protocol, and no trade cancellation mechanism.  Once a swap was executed—even fraudulently—Phantom's infrastructure offered no means of redress.

242.    These material omissions and affirmative misstatements violated 7 U.S.C. § 9(1),[59] which prohibits the use of any manipulative or deceptive device or contrivance in connection with any swap or commodity transaction. Phantom's conduct also violated 17 C.F.R. § 180.1(a)(2)-(3),[60] which prohibit making misleading statements of material fact and engaging in practices that operate as a fraud or deceit upon any person in connection with any swap.

243.    These violations were part of a coordinated strategy to maximize trading volume and user growth while sidestepping CEA and CFTC oversight.  Phantom's mischaracterization of its trading functionality as a "wallet," its concealment of its commercial incentives, and its failure to warn users of known risks materially influenced user behavior and caused substantial harm to Plaintiffs and the broader investing public.

244.    In this context, the Swapper itself qualifies as a "deceptive device" under the CEA. It was designed and marketed as a simple and user-friendly wallet tool, but in reality, it routed unregistered and unsupervised swap transactions through Phantom's system while profiting from hidden commercial arrangements.  It lacked the transparency, oversight, and structural safeguards

---

[59] 7 U.S.C. § 9(1) (Prohibition Regarding Manipulation and False Information) ("It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010, provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.").

[60] 17 C.F.R. § 180.1(a)(2)-(3) (Prohibition on the employment, or attempted employment, of manipulative and deceptive devices) ("(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.").

required by law—thereby operating as a trapdoor for unsuspecting users like Plaintiff Liam, who lost over $500,000 worth of tokens in a single, unmonitored transaction.

245.    For these reasons, Phantom is liable for commodities fraud under the CEA. Its statements and omissions were made with intent, knowledge, or at minimum, reckless disregard for the truth. These misrepresentations caused real-world economic harm to Plaintiffs and undermined the integrity of the crypto markets the CEA was designed to protect.

### C.    Regulatory Evasion (17 C.F.R. § 1.6(a))

246.    Phantom deliberately structured its business operations to avoid the CEA, the jurisdiction of the CFTC, and the supervisory obligations imposed on SEFs and IBs.  Rather than comply with federal commodities laws, Phantom built an infrastructure designed to function as a trading platform in all but name—while hiding behind the regulatory ambiguity of a "wallet" provider.

247.    *First*, Phantom's platform enabled pseudonymous trading by design.  Users could download the app, generate wallet addresses, and immediately begin swapping virtual currencies—without ever verifying their identity, submitting documentation, or undergoing basic KYC checks.  The system was entirely self-contained and transactional anonymity was not a byproduct of technology—it was a deliberate architectural and commercial choice.  By avoiding user onboarding procedures that are standard for registered entities, Phantom created a closed environment where users could conduct high-volume, high-risk swaps without scrutiny.

248.    *Second*, Phantom knowingly refused to register with the CFTC under any legal category applicable to its conduct.  Despite operating as a trading platform, matching user orders to liquidity from market makers and decentralized exchanges, Phantom never registered as an SEF or IB.  Phantom leadership was fully aware of the registration requirements; the company's founders, legal counsel, and senior executives routinely engaged with the crypto regulatory space and understood the CEA's reach.  The decision not to register was strategic, not accidental—it was

based on an internal judgment that noncompliance would facilitate faster user growth, lower overhead, and greater revenue from unregulated trading.

249.    _Third_, Phantom actively mischaracterized its core functionality by calling itself a "wallet" rather than a trading platform.  Although the term "wallet" implies a passive storage utility, Phantom's app functioned as a vertically integrated exchange.  Through its Swapper, Phantom facilitated dynamic token-to-token conversions, routed trades to third-party exchanges, and embedded automated order execution inside the interface.  At all times, Phantom exerted control over pricing logic, trade routing, spread capture, and settlement.  But by branding itself as a "wallet," Phantom evaded the attention of federal regulators and created confusion about the true nature of its business.

250.    _Fourth_, Phantom intentionally avoided collecting any identifying user information.  In an industry where most trading platforms—centralized or decentralized—have begun adopting voluntary KYC and CIP standards, Phantom went in the opposite direction.  It emphasized its refusal to collect data as a competitive advantage.  Phantom explicitly promoted "no KYC" as a feature, not a limitation, and even reposted tweets from its users celebrating that fact.  This refusal to implement baseline compliance tools was not a technical oversight—it was a deliberate maneuver to remain outside the regulatory perimeter.

251.    These combined steps—pseudonymity, non-registration, functional mislabeling, and identity avoidance—constitute a pattern of regulatory evasion squarely within the prohibition set forth in 17 C.F.R. § 1.6. That rule makes it unlawful to structure entities or conduct trading activity in a way that willfully evades or attempts to evade the CEA or any CFTC rule or order. Phantom's design, business model, marketing, and operational policies were specifically intended to frustrate the application of U.S. commodity law.

252.    The CFTC has made clear that evasion includes not only offshore structuring, but also domestic software design choices that obscure trading activity or sidestep registration requirements. Phantom falls into precisely that category: it created a U.S.-based trading tool that operates across state lines via interstate commerce, facilitates the trading of commodities, and profits from retail swap execution, all while refusing to comply with statutory and regulatory safeguards.

253.    As a result, Phantom is liable for willfully evading the CEA.  By intentionally designing a system to fall outside the reach of United States law, Phantom exposed consumers to grave financial risk while shielding itself from transparency, oversight, and accountability.

### D.    OKX Aided & Abetted Phantom's CEA Obligations

254.    Defendant OKX knew that Phantom was engaging in commodity-related trading activity without registering with the CFTC and without implementing any of the regulatory safeguards required under the CEA.  OKX partnered with Phantom with actual knowledge that Phantom was not registered as an SEF or IB and that Phantom had no intention of pursuing registration.

255.    OKX also knew, or deliberately turned a blind eye to the fact, that Phantom lacked even the most rudimentary surveillance or compliance infrastructure.  OKX knew that Phantom did not maintain a supervisory system, had no customer identification process, and offered its Swapper platform to pseudonymous users without KYC, AML, or SAR protocols.  OKX was aware that Phantom's app permitted anonymous U.S. consumers to trade freely in digital assets classified as commodities under the CEA—without oversight, reporting, or enforcement.

256.    OKX was fully aware that trades routed through Phantom's Swapper were being executed against OKX's decentralized exchange infrastructure.  These trades occurred without user onboarding, without counterparty verification, and without risk controls.  OKX not only executed these swaps but also designed its system to allow Phantom users to access OKX liquidity without identity verification or transactional screening.  In effect, OKX operated as Phantom's

backend execution engine for retail-facing commodity swaps—knowing full well that these swaps were unregistered and unsupervised.

257.    OKX executed the unauthorized swaps that liquidated over $500,000 worth of Plaintiff Liam Murphy's Wiener Doge tokens.  These trades were processed through OKX's infrastructure, using routing logic and price feeds made available through the OKX DEX API.  OKX profited from the transactions by earning revenue tied to liquidity provisioning, trading volume, and order flow routed from Phantom's Swapper.  OKX's commercial incentives were aligned with Phantom's regulatory violations, and OKX knowingly facilitated the trades that caused the damage at the heart of this case.

258.    OKX publicly promoted its commercial partnership with Phantom.  On November 27, 2024, both companies issued statements confirming their integration, touting the expansion of crypto trading capabilities within the Phantom application.  OKX described the integration as a strategic milestone, highlighting the surge in user trades routed through its infrastructure and praising the performance of its decentralized exchange aggregator.  These public acknowledgments demonstrate that OKX was not merely a passive code provider—it was an active participant in the execution, growth, and monetization of the Swapper's illicit trading activity.

259.    OKX's actions constitute willful aiding and abetting under 7 U.S.C. § 13c(a), which imposes liability on any person who knowingly aids, abets, counsels, induces, or procures the commission of a violation of the CEA or any CFTC rule.  OKX substantially assisted Phantom's unregistered trading business while knowing, or recklessly disregarding, that the business was operating outside the legal boundaries established by federal commodities law.

260.    Without OKX's infrastructure, liquidity, and routing capabilities, Phantom's Swapper could not have functioned as an exchange.  OKX was the counterparty to these trades in all but

name. It executed the very transactions that violated the CEA.  As such, OKX is jointly and severally liable with Phantom for the harm inflicted on Plaintiffs and the violations of law alleged herein.

### E.    Causation & Liability

261.    Phantom and OKX's combined conduct—executing unregistered swaps through an unmonitored, unregulated, and deliberately opaque trading platform—directly enabled the unauthorized liquidation of over $500,000 worth of Plaintiff Liam Murphy's Wiener Doge tokens.  A cybercriminal, exploiting the complete lack of user authentication and transactional oversight in Phantom's Swapper, was able to access Liam's wallet, initiate swap orders, and execute trades without challenge, confirmation, or delay.  These trades were routed through OKX's DEX infrastructure, which processed the unauthorized swaps and returned SOL to the attacker.

262.    Because Phantom failed to implement even basic supervisory safeguards—including KYC, transaction monitoring, or suspicious activity detection—the platform had no mechanism to halt the swaps, freeze the wallet, or trigger fraud alerts.  Phantom's system not only failed to prevent the unauthorized trades; it enabled them.  The trades occurred inside an ecosystem intentionally designed to minimize regulatory friction and evade oversight—precisely the conditions prohibited under the CEA and CFTC rules.

263.    The unauthorized liquidation of Plaintiff's tokens triggered a catastrophic price collapse of the Wiener Doge token. Following the unauthorized swap, the token's market value fell by over 99%, dropping from approximately $1 per token to just $0.01.  This collapse was caused not by market volatility or investor sentiment, but by a sudden and massive selloff conducted by a cybercriminal acting through Phantom's Swapper, using OKX's liquidity infrastructure.

264.    The effects of the breach extended far beyond Plaintiff Liam Murphy.  At the time of the attack, over 300 holders owned Wiener Doge tokens, most of whom suffered immediate and

permanent losses in the value of their holdings. The unauthorized transactions caused reputational damage, loss of community trust, and the effective destruction of the token's viability as a project. The token's development roadmap, adoption potential, and commercial partnerships all became irreparably compromised.

265.    As a direct result of Defendants' conduct, Plaintiffs suffered actual damages in excess of $3.1 million. These damages include the loss of virtual currency, the destruction of project equity and goodwill, and the permanent impairment of the token's market price. Phantom and OKX are jointly and severally liable for these harms.

266.    Plaintiffs specifically seek compensation for: (1) the unauthorized swap of Liam's Wiener Doge tokens valued at $500,000 at the time of the incident; (2) the immediate and total devaluation of the remaining token supply held by the Plaintiffs; and (3) lost economic opportunities stemming from the destruction of the token's market, credibility, and growth potential. These losses were the foreseeable and proximate result of Defendants' decisions to operate outside the regulatory framework established to prevent precisely this kind of catastrophic harm.

## FOURTH CAUSE OF ACTION

**Negligence *Per Se*
23 NYCRR Part 500
(Against Phantom)**

267.    Plaintiffs incorporate the preceding paragraphs.

268.    This claim arises under New York's cybersecurity regulation, 23 NYCRR Part 500,[61] a binding framework promulgated by the New York Department of Financial Services ("DFS") to ensure that financial service providers implement robust, auditable cybersecurity

---

[61] 23 NYCRR Part 500 (Cybersecurity Requirements for Financial Services Companies).

programs.  These regulations are mandatory safeguards, enacted in recognition of the growing threat posed by cybercriminals and tailored to prevent the precise type of catastrophic harm that Plaintiffs suffered: the unauthorized access and liquidation of a New York resident's digital assets via a trading wallet application that failed to implement basic cybersecurity protocols.

269.    DFS made clear in its own rulemaking statement that "[c]ybercriminals can cause significant financial losses for DFS-regulated entities as well as for New York consumers whose private information may be revealed and/or stolen for illicit purposes." 23 NYCRR § 500.0.  These rules were adopted in response to a rising pattern of breaches, precisely like the one at issue in this case: where criminals exploit a digital service provider's failure to encrypt user keys, monitor app activity, or implement multi-factor authentication.  Here, Phantom—the developer of a crypto wallet and in-app trading platform with millions of users—failed to implement any of these mandated defenses, and a cybercriminal used that omission to empty Liam's account of hundreds of thousands of dollars in digital assets.

270.    New York's Part 500 regulations apply to any financial services company operating in New York or serving New York consumers, including virtual asset providers like Phantom.  Phantom, which holds and transmits crypto funds, stores private keys, processes user swaps, and collects transaction fees from both retail and institutional users, easily qualifies as a "covered entity."  Indeed, Phantom publicly markets itself as one of the biggest consumer financial platforms in the world and boasts about its users' wallets holding over $25 billion in assets across 15 million users—many of whom reside in New York.

271.    DFS has repeatedly issued enforcement actions and advisories warning fintech and virtual currency companies that operating in New York without appropriate cybersecurity safeguards will trigger liability under Part 500.  In enforcement guidance, DFS emphasizes that all

entities transmitting financial value or storing sensitive information for New York residents are expected to comply with Part 500—even if they operate under novel or decentralized business models.  Phantom's choice to ignore these public warnings, while simultaneously expanding its user base in New York, underscores its reckless disregard for regulatory compliance.

272.    23 NYCRR Part 500 is exactly the kind of safety regulation contemplated by the doctrine of negligence *per se*.  It does not delegate standards to private parties or call for flexible interpretation. It mandates concrete, auditable conduct—such as encryption, MFA, and written risk policies—and ties that conduct to consumer protection goals.  The specificity and mandatory nature of these obligations mean that a violation constitutes a *per se* breach of duty under New York law, as confirmed by New York courts applying this doctrine to similarly detailed safety regimes.

273.    Phantom publicly admits that it does not require names, emails, or phone numbers from users. Phantom stores private keys in unencrypted browser memory—a practice flagged as dangerous in its own 2021 and 2024 security audits.  Phantom offers no incident response, no customer redress, and no ability to reverse or flag unauthorized trades.  And Phantom actively misrepresented to users that its platform was "best-in-class" on security, despite knowing that it had never implemented even the most basic DFS-mandated protections.  These are not just design flaws; they are violations of clearly enumerated legal duties owed to consumers like Liam.

274.    This claim does not rest on a novel theory.  It relies on a straightforward application of the negligence *per se* doctrine to a defendant who: (1) is subject to cybersecurity regulations; (2) violated those regulations; (3) caused exactly the harm those rules were written to prevent; and (4) did so to a New York resident fully within the class protected by the statute.  Phantom's

violations substitute for the "duty" and "breach" elements of a standard negligence claim, leaving only causation and damages to be established—both of which are undisputed here.

275.    At its core, this case asks whether companies who store billions of dollars in consumer crypto assets should be allowed to operate without encryption, without risk monitoring, and without multi-factor authentication—all while marketing themselves as secure.  Phantom's statutory violations are the very reason a cybercriminal was able to gain access to Liam's Phantom wallet, execute unauthorized swaps, and destroy the market value of a once-thriving digital token project.

### A.    Regulatory Framework

276.    Phantom is a financial technology company that solicits New York consumers and facilitates financial transactions involving the custody and transmission of digital assets.

277.    By operating a platform that holds user assets, facilitates swaps, collects fees, and stores private keys—especially for New York residents—Phantom squarely falls within the scope of regulated entities under 23 NYCRR Part 500.

278.    Phantom advertised and targeted its services to New York consumers, including the lead Plaintiff, Liam, who resided in New York at the time of the cyberattack and used Phantom's platform.

279.    Phantom is a financial technology company that operates at the intersection of consumer finance and digital asset management.  It markets itself as an "all-in-one" crypto wallet and trading platform, offering users the ability to store, manage, and exchange digital assets from within a single application.  In performing these functions, Phantom engages in activities that mirror those of traditional financial institutions, including the custody of assets, facilitation of financial transactions, and provision of payment and exchange services—all of which are expressly regulated under New York's financial and cybersecurity laws.

280.    Phantom facilitates the custody and transmission of digital assets by storing users' private keys, executing virtual currency swaps, and routing trades through embedded APIs connected to exchanges like OKX.  Phantom collects transaction fees from both users and liquidity providers, stores nonpublic user data, and exerts control over the trade execution process. These are not merely passive software functions—they are core financial activities subject to oversight under 23 NYCRR Part 500.  The regulation's purpose is to ensure that any company holding or transmitting financial information or digital assets belonging to New York consumers adheres to minimum cybersecurity standards to prevent data breaches, fraud, and theft.  By offering services that involve the transmission of funds and the safeguarding of sensitive data, Phantom squarely qualifies as a "Covered Entity" under 23 NYCRR § 500.1(c).

281.    Phantom not only operates within this regulatory perimeter—it affirmatively and aggressively markets to New York residents.  Throughout 2024 and early 2025, Phantom conducted nationwide social media campaigns explicitly targeting New York users with advertisements encouraging them to "onboard" friends and family into crypto using Phantom's platform. Liam was a New York resident during the relevant period and used Phantom to store and manage his substantial holdings in Wiener Doge tokens.  He was among the U.S. and New York consumers solicited by Phantom and led to believe that Phantom's application offered a secure, regulated environment to store digital assets.  As such, Phantom's direct commercial engagement with New York consumers—combined with its financial functions and data-handling practices—firmly subjects it to the jurisdiction of 23 NYCRR Part 500.

282.    DFS regulations define a "Covered Entity" to include any organization "required to operate under a license, registration, charter, certificate, permit, accreditation or similar

authorization under the Banking Law, Insurance Law or Financial Services Law."[62]  Courts and DFS guidance interpret this broadly to include non-custodial financial applications that serve New York residents and facilitate financial transactions.  Even if Phantom is not formally licensed by DFS, its operations clearly fall within the functional scope: it transmits value, facilitates trading, processes fees, and stores private cryptographic material on behalf of users.  DFS's jurisdiction is functional, not formalistic—and Phantom's platform satisfies every functional indicator of regulatory applicability.

283.    DFS has long emphasized that its regulatory authority is based not on formality but on function.  Whether or not an entity is formally chartered under New York's banking laws is immaterial if it performs the core functions of a financial intermediary.  Phantom generates and stores private crypto wallet keys, executes swaps, earns revenue through transaction fees, and directly impacts the financial interests of New York consumers.  These functions fall squarely within DFS's cybersecurity regulatory framework.  DFS has made clear that if a platform performs regulated activities, it cannot use its technology label to evade oversight.

284.    Phantom may argue that it is not formally "licensed" by DFS, but the text and intent of 23 NYCRR Part 500 make clear that actual licensure is not required where the entity performs covered financial activities.  DFS has enforced Part 500 against entities operating in the virtual currency and fintech sectors without requiring formal chartering, provided they offer services to New York consumers.  Phantom's failure to seek registration or licensure cannot immunize it from

---

[62] *See* 23 NYCRR § 500.1(c) ("A Covered Entity may meet the requirement(s) of this Part by adopting the relevant and applicable provisions of a cybersecurity program maintained by an Affiliate, provided that such provisions satisfy the requirements of this Part, as applicable to the Covered Entity.").

the statute's requirements—it is the activity and consumer exposure, not the paperwork, that determine regulatory applicability.

285.    DFS has confirmed through guidance and enforcement activity that 23 NYCRR Part 500 applies to virtual currency platforms and fintech companies offering financial services to New York residents—even if those entities do not hold formal banking licenses. In past enforcement actions, DFS has applied Part 500 to non-bank entities that held or transmitted value on behalf of New York consumers.

**B.    Violations**

**1.    Failure to Maintain Risk-Based Cybersecurity Program**

286.    Phantom violated 23 NYCRR § 500.2[63] by failing to maintain a cybersecurity program based on a risk assessment designed to identify cybersecurity risks, protect users' funds from unauthorized access, detect cybersecurity events, respond to and recover from such events, and fulfill regulatory reporting obligations.

---

[63] 23 NYCRR § 500.2 (Cybersecurity Program) ("(a) Cybersecurity Program. Each Covered Entity shall maintain a cybersecurity program designed to protect the confidentiality, integrity and availability of the Covered Entity's Information Systems. (b) The cybersecurity program shall be based on the Covered Entity's Risk Assessment and designed to perform the following core cybersecurity functions: (1) identify and assess internal and external cybersecurity risks that may threaten the security or integrity of Nonpublic Information stored on the Covered Entity's Information Systems; (2) use defensive infrastructure and the implementation of policies and procedures to protect the Covered Entity's Information Systems, and the Nonpublic Information stored on those Information Systems, from unauthorized access, use or other malicious acts; (3) detect Cybersecurity Events; (4) respond to identified or detected Cybersecurity Events to mitigate any negative effects; (5) recover from Cybersecurity Events and restore normal operations and services; and (6) fulfill applicable regulatory reporting obligations. (c) A Covered Entity may meet the requirement(s) of this Part by adopting the relevant and applicable provisions of a cybersecurity program maintained by an Affiliate, provided that such provisions satisfy the requirements of this Part, as applicable to the Covered Entity. (d) All documentation and information relevant to the Covered Entity's cybersecurity program shall be made available to the superintendent upon request.").

287.    Phantom failed to implement a cybersecurity program that was reasonably de-signed, based on risk, to identify, detect, prevent, and respond to cybersecurity threats affecting its wallet-based trading platform.  This failure is especially egregious considering Phantom operates a high-volume consumer-facing application that stores private cryptographic keys and enables real-time cryptocurrency swaps—functions that inherently carry elevated cybersecurity risks.  Rather than designing its program around these known vulnerabilities, Phantom allowed sensitive user operations to proceed without any robust protections, violating the very purpose of § 500.2 and leaving users defenseless against sophisticated and foreseeable cyber threats.

## 2.    Failure to Maintain Risk-Based Cybersecurity Policies

288.    Phantom violated 23 NYCRR § 500.3[64] by failing to implement and maintain writ-ten cybersecurity policies approved by senior management or its governing body, specifically ne-glecting to establish adequate policies for protecting users' wallet keys and crypto funds from unauthorized access and cybersecurity breaches.  Phantom never adopted or enforced written cy-bersecurity policies that were reviewed or approved by its board or senior officers, as required by § 500.3.  These policies should have governed critical areas such as secure development of its browser extension, access management, incident response, and user data protection.  Instead,

---

[64] 23 NYCRR § 500.3 (Cybersecurity Policy) ("Cybersecurity Policy.  Each Covered Entity shall implement and maintain a written policy or policies, approved by a Senior Officer or the Covered Entity's board of directors (or an appropriate committee thereof) or equivalent governing body, setting forth the Covered Entity's policies and procedures for the protection of its Information Systems and Nonpublic Information stored on those Information Systems.  The cybersecurity pol-icy shall be based on the Covered Entity's Risk Assessment and address the following areas to the extent applicable to the Covered Entity's operations: (a) information security; (b) data governance and classification; (c) asset inventory and device management; (d) access controls and identity management; (e) business continuity and disaster recovery planning and resources; (f) systems operations and availability concerns; (g) systems and network security; (h) systems and network monitoring; (i) systems and application development and quality assurance; (j) physical security and environmental controls; (k) customer data privacy; (l) vendor and Third Party Service Provider management; (m) risk assessment; and (n) incident response.").

Phantom's architecture developed without institutional oversight or a framework of accountability, and its failure to adopt policies for internal system security directly contributed to the theft of Plaintiff's private keys and tokens.

### 3. Failure to Monitor & Test Cyber Defenses

289.    Phantom violated 23 NYCRR § 500.5[65] by failing to monitor and test its cybersecurity program to address publicly known cybersecurity vulnerabilities.  Phantom failed to perform continuous monitoring or periodic vulnerability testing of its systems, including its browser extension, despite the well-known and documented risk of in-memory key theft.  Phantom was on notice, as early as 2021, from security audits that flagged local key storage as a medium-risk vector. Yet, Phantom did not remediate or test its defenses for evolving exploits.  This ongoing neglect violated § 500.5 and directly enabled the January 20, 2025 attack.

### 4. Failure to Maintain Audit Trails

290.    Phantom violated 23 NYCRR § 500.6[66] by failing to conduct "audit trails designed to detect and respond to" cybersecurity events.  Phantom failed to establish and maintain audit

---

[65] 23 NYCRR § 500.5 (Penetration Testing and Vulnerability Assessments) ("The cybersecurity program for each Covered Entity shall include monitoring and testing, developed in accordance with the Covered Entity's Risk Assessment, designed to assess the effectiveness of the Covered Entity's cybersecurity program.  The monitoring and testing shall include continuous monitoring or periodic Penetration Testing and vulnerability assessments.  Absent effective continuous monitoring, or other systems to detect, on an ongoing basis, changes in Information Systems that may create or indicate vulnerabilities, Covered Entities shall conduct: (a) annual Penetration Testing of the Covered Entity's Information Systems determined each given year based on relevant identified risks in accordance with the Risk Assessment; and (b) bi-annual vulnerability assessments, including any systematic scans or reviews of Information Systems reasonably designed to identify publicly known cybersecurity vulnerabilities in the Covered Entity's Information Systems based on the Risk Assessment.").

[66] 23 NYCRR § 500.6 (Audit Trail) ("(a) Each Covered Entity shall securely maintain systems that, to the extent applicable and based on its Risk Assessment: (1) are designed to reconstruct material financial transactions sufficient to support normal operations and obligations of the Covered Entity; and (2) include audit trails designed to detect and respond to Cybersecurity Events

trails sufficient to reconstruct material financial events or detect cybersecurity breaches.  The un-authorized swaps that liquidated Liam's tokens proceeded without any internal alerts, red flags, or ability for Phantom to trace in real time that a criminal actor had taken over a customer's wallet. A properly implemented audit trail system would have identified anomalous swap behavior, in-cluding large token sales with immediate price impact, and would have allowed Phantom to detect and prevent the attack in progress.

### 5.        Failure to Implement Multi-Factor Authentication

291.    Phantom violated 23 NYCRR § 500.12[67] by failing to implement multi-factor au-thentication or equivalent effective security controls, thereby allowing unauthorized access and facilitating the criminal theft of users' crypto funds.  Phantom failed to implement MFA or any reasonably equivalent control, in violation of § 500.12.  Once a cybercriminal imported Liam's private key into a new Phantom instance, there were no identity checks, device fingerprints, pass-word prompts, or other barriers to prevent access.  Phantom did not require a second authentication factor for withdrawals, swaps, or high-value transactions.  As a result, the attacker was able to liquidate over $500,000 in user assets with impunity and without detection.

---

that have a reasonable likelihood of materially harming any material part of the normal operations of the Covered Entity.  (b) Each Covered Entity shall maintain records required by paragraph (a)(1) of this section for not fewer than five years and shall maintain records required by paragraph (a)(2) of this section for not fewer than three years.").

[67] 23 NYCRR § 500.12 (Multi-Factor Authentication) ("(a) Multi-Factor Authentication. Based on its Risk Assessment, each Covered Entity shall use effective controls, which may include Multi-Factor Authentication or Risk-Based Authentication, to protect against unauthorized access to Nonpublic Information or Information Systems.  (b) Multi-Factor Authentication shall be utilized for any individual accessing the Covered Entity's internal networks from an external network, unless the Covered Entity's CISO has approved in writing the use of reasonably equivalent or more secure access controls.").

### 6.    Failure to Monitor User Behavior for Red Flags

292.    Phantom violated 23 NYCRR § 500.14[68] by failing to "implement risk-based poli-cies, procedures, and controls designed to monitor the activity" of its platform application.  Phan-tom did not implement automated systems to detect suspicious behavior within its platform, such as account takeovers, impersonation, large volume swaps, or repeated attempts to drain new wal-lets.  Its failure to monitor internal user activity—required under § 500.14—meant that criminal actors could exploit its system without fear of being detected or stopped.  These oversight failures allowed the attacker to move across multiple wallets, access large token balances, and complete a sequence of high-risk transactions in under five minutes.

### 7.    Failure to Encrypt Private Key

293.    Phantom violated 23 NYCRR § 500.15[69] by failing to implement effective encryp-tion or approved compensating controls to secure users' private keys from unauthorized access, resulting in the theft of users' crypto funds by cybercriminals.  Phantom specifically failed to

---

[68] 23 NYCRR § 500.14 (Training and Monitoring) ("As part of its cybersecurity program, each Covered Entity shall: (a) implement risk-based policies, procedures and controls designed to mon-itor the activity of Authorized Users and detect unauthorized access or use of, or tampering with, Nonpublic Information by such Authorized Users; and (b) provide regular cybersecurity awareness training for all personnel that is updated to reflect risks identified by the Covered Entity in its Risk Assessment.").

[69] 23 NYCRR § 500.15 (Encryption of Nonpublic Information) ("(a) As part of its cybersecurity program, based on its Risk Assessment, each Covered Entity shall implement controls, including encryption, to protect Nonpublic Information held or transmitted by the Covered Entity both in transit over external networks and at rest.  (1) To the extent a Covered Entity determines that encryption of Nonpublic Information in transit over external networks is infeasible, the Covered Entity may instead secure such Nonpublic Information using effective alternative compensating controls reviewed and approved by the Covered Entity's CISO. (2) To the extent a Covered Entity determines that encryption of Nonpublic Information at rest is infeasible, the Covered Entity may instead secure such Nonpublic Information using effective alternative compensating controls re-viewed and approved by the Covered Entity's CISO.  (b) To the extent that a Covered Entity is utilizing compensating controls under (a) above, the feasibility of encryption and effectiveness of the compensating controls shall be reviewed by the CISO at least annually.").

encrypt private keys stored in users' web browsers, leaving them accessible to cybercriminals. Phantom failed to encrypt private keys at rest or in browser memory, which enabled the attacker to scrape Liam's wallet credentials from his computer's volatile memory using standard malware. This was a direct violation of § 500.15, which mandates encryption of sensitive information both at rest and in transit. Phantom knew that local key storage in browser extensions was vulnerable to memory attacks, but it made no meaningful effort to mitigate the risk—even though it continued to promote its browser wallet as "safe" and "best-in-class."

### 8.    Failure to Establish Incident Response Plan

294.    Phantom violated 23 NYCRR § 500.16[70] by failing to establish and implement an effective incident response plan capable of promptly responding to cybersecurity breaches, including adequate internal and external communication, documentation, reporting, and remediation of identified weaknesses. Phantom failed to develop or implement an incident response plan capable of promptly responding to cybersecurity events. After the attack, Phantom did not notify affected users, regulators, or law enforcement. It offered no substantive support to the victim, Liam, despite receiving a direct report within hours of the breach. It made no effort to freeze related assets, investigate the breach internally, or notify downstream partners such as OKX. Phantom also failed

---

[70] 23 NYCRR § 500.16 (Incident Response Plan) ("(a) As part of its cybersecurity program, each Covered Entity shall establish a written incident response plan designed to promptly respond to, and recover from, any Cybersecurity Event materially affecting the confidentiality, integrity or availability of the Covered Entity's Information Systems or the continuing functionality of any aspect of the Covered Entity's business or operations.  (b) Such incident response plan shall address the following areas: (1) the internal processes for responding to a Cybersecurity Event; (2) the goals of the incident response plan; (3) the definition of clear roles, responsibilities and levels of decision-making authority; (4) external and internal communications and information sharing; (5) identification of requirements for the remediation of any identified weaknesses in Information Systems and associated controls; (6) documentation and reporting regarding Cybersecurity Events and related incident response activities; and (7) the evaluation and revision as necessary of the incident response plan following a Cybersecurity Event.").

to assist with the ongoing law enforcement efforts to catch the cybercriminal. This total absence of post-breach infrastructure is a direct violation of § 500.16 and demonstrates a reckless disregard for consumer protection and legal compliance.

295. Phantom also violated 23 NYCRR § 500.17(a)[71] by failing to notify the Department of Financial Services within 72 hours of the cybersecurity event. This provision requires covered entities to report material cybersecurity incidents involving unauthorized access to sensitive data. Despite the breach resulting in the theft of over $500,000 in digital assets belonging to a New York resident, Phantom failed to notify DFS, users, or law enforcement. This omission deprived regulators of the opportunity to investigate or mitigate the breach and confirms that Phantom had no effective compliance plan in place.

### C.    Proximate Causation & Liability

296. The unauthorized liquidation of Liam Murphy's crypto holdings was not an unforeseeable, isolated event—it was the direct and predictable consequence of Phantom's failure to comply with mandatory cybersecurity requirements under 23 NYCRR Part 500. These violations removed the guardrails that the New York DFS established specifically to prevent the kind of cyberattack that occurred here. Had Phantom taken even basic steps required by law, the attacker would have encountered barriers that would have stopped or disrupted the theft.

297. The method of attack used by the cybercriminal—a memory scraping malware that extracted Liam's decrypted private key from his browser—was not novel or sophisticated. This

---

[71] 23 NYCRR § 500.17(a) (Notices to Superintendent) ("Notice of Cybersecurity Event. Each Covered Entity shall notify the superintendent as promptly as possible but in no event later than 72 hours from a determination that a Cybersecurity Event has occurred that is either of the following: (1) Cybersecurity Events impacting the Covered Entity of which notice is required to be provided to any government body, self-regulatory agency or any other supervisory body; or (2) Cybersecurity Events that have a reasonable likelihood of materially harming any material part of the normal operation(s) of the Covered Entity.").

type of key extraction exploit had been widely documented in cybersecurity literature and was specifically flagged in Phantom's own 2021 Kudelski audit and 2024 Least Authority audit. In both instances, Phantom was warned that storing sensitive wallet data in local or in-memory browser storage posed serious risks. Despite receiving these warnings, Phantom knowingly accepted the risk and did not redesign its architecture or implement compensating security controls.

298.    Rather than respond responsibly to known vulnerabilities, Phantom chose to ignore expert recommendations and continued operating without basic protections like MFA, secure encryption of keys, or real-time monitoring of suspicious transactions. Worse still, Phantom publicly marketed its platform as "safe," "secure," and "private by design"—despite having internal knowledge that its browser-based key storage model was vulnerable to precisely the kind of attack that ultimately occurred. This conduct rises to the level of recklessness, as Phantom chose to protect its onboarding metrics and market image at the expense of user safety.

299.    Had Phantom complied with even a single one of the cybersecurity requirements outlined in Part 500—such as encrypting private keys, requiring MFA for critical functions, performing ongoing risk assessments, or maintaining an incident response plan—the attack on Liam would likely have been prevented or, at minimum, detected and stopped before the damage became catastrophic. The failure was not technical—it was systemic, policy-driven, and rooted in Phantom's conscious decision to prioritize convenience and user growth over regulatory compliance and consumer protection.

300.    Each specific violation of Part 500 alleged above contributed to the chain of events that enabled the unauthorized liquidation of Liam's digital assets. The lack of multi-factor authentication allowed account access; the absence of audit trails allowed the attacker to execute swaps undetected; the failure to encrypt keys enabled malware to extract them; and the lack of incident

response protocols allowed the attack to unfold without intervention.  These are not speculative linkages—they are direct consequences of omitted safeguards that Phantom was legally required to implement.  Under the doctrine of negligence *per se*, these statutory breaches substitute for the elements of duty and breach, leaving only causation and damages, both of which are satisfied here as a matter of law.

301.    Each regulatory failure by Phantom played a distinct and indispensable role in the January 2025 cyberattacks.  Phantom's failure to implement MFA enabled the attacker to access the wallet using only the private key.  Its failure to encrypt that key allowed it to be extracted by malware.  Its lack of audit trails ensured the exploit went undetected in real time.  Its absence of user transaction monitoring and incident response ensured the attacker completed the liquidation without triggering internal alerts or external notifications.  These omissions were not peripheral— they were the exact gaps that enabled, facilitated, and compounded the harm.

302.    Plaintiffs fall squarely within the class of persons that the DFS regulations were designed to protect.  The regulatory scheme under 23 NYCRR Part 500 is expressly aimed at safeguarding New York residents who use financial services platforms.  As a New York resident, Liam—and others similarly situated—was among the primary intended beneficiaries of these protections.  Phantom solicited, onboarded, and serviced New York users, and its failure to implement required security measures foreseeably harmed those very individuals the law was crafted to protect.  The statutory framework was enacted precisely to ensure that companies like Phantom did not exploit regulatory loopholes to operate insecure, consumer-facing platforms without accountability.

303.    The harm suffered—unauthorized access, exploitation of private keys, and criminal liquidation of digital assets—is exactly the type of injury 23 NYCRR Part 500 is designed to

prevent.  The regulatory text, DFS commentary, and enforcement guidance make clear that the Part 500 rules were enacted in direct response to the rising threat of cybercriminals exploiting software vulnerabilities in financial platforms.  The core objective of the regulation is to prevent precisely this scenario: a third-party actor exploiting architectural weaknesses in a digital wallet to siphon off customer assets undetected.  Phantom's failure to encrypt keys, enable MFA, or monitor transactions directly enabled the exploit that caused Plaintiffs' financial loss, demonstrating the exact causal chain the regulation was intended to break.

304.     Because these statutory breaches directly resulted in the precise harm the statute aims to prevent, Phantom's liability is automatically established under the doctrine of negligence *per se*.  In New York, when a plaintiff demonstrates that a defendant violated a safety statute, that the statute was designed to protect a class that includes the plaintiff, and that the violation caused the harm the statute was intended to prevent, the breach element of negligence is conclusively established.  There is no need to prove the ordinary "reasonable care" standard, as the law has already articulated what reasonable cybersecurity looks like in this context.  Phantom's failure to meet these minimum statutory requirements—despite internal warnings, regulatory clarity, and repeated opportunities—renders it liable for the harm suffered by Plaintiffs without further inquiry into its subjective intent or general prudence.

## FIFTH CAUSE OF ACTION

### Gross Negligence
### (Against Phantom)

305.    Plaintiffs incorporate the preceding paragraphs.

306.    Phantom did not simply fail to prevent a cybersecurity breach.  Phantom built and scaled an entire financial platform in a manner that invited and enabled criminal exploitation—and it did so with full knowledge of the risks.  It designed a consumer-facing crypto wallet that stored users' private keys in exposed browser memory, lacked basic encryption, required no multi-factor authentication, and imposed no transaction surveillance or fraud detection—then handed that tool to millions of unsuspecting users, many of them new to crypto.

307.    This wasn't a one-off mistake.  It was a business model.  Phantom knew that its design left users completely defenseless against account takeovers, yet it made a conscious choice to prioritize speed, convenience, and growth over safety and control.  Even after internal audits, external security reports, and a growing number of users reporting "wallet drains," Phantom did nothing.  It didn't fix the problem.  It didn't warn its users.  It didn't implement safeguards.  It didn't act like a financial institution.  It acted like a tech startup trying to boost engagement metrics—regardless of the cost.

308.    And that cost was catastrophic.  A cybercriminal exploited Phantom's design flaws to steal over $500,000 in digital assets from Liam—tokens that were integral to a million-dollar project he built.  The theft destroyed over $1 million in market value in minutes, collapsed a thriving crypto community, and permanently tarnished Liam's professional reputation.  Worse still, Phantom offered no help.

309.    Phantom's app wasn't breached because it was unlucky.  It was breached because it was designed to be breached.  It offered criminals a perfect tool: anonymous access, no identity

checks, no monitoring, and full trading functionality—combined with unencrypted private keys stored right in browser memory. This wasn't negligence. It was reckless disregard.

310.    Under New York law, gross negligence exists when a defendant demonstrates a conscious indifference to known and foreseeable risks—when it knows what could go wrong, chooses not to fix it, and watches as the harm unfolds. That is exactly what happened here. Phantom's leaders knew about the threat. They knew the architectural vulnerability. They were warned by cybersecurity experts. They ignored user complaints. And still, they did nothing—until it was too late.

311.    This case is about more than lost crypto. It's about a platform that helped cyber-criminals thrive. And it's about a company that claimed to protect its users, while quietly enabling the very attacks that ruined them.

## A.    Legal Standard & Duty of Care

312.    Under New York law, gross negligence is defined as conduct that evinces a reckless disregard for the rights or safety of others. It goes beyond mere inadvertence or mistake and constitutes a failure to exercise even slight care in circumstances where the risk of harm is obvious, severe, and preventable.

313.    Phantom is not a niche software startup—it is a $3 billion consumer financial platform that has onboarded millions of novice users and publicly declared its ambition to "replace traditional finance." With that scale and promise comes a heightened duty to implement and maintain baseline protections for user funds, including those required by statute, regulation, and basic cybersecurity hygiene.

314.    Despite publicly promoting "best-in-class" security, Phantom designed and operated its crypto wallet as a vulnerable hot wallet—always connected to the internet, lacking proper encryption protocols, and devoid of multifactor authentication. The application stored users'

private keys in browser memory, exposing those keys to browser-based malware and phishing attacks that were both well-documented and fully foreseeable.

315.    At the same time, Phantom refused to collect identifying information from users and did not implement any transactional monitoring whatsoever.  It created a digital environment where anyone with access to a private key—legitimately or not—could swap or send funds instantly, without detection, review, or red-flag escalation.  It functioned not as a wallet, but as a trade platform without brakes.

316.    This design choice became even more dangerous when Phantom partnered with OKX, a foreign crypto exchange later revealed to have laundered billions in suspicious transactions.  Through this integration, Phantom routed user swaps across expanded decentralized exchanges and liquidity providers—without adding a single compliance safeguard, KYC check, or anti-fraud protocol.

317.    Worse still, Phantom explicitly marketed its platform to unsophisticated users—encouraging the onboarding of "your friends, family, even your grandparents" to trade meme coins through its Swapper.  It promoted a culture of casual trading while knowing the risks were anything but casual.

318.    The result is that Phantom knowingly built, scaled, and monetized a financial infrastructure that was uniquely attractive to cybercriminals.  And cybercriminals have taken full advantage: the hacker who drained Liam's wallet remains active, conducting the same exploit on other Phantom users to this day, with Phantom failing to meaningfully intervene or warn its users.

319.    Taken together, this pattern of conduct—soliciting novices, storing sensitive keys in unprotected memory, refusing to monitor transactions, allowing anonymous access, routing swaps through foreign exchanges, and lying about security features—goes well beyond

negligence.  It is gross negligence, and it speaks to a systemic, reckless indifference to the safety

of Phantom's users.

**B.    Phantom's Recklessness**

320.    Phantom acted with gross negligence by failing to implement even the most basic

cybersecurity protections required for any financial platform—let alone one trusted by millions to

store and trade high-value digital assets.  These failures include:

a.    Storing users' private keys in unencrypted browser memory despite multiple security audits warning that this practice posed a serious risk of in-memory key extraction.

b.    Failing to implement multi-factor authentication (MFA) or any equivalent safeguard to verify user identity, even for high-value or outbound transactions.

c.    Operating without transactional safeguards such as slippage limits, account behavior profiling, velocity checks, or fraud detection systems.

d.    Ignoring security audits, user complaints, and real-world breaches that confirmed these vulnerabilities were being actively exploited.

e.    Failing to register with the CEA and violating the statutory security obligations required under U.S. law for SEFs, Swap Dealers, and IBs.

321.    Phantom compounded these failures by misrepresenting its platform as "safe," "se-

cure," and "best-in-class"—actively marketing itself as a safer alternative to centralized ex-

changes.  This was a conscious decision to prioritize user growth, trading volume, and market

positioning over meaningful investment in user safety or platform integrity.  In effect, Phantom

operated an unregistered trading platform dressed in the clothing of a self-custody wallet, without

the regulatory infrastructure or protective features necessary to secure customer assets.

322.    Phantom was not operating in ignorance.  Its own internal communications and

public blog posts acknowledged that most users were new to cryptocurrency and that phishing

attacks, malware, and social engineering exploits were escalating threats.  Phantom's October 2021

blog post stated plainly that many users were "operating with blockchain-based applications for the very first time" and that "education can only go so far" in preventing attacks against novice users.

323.    Despite this knowledge, Phantom deliberately chose not to act to protect its users. Discovery will show that Phantom received hundreds of complaints from users who reported that their wallets had been "drained" under suspicious circumstances—often involving malware, phishing links, or compromised devices.  Yet Phantom never redesigned its key storage model, never introduced multi-factor authentication, and never implemented compensating security controls such as behavioral monitoring, identity checks, or transaction review queues.

324.    Phantom's failure to act cannot be explained by technical limitations or oversight. It was a business decision to disregard these foreseeable risks in order to preserve the app's "frictionless" user experience and to maximize the number of trades completed through Phantom's Swapper—trades from which Phantom profited.  This was not simple negligence; it was the calculated avoidance of responsibility in the face of mounting evidence that users were being targeted, exploited, and financially devastated.

325.    Compounding this recklessness is the fact that the same criminal actor who drained Liam's wallets remains active on Phantom to this day, executing the same exploit against other users.  Phantom has neither warned users nor attempted to shut down the criminal operation, despite the activity being visible on-chain.  Phantom has made no meaningful attempt to identify the attacker, assist law enforcement, or notify its user base of the ongoing threat—demonstrating a complete abandonment of its basic duties to users.

326.    Critically, the very same attacker who hacked Liam—and other cybercriminals using the same method—continue to exploit Phantom's security flaws today.  Hackers are actively

draining wallets through Phantom's application on a near-daily basis, taking advantage of the company's refusal to encrypt keys, monitor red-flag activity, or assist victims. Despite this known and ongoing harm to users, Phantom continues to operate its platform without fixing the core vulnerabilities exploited by cybercriminals.

### C.    Phantom's Gross Negligence

327.    Phantom's gross negligence manifests in three distinct but deeply interrelated categories, each representing a systemic failure to fulfill its legal, operational, and ethical duties to users. These failures—(1) cybersecurity defenses, (2) transactional safeguards, and (3) breach response—together constitute a pattern of reckless disregard for the rights and safety of consumers. The resulting harm was not just foreseeable—it was inevitable.

#### 1.    Inadequate Cybersecurity Defenses

328.    Phantom's most fundamental obligation as a self-described financial services platform was to secure the private keys it generated, stored, and managed on behalf of its users. Yet Phantom willfully adopted—and publicly defended—an architecture that placed those keys in the most vulnerable location imaginable: the unencrypted memory of a user's web browser.

329.    Key storage in browser memory is among the riskiest known practices in the digital asset ecosystem. It exposes private keys to in-memory scraping malware and malicious extensions, both of which have long been known vectors of attack. Despite being warned of this exact vulnerability, Phantom chose to "accept" the risk rather than fix it.

330.    Phantom's failure to implement multi-factor authentication (MFA) or any equivalent control further demonstrates its reckless indifference. MFA is a basic, industry-standard protection employed by nearly all regulated financial institutions. Without MFA, a cybercriminal with a stolen private key—or access to the local memory where it's temporarily decrypted—can

immediately access the user's wallet and execute irreversible transactions without so much as a second verification step.  Phantom knew this and chose to ignore it.

331.    Phantom lacked any meaningful risk-based cybersecurity program.  It conducted no documented risk assessments, had no internal threat modeling adapted to the evolving Solana ecosystem, and implemented no compensating controls to mitigate architectural weaknesses. These omissions are especially egregious given the company's knowledge that it was serving millions of novice crypto users, many of whom were prime targets for phishing, malware, and social engineering attacks.  Phantom didn't simply fail to foresee a risk—it stared directly at it, acknowledged it, and decided to do nothing.

## 2.    Inadequate Transaction Safeguards

332.    Phantom's Swapper was not a neutral, user-directed tool—it was a profit-generating engine, embedded into the app, marketed heavily on social media, and used by millions of users to conduct real-time trades.  Yet Phantom implemented no mechanisms to detect or halt suspicious or malicious activity on this trading interface.

333.    Phantom enabled "auto-slippage," a feature that allows swaps to go through even when the price impact is extreme or unpredictable.  There were no warnings to users about how much value they might lose in a volatile market, and no real-time prompts alerting them to outlier behavior.  As a result, cybercriminals could execute massive price-impacting trades immediately, without any obstacles, draining entire liquidity pools, without triggering any internal alarms.

334.    Phantom failed to monitor for suspicious activity such as rapid liquidations of obscure tokens, multi-wallet draining patterns, or transactions matching the known behaviors of previously identified cybercriminals.  Despite the attack on Liam being traceable on-chain, no human or automated review flagged the behavior as anomalous, even as it wiped out over $3 million in market value.

335.    Phantom did not design the Swapper to distinguish legitimate trading from exploitative behavior.  The platform processed large and obviously suspicious trades with no safeguards, red flags, or reversal mechanisms.  It did not require verification for high-volume or high-value trades, and it permitted pseudonymous actors—including known attackers—to use the Swapper freely.

### 3.    Inadequate Breach Response

336.    Even after the attack occurred, Phantom failed to act in a manner remotely consistent with its obligations or representations.  Its post-breach response was defined by silence, evasion, and continued misrepresentation.

337.    Phantom offered no meaningful support to victims.  Despite receiving real-time notice from Liam—within hours of the breach—and numerous public messages across social media, Phantom provided no direct assistance, no guidance on asset recovery, and no plan for remediation.  Its only reply was a canned customer support message disavowing all responsibility.

338.    Phantom refused to cooperate with law enforcement.  Even after a police report was filed, Phantom did not engage with the NYPD or federal agencies to assist in tracking the attacker.  It did not freeze associated wallets, flag malicious actors, or provide transaction data that could have assisted in recovery or deterrence.

339.    Phantom misled users before and after the breach.  It continued to represent its product as "best-in-class" and "private by design," with "industry-leading security," despite knowing internally that the platform lacked basic encryption, identity verification, or incident response planning.  Worse still, Phantom failed to notify other users of the exploit—despite clear evidence that the same attacker remained active and continued draining wallets using the same method.

340.    By failing to support victims, failing to notify regulators, and failing to acknowledge the active threat targeting its user base, Phantom made clear that user safety was not part of its business model.

### D.    Causation & Harm

341.    Phantom's gross negligence was not just a contributing factor—it was the direct and proximate cause of the unauthorized liquidation of Liam's Wiener Doge tokens.  The attack was not a fluke, nor was it the result of an unforeseeable or novel technique.  It was the predictable and preventable consequence of Phantom's systemic refusal to implement even the most basic cybersecurity protections—protections that any responsible financial services company would treat as foundational.

342.    Had Phantom encrypted the private keys stored in browser memory, the malware that extracted Liam's key would have yielded only unusable ciphertext.  The criminal would not have been able to import the key into their own Phantom wallet and gain full access to Liam's accounts.

343.    Had Phantom implemented MFA, the criminal—even with Liam's private key—would have been unable to access his wallet or authorize swaps without passing a second authentication check, such as a time-based passcode, biometric verification, or hardware device confirmation.  No such check was required.

344.    Had Phantom deployed transaction monitoring systems to flag suspicious or anomalous behavior—such as the draining of multiple wallets in under five minutes, swaps of obscure tokens for below-market rates, or massive slippage transactions targeting a low-liquidity asset like Wiener Doge—the platform could have paused, flagged, or halted the trades before permanent harm occurred.  Instead, the Swapper processed every one of the criminal's trades automatically, collecting fees for Phantom in the process.

345.    Phantom's gross negligence caused $3.1 million worth of financial harm here.  The value of each of the 1,000,000 Wiener Doge tokens one week before the cyberattack was $3.10. On the day of the cyberattack, January 20, 2025, each of the 1,000,000 tokens were worth over $1. But for the cyberattack, Wiener Doge would have continued to grow in value to at least a $3.1 million market cap, or $3.10 per token.

346.    As his first cryptocurrency project, Liam valued his Wiener Doge tokens uniquely as property and claimed publicly that believed that each token would be worth $100 someday.

347.    This economic harm was devastating—but it was only part of the damage.

348.    Liam's public identity was intertwined with Wiener Doge.  As a lawyer known for advocating consumer protection and financial transparency, Liam had launched the project to build a fun, stable, and ethical alternative to meme coins driven by hype and fraud.  The unauthorized liquidation triggered widespread panic and gave rise to the false but widespread perception that Liam had "rug pulled" his own community—a stigma that carries severe reputational consequences in the cryptocurrency world.

349.    Within hours of the breach, Liam received death threats, hate mail, and public accusations of fraud.  The emotional toll was profound—Liam suffered anxiety, insomnia, and isolation.  His professional reputation, which he had spent over a decade building as a white-collar lawyer was irreparably tarnished.

350.    This reputational destruction was not speculative—it was a direct byproduct of Phantom's failure to secure its platform, detect the attack in real-time, or assist in its aftermath. Phantom's negligence created the conditions for the breach, enabled its execution, and then allowed the criminal actor to vanish without consequence.  Worse, the same criminal continues to exploit Phantom's platform to this day, draining other users' wallets using the same attack vector.

351.     This was not just a security failure.  It was a platform-wide collapse of duty—a failure to protect, a failure to supervise, a failure to respond. And its consequences were devastating: financial ruin, reputational destruction, and profound emotional harm—all directly traceable to Phantom's gross negligence.

352.     Phantom's reckless disregard for basic cybersecurity standards did more than facilitate a digital theft—it destroyed the professional reputation of a lawyer and entrepreneur who had spent over a decade cultivating trust, credibility, and a public-facing identity rooted in integrity. Liam Murphy, the lead Plaintiff, is not a faceless crypto trader or anonymous speculator.  He is a licensed attorney with a documented record of white-collar fraud litigation.  When the unauthorized liquidation of his Wiener Doge tokens occurred—triggered by a breach of Phantom's own platform security—the optics were indistinguishable from a classic "rug pull" in the crypto world.

353.     In the days that followed, Liam was bombarded with hate mail, public accusations of fraud, and even death threats.  Online forums filled with users accusing him of orchestrating a scheme to cash out and leave investors holding worthless tokens.  The perception, although false, was reinforced by the nature of the attack itself: rapid-fire wallet draining transactions that looked intentional, facilitated by Phantom's own Swapper feature.  Because the platform allowed the criminal to conduct these trades without oversight, review, or even a notification system, the public was left to draw their own conclusions—conclusions that have had devastating consequences for Liam's professional standing.

354.     Liam's personal brand, which had been tied closely to his commitment to transparency, accountability, and consumer protection, was now associated with one of the most stigmatized forms of crypto misconduct.  The reputational fallout was not just digital—it was deeply

human.  He lost key relationships, both professional and personal.  This is the type of harm that no monetary recovery can fully reverse.

355.    Emotionally, the toll has been immense.  Liam continues to experience trauma from the backlash: paranoia, disrupted sleep, anxiety about his professional future, and real fear for his physical safety.  He has been forced to live under a cloud of suspicion not because of anything he did—but because Phantom failed to do the bare minimum to secure the digital infrastructure it controls.  The very product Phantom marketed as "safe," "fun," and "best-in-class" became a vehicle for his public and personal downfall.

356.    Importantly, this harm is not hypothetical, nor is it limited to the aftermath of a one-time event.  It is ongoing, avoidable, and deeply rooted in Phantom's conscious choice to prioritize platform growth and user acquisition over security and accountability.  Rather than redesign its architecture after receiving repeated warnings—from its own security auditors and from victims like Liam—Phantom doubled down.  It solicited new users, enabled anonymous onboarding, and aggressively marketed meme coin trading on a platform that lacked even the most basic anti-fraud infrastructure.

357.    Liam's case illustrates the real-world consequences of platform negligence at scale.  This wasn't just a failure to safeguard assets.  It was a systemic and repeated abdication of duty by a $3 billion consumer financial platform that knowingly operated in a way that left real people—like Liam—vulnerable to catastrophic and life-altering harm.

## SIXTH CAUSE OF ACTION

### Deceptive Trade Practices & False Advertising
### N.Y. Gen. Bus. Law §§ 349, 350 & 15 U.S.C. § 1125(a)(1)
### (Against Phantom)

358.    Plaintiffs incorporate the preceding paragraphs.

359.    Phantom built its $3 billion platform by misleading consumers about the nature and quality of its product.  Through an aggressive advertising campaign spanning its website and social media, Phantom represented that its crypto wallet featured "industry-leading" and "best-in-class" security, and that it was safer than centralized exchanges.  It marketed its app as "safe, easy, and fun—for everyone," including families, novices, and elderly users.  These were not vague slogans or opinions.  They were specific, factual claims intended to drive adoption, increase transaction volume, and earn fees—claims that were materially false and contradicted by Phantom's own knowledge of persistent wallet-draining hacks, its lack of basic cybersecurity protections, and its undisclosed partnership with OKX, a decentralized exchange later convicted of laundering billions in criminal funds.

360.    This conduct violates both New York General Business Law §§ 349[72] and 350,[73] which prohibit deceptive consumer practices and false advertising, and Section 43(a)(1)(B) of the Lanham Act,[74] which bars false or misleading commercial representations about the characteristics

---

[72] New York General Business Law § 349 (Deceptive Acts and Practices Unlawful) ("(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.").

[73] New York General Business Law § 350 (False advertising Unlawful) ("False advertising unlawful.  False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

[74] 15 U.S.C. § 1125(a)(1) (False designations of origin, false descriptions, and dilution forbidden) ("(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or in combination thereof, or any false

or qualities of a product. Phantom's statements were made in commercial advertising, were likely to deceive a reasonable consumer, and were clearly material—security is one of the most important features influencing a consumer's choice of wallet. Plaintiffs relied on these statements in choosing to store valuable digital assets with Phantom and suffered actual losses when a cybercriminal exploited the very vulnerabilities Phantom concealed.

361.    Phantom's representations of security and support were central to its marketing campaign and designed to lull users into a false sense of safety. The statutory elements are fully satisfied: Phantom engaged in consumer-oriented and commercial conduct, made materially false and misleading statements, and caused real financial harm.

### A.    Statutory Framework

362.    Phantom's conduct violates New York General Business Law § 349, which prohibits deceptive acts or practices in the course of business. This statute is designed to protect the general public from unfair or misleading conduct by businesses operating in New York. It applies broadly to any consumer-facing representations that have the capacity to mislead, regardless of whether the conduct was intentional. A deceptive practice under § 349 is one that is likely to mislead a reasonable consumer acting under typical circumstances. Phantom's conduct falls squarely within the scope of this statute because it made repeated, public-facing misrepresentations about the safety, functionality, and trustworthiness of its crypto wallet and trading platform—

---

designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.").

claims that were calculated to shape consumer decision-making and that concealed the actual risks facing its users.

363.    Phantom also violated New York General Business Law § 350, which prohibits false advertising in the conduct of any business.  Advertising is considered false under this statute when it is materially misleading—meaning the representation has the capacity to influence a consumer's choice.  Phantom advertised its platform as featuring "best-in-class" security and as safer than centralized exchanges, promoting these claims through widespread online campaigns and onboarding materials.  These advertisements were not general brand slogans; they were framed as factual assurances about the security architecture of the product.  Phantom knew these claims were untrue or at minimum recklessly disregarded their falsity, as its wallet lacked basic cybersecurity protections and its swapper was integrated with a decentralized exchange known to facilitate illicit activity.  By failing to disclose these known defects, Phantom created a misleading impression that directly impacted how consumers evaluated and trusted its product.

364.    Phantom's conduct further violates Section 43(a)(1)(B) of the Lanham Act, which prohibits false or misleading representations of fact made in commercial advertising or promotion. This federal law is intended to protect the integrity of interstate commerce by ensuring that businesses do not mislead the public about the nature, quality, or characteristics of their products or services.  The Lanham Act targets false claims made in advertisements or promotional campaigns that are intended to influence consumer behavior and that distort the competitive landscape.  Phantom's marketing strategy clearly meets this standard.  It promoted its wallet and integrated trading functionality as technically superior and uniquely secure—when in truth, its system was built on architecture that lacked encryption, had no meaningful fraud detection tools, and was repeatedly exploited by criminals.  The false assurances Phantom made were not only likely to deceive but

were intended to reassure unsophisticated consumers, draw them into its platform, and extract transaction fees from their activity.

365.    Together, these statutes form a cohesive legal framework that prohibits businesses from concealing known risks while affirmatively advertising a product's reliability and safety. Phantom used the trust created by its security claims to build one of the largest consumer-facing crypto applications in the United States.  But the truth it concealed is what these laws were enacted to address: that Phantom's product lacked basic protections, was structurally vulnerable to exploitation, and operated with reckless indifference to user safety.  Its omissions and misstatements were not minor inaccuracies—they were central to its business model and devastating in their consequences.  Each of these statutes provides an independent and fully satisfied basis for liability. Taken together, they present a clear mandate for accountability.

### B.    Consumer-Oriented & Commercial Conduct

366.    Phantom's conduct was clearly consumer-oriented within the meaning of New York General Business Law §§ 349 and 350.  From the outset, Phantom marketed its application not to developers, institutions, or sophisticated financial professionals, but to everyday consumers across the United States, including in New York.  It promoted itself as the "friendly crypto wallet," intentionally adopting branding and language that would resonate with individuals who had no prior experience with decentralized finance.  The product was not presented as a technical tool requiring specialized knowledge—it was positioned as the first step into crypto for the masses. That strategy reflected Phantom's stated goal of "onboarding the next million users" and "bringing Web3 to everyone."  These aren't the aspirations of an infrastructure provider.  They are the strategic messaging of a consumer product company targeting unsophisticated users, families, and first-time investors.

367.    Phantom's marketing campaign was national in scope and explicitly aimed at driving mainstream adoption.  In November and December 2024, Phantom executed a coordinated social media campaign designed to capitalize on the holiday season by urging users to onboard their friends, family members, and even grandparents.  This campaign included posts on Instagram, X, and LinkedIn that encouraged consumers to introduce their relatives to Phantom over Thanksgiving dinner, to "talk tokens over turkey," and to celebrate the holidays by helping their loved ones create Phantom wallets and claim usernames.  These promotions did not merely invite consumers to try the product—they framed Phantom as a community-driven, celebratory part of family gatherings and social relationships.  In doing so, Phantom blurred the line between social media engagement and financial behavior, deliberately targeting people who would be influenced by peer encouragement rather than technical understanding or market research.

368.    Phantom's commercial conduct focused heavily on expanding its user base through representations about ease of use, safety, and inclusivity.  It described its product as "easy, safe, and fun. For everyone," and marketed its mobile application as a lifestyle tool—a place to create a profile, follow friends, and send money with the tap of a button.  This positioning was no accident.  Phantom intentionally designed its product to resemble a social app more than a financial services platform, lowering the perceived risk barrier and making users more comfortable engaging in high-stakes financial transactions they might otherwise avoid.  The central promise of Phantom's messaging was that users could take control of their crypto investments with a sense of community and confidence—promises that were later betrayed by the platform's failure to protect even the most basic security interests of those users.

369.    Phantom's decision to frame its application as a consumer-friendly product also subjected its representations to the commercial advertising and promotion standards of the Lanham

Act.  Phantom's statements about security, trust, and user empowerment were not abstract mission statements buried in investor documents.  They were front-and-center promotional claims—amplified by paid advertising, algorithmic reach, and mass social sharing.  These representations were plainly designed to influence consumer behavior in the marketplace, and they succeeded.  Millions of consumers downloaded Phantom, moved funds into its wallets, and used its integrated trading features based on their understanding that Phantom offered a safer, simpler alternative to traditional crypto exchanges.  That understanding was shaped entirely by Phantom's public claims and advertising—and those claims were materially false.

370.    Phantom cannot now disown the consumer-facing nature of its conduct.  The law does not exempt tech-forward or "decentralized" companies from consumer protection statutes when they deliberately target and monetize novice users.  Phantom's product is a mobile-first application available in app stores, marketed on social media, and used by millions of everyday people to store and trade financial assets.  Its design, promotion, and user acquisition strategy all reflect a deliberate effort to capture consumer trust and participation in financial transactions.  Phantom's conduct is exactly the kind of activity New York's consumer protection laws were designed to address—and its false and misleading promotional statements are well within the regulatory reach of both state law and federal commercial advertising law.

### C.    False & Misleading Statements

371.    Phantom deliberately made false and misleading statements of fact about the nature, safety, and reliability of its crypto wallet and integrated Swapper feature.  These statements were direct claims about Phantom's product functionality, security architecture, and customer support infrastructure, designed to instill trust and drive consumer adoption.  In its promotional materials, Phantom described its product as having "industry-leading" and "best-in-class" security.  It positioned its wallet as a safer alternative to centralized exchanges, claiming that self-custody through

Phantom offered users more control, more privacy, and greater protection from institutional fail-
ure. Phantom also told consumers that they would be supported by a "24/7 global support team"
and could rely on Phantom to help them stay safe. These statements were repeated across multiple
platforms—including Phantom's official website, LinkedIn page, and Instagram feed—and
formed the centerpiece of Phantom's marketing strategy to acquire and retain millions of new
users.

372.    These representations were not only factual in nature but were made within the
context of commercial advertising and promotion, satisfying the threshold for liability under the
Lanham Act. Phantom's statements were disseminated as part of its broader effort to grow its user
base and increase transaction volume through its Swapper feature, from which Phantom collected
fees. The representations were presented as product attributes—claims about what the application
"offers," what it "does," and how it "protects" users—and were designed to induce action. A
reasonable consumer would not understand "industry-leading security" to mean general compe-
tence; they would interpret it to mean the product meets or exceeds prevailing cybersecurity stand-
ards. Likewise, a claim that Phantom is "safer than centralized exchanges" implies an empirical
comparison—that consumers' assets are less likely to be lost, stolen, or compromised if stored in
Phantom. The promise of "24/7 global support" conveys the impression of real-time, human as-
sistance from a team prepared to intervene and resolve urgent issues, particularly in the event of
suspected fraud or cyberattack.

373.    In truth, Phantom's wallet lacked even the most basic security infrastructure neces-
sary to protect users from foreseeable harm. Phantom did not require or support multi-factor au-
thentication—an industry-standard safeguard that dramatically reduces the likelihood of unauthor-
ized access. Phantom did not encrypt private keys properly. It lacked real-time transaction

monitoring or suspicious activity alerts that could detect and halt unauthorized wallet-draining events. Phantom had no responsive mechanism to intervene or freeze assets when alerted to a security breach, and in the event of a compromise, its so-called "support team" offered little more than automated replies and disclaimers of liability. In short, the protective ecosystem Phantom promised did not exist. The application's design was centered around speed and convenience, not defense or accountability, and its marketing misrepresented that foundational truth.

374.    Even more deceptive was Phantom's failure to disclose its direct integration with OKX—a decentralized exchange that, during the relevant period, was under investigation and ultimately pleaded guilty to violations of the BSA for facilitating billions of dollars in illicit transactions. Rather than distancing itself from OKX, Phantom embedded its Swapper tool directly into OKX's infrastructure, allowing users to execute cross-chain token swaps with no identity verification, no transaction friction, and no safeguards against criminal abuse. These transactions were routed through Phantom's user interface, monetized through Phantom's transaction fee model, and falsely marketed as part of a secure and consumer-friendly ecosystem. Not only were users not warned about this partnership—they were actively misled into believing they were participating in a safer alternative to centralized exchanges, when in fact Phantom had exposed them to even greater systemic risk.

375.    These false and misleading statements were not peripheral. They were core to Phantom's brand identity and consumer appeal. Users like Liam were persuaded to trust Phantom based on these representations. They chose to store significant crypto assets—including the full value of an emerging cryptocurrency project—in Phantom's wallet precisely because of the belief that Phantom offered a higher level of security, reliability, and support than other available platforms. When Phantom's infrastructure failed and a cybercriminal drained Liam's wallet within

minutes, that trust was irreparably broken. But the loss was not the result of consumer negligence. It was the direct consequence of Phantom's decision to promote a false narrative about the safety and strength of its platform while failing to implement the very protections it claimed to offer.

### D.    Material Omissions of Known Risk

376.    Phantom's failure to disclose known and ongoing security vulnerabilities constituted a material omission that rendered its public statements deceptive and misleading. While Phantom touted its application as offering "best-in-class" security, it omitted the single most important fact any user would need to make an informed decision about whether to entrust their funds to the platform: that wallet-draining attacks were already widespread and ongoing. Phantom users had reported thousands of instances in which unauthorized actors drained the contents of their wallets by exploiting known weaknesses in Phantom's security architecture. These were not isolated or speculative threats—they were real, repeated, and well-documented occurrences that affected Phantom's actual user base. Phantom had full visibility into these events. The company received direct user complaints, saw transactional patterns on-chain, and tracked community posts publicly describing account takeovers and lost assets. Yet nowhere on Phantom's website, in its onboarding materials, or in its public-facing campaigns did Phantom acknowledge the existence of this pattern.

377.    Phantom also failed to disclose that it had actual knowledge of the security exploits that allowed these wallet-draining attacks to occur. As a technology company that controls both the frontend interface and backend wallet interactions, Phantom has constant access to real-time data about its users' accounts. It knew, or should have known, that its lack of multi-factor authentication, inadequate key storage practices, and failure to detect suspicious trading behavior were enabling cybercriminals to bypass user protections entirely. Phantom's own infrastructure made it easy for attackers to import stolen private keys and instantly liquidate wallets using the pre-

integrated Swapper tool—without triggering any alerts, delays, or authentication challenges. Phantom had internal awareness of these vectors, as evidenced by the volume of complaints it received and the company's own acknowledgment, on its website, that phishing and wallet scams were on the rise. Even while privately observing the growing frequency of attacks and their technical causes, Phantom chose not to disclose that these risks were not just theoretical—they were already being exploited through its application at scale.

378.    Phantom's decision to conceal its partnership with OKX further compounded the deception. During the relevant time period, OKX was under active investigation by U.S. law enforcement for its role in facilitating unlicensed money transmission and money laundering. On February 24, 2025, OKX pleaded guilty to violating the Bank Secrecy Act and admitted to enabling more than $5 billion in illicit transactions. Phantom had already partnered with OKX months earlier, deeply integrating OKX's decentralized exchange infrastructure into Phantom's Swapper feature. This partnership allowed Phantom users to conduct anonymous swaps through OKX without identity verification or transaction monitoring. Phantom's users were never told that they were engaging with an unlicensed, criminally compromised counterparty. Instead, Phantom portrayed these trading capabilities as a seamless benefit of its wallet—failing to disclose the substantial legal, financial, and reputational risks associated with executing transactions through a known conduit for laundering illicit funds.

379.    Each of these omissions was material. Phantom's core value proposition to users was its supposed superiority in security, safety, and trustworthiness. It was not merely offering a tool—it was offering reassurance. It invited users to store significant portions of their digital wealth inside its platform, to trade emerging tokens using its integrated tools, and to introduce their friends and family to a financial ecosystem that it claimed was safe. No reasonable consumer

would have agreed to store their assets with Phantom had they known that Phantom's application had already facilitated widespread wallet theft, that the company had failed to address its known security gaps, or that the transactions they executed were routed through an exchange that was enabling global financial crime. These were facts that cut directly to the heart of consumer decision-making. The omission of such information created a materially distorted view of the risks associated with using Phantom—and that distortion was the point. Phantom built its user base by suppressing the truth.

380.   By omitting known facts about wallet thefts, platform vulnerabilities, and its entanglement with OKX, Phantom deprived consumers of the information they needed to make informed, autonomous financial decisions. These omissions were not accidental—they were strategic. Phantom made a deliberate choice to emphasize security and trust in its messaging while concealing every material indicator to the contrary. These omissions fundamentally altered the consumer risk calculus and directly contributed to the decisions of Plaintiffs, including Liam, to entrust Phantom with their digital assets. Had the truth been known, Plaintiffs would have avoided Phantom entirely. Instead, Phantom's concealment of these material facts laid the groundwork for devastating financial losses and irreparable harm. That concealment—just as much as Phantom's affirmative misrepresentations—is the foundation of its liability under state and federal law.

### E.   Consumer Deception & Reliance

381.   Phantom's representations were materially deceptive to reasonable consumers. Its marketing campaign targeted everyday users—particularly those new to cryptocurrency—by promoting its wallet as "best-in-class," "industry-leading," and safer than centralized exchanges. It further promised "24/7 global support" and a secure, user-friendly experience. These statements, presented repeatedly through Phantom's website and social media, were framed as factual

guarantees, not general opinions.  Consumers were led to believe that Phantom's product offered strong protections against cyber threats and that they would have support if something went wrong.

382.    In reality, Phantom lacked even basic cybersecurity safeguards.  The platform did not implement multi-factor authentication, failed to encrypt private keys at rest, and had no mechanisms to detect or prevent unauthorized access.  Its Swapper feature was directly integrated with OKX—a decentralized exchange that later admitted to facilitating billions in illicit transactions. Phantom had actual knowledge of wallet-draining attacks affecting its users yet concealed these incidents while continuing to market its platform as secure.

383.    Liam relied on these assurances in storing significant assets, including the Wiener Doge token, in Phantom's wallet.  On January 20, 2025, a cybercriminal exploited Phantom's known vulnerabilities, accessed Liam's wallets, and liquidated over $500,000 in assets in minutes. The attack also destroyed the market value of the Wiener Doge project, causing lasting financial and reputational harm.

384.    Phantom's vague disclaimers about "self-custody risk" do not cure the deception. These statements were buried and general, and they were directly contradicted by Phantom's core messaging, which emphasized security, trust, and institutional-quality protection.  Under consumer protection law, such disclaimers cannot shield a company from liability when they are overshadowed by specific, misleading representations.  Phantom made the security of its platform a centerpiece of its brand—and failed to deliver on that promise.  Plaintiffs suffered direct and foreseeable harm as a result.

### F.    Statutory Violations & Remedies

385.    Phantom's conduct satisfies the legal standards under all three statutory frameworks: N.Y. General Business Law § 349, which prohibits deceptive acts or practices in the conduct of any business; § 350, which prohibits materially false advertising; and Lanham Act

§ 43(a)(1)(B), which bars false or misleading factual representations in commercial advertising or promotion. Each of these statutes is designed to protect the public from commercial misconduct that misleads consumers, distorts market choices, and causes financial injury. Phantom engaged in conduct that falls squarely within the scope of each.

386.    Phantom's marketing was plainly consumer-facing. It was directed at individual users, including those in New York, and appeared across widely accessible platforms such as Instagram, LinkedIn, X, and its own website. Its statements were not abstract or aspirational—they were framed as definitive claims about the security, functionality, and safety of its product. These statements were not only made with the intent to induce consumer reliance but were disseminated in contexts that meet the definition of "advertising" under both state and federal law. Phantom's representations concerning "industry-leading security," "24/7 global support," and superior safety compared to centralized exchanges were presented as reliable, factual assertions meant to influence consumer decision-making.

387.    These statements were false, material, and deceptive. They were false because Phantom lacked the security features it claimed to offer and had knowledge of significant risks it failed to disclose. They were material because they addressed core product attributes that go directly to the heart of consumer trust and platform selection. And they were deceptive because they created a misleading impression that Phantom was a safer alternative when, in fact, its design exposed users to increased risk and lacked the capacity to prevent or respond to known forms of cyberattack. This deception was not theoretical—it directly caused measurable harm to Plaintiffs, including the loss of valuable digital property, the collapse of a cryptocurrency project, and the financial, reputational, and emotional consequences that followed.

388.    As a result, Plaintiffs are entitled to relief under all applicable statutes.  Under N.Y. Gen. Bus. Law § 349(h),[75] Plaintiffs seek actual damages for the losses incurred, and because Phantom's conduct was knowing and reckless, they further seek treble damages as authorized by statute.  Under § 350, Plaintiffs seek recovery for Phantom's materially misleading advertising and its impact on consumer behavior.  Under the Lanham Act, Plaintiffs are entitled to statutory damages, injunctive relief, and attorneys' fees for the dissemination of false commercial representations that distorted the market and caused financial injury.  These remedies reflect the full scope of the harm caused by Phantom's misconduct and the comprehensive liability it now faces.

## SEVENTH CAUSE OF ACTION

### Aiding & Abetting Cybercrime
### (Against Phantom & OKX)

389.    Plaintiffs incorporate the preceding paragraphs.

390.    Under New York law, a defendant is liable for aiding and abetting a tort where it (1) has actual knowledge of the underlying wrongful conduct, (2) provides substantial assistance to that conduct, and (3) that assistance is a proximate cause of the plaintiff's injury.

391.    This claim arises from Phantom and OKX's knowing facilitation of the cybercriminal conversion and laundering of Plaintiff Liam Murphy's digital assets, in violation of criminal law and civil rights protected under New York tort principles.

---

[75] N.Y. Gen. Bus. Law § 349(h) ("In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. … The court may award reasonable attorney's fees to a prevailing plaintiff.").

A.    **Knowledge & Wrongful Conduct**

392.    From inception, Phantom knowingly designed its wallet application to facilitate anonymous transactions.  It intentionally collects no identifying information—no name, email, or phone number—despite knowledge that anonymity increases criminal misuse.  Phantom promoted this architecture as "Private by Design" and "Security, not Surveillance."

393.    Phantom publicly acknowledged the cyber risks of its design.  In October 2021, Phantom's co-founders admitted that many of its users were "new to crypto," that phishing attacks were rampant, and that "user education can only go so far in preventing such attacks."

394.    Phantom knew that it stored private keys in decrypted browser memory—a risk flagged as "medium" in its May 2021 Kudelski audit.  Phantom accepted that risk and continued onboarding users with no change in design.

395.    Phantom also had actual knowledge of ongoing criminal activity on its platform. From December 2024 to present, hundreds of users reported that their wallets were "drained" by cybercriminals.  Public complaints consistently described wallet takeovers, stolen tokens, and unauthorized swaps via Phantom's Swapper.

396.    In November 2024, Phantom integrated OKX's decentralized exchange into its Swapper without implementing any KYC or AML measures.  Phantom knew that this integration would allow its anonymous users to swap funds via OKX's infrastructure without oversight.

397.    OKX, for its part, admitted in its February 2025 criminal plea agreement with the U.S. Department of Justice that it partnered with "non-disclosure brokers" like Phantom to facilitate anonymous trading with U.S. users in violation of federal law.  OKX admitted it had no adequate controls for suspicious activity and facilitated $5 billion in unlawful transactions.

398.    Phantom and OKX jointly promoted their integration to the public in November 2024 and deliberately solicited U.S. users, including through campaigns like "It's Onboarding

Season." Phantom encouraged novice U.S. consumers to onboard their "grandparents" into its anonymous crypto trading application.

399.    Phantom marketed the platform as a secure, all-in-one crypto trading solution, despite knowing that it lacked MFA, transaction monitoring, account flagging, and the ability to freeze compromised wallets.

### B.    Substantial Assistance

400.    Phantom substantially assisted the January 20, 2025 cybercrime by designing and operating the very infrastructure used to execute the theft. The attacker gained access to Liam's wallet using Phantom's known-insecure browser storage, then conducted a series of swaps through Phantom's in-app Swapper—without triggering any alerts or verification mechanisms.

401.    Phantom's Swapper, which facilitates trades from within the same app where private keys are stored, executed the unauthorized transactions using an "auto-slippage" feature. This feature allowed trades to proceed automatically, even if the result was catastrophic value loss.

402.    The attacker used Phantom's Swapper to swap nearly 50% of _all_ Wiener Doge tokens in existence—then worth over $500,000—for less than $38,000 in SOL. Phantom's system approved each trade instantly. OKX's exchange infrastructure received and routed these trades.

403.    Phantom refused to intervene, investigate, or freeze trading routes following the incident. It denied any responsibility, despite controlling both the wallet software and the in-app Swapper used in the attack.

404.    Both defendants designed a system that deliberately excluded all standard safeguards: no identity checks, no suspicious transaction flags, no post-swap audit trail, and no customer remediation support.

405.    Following the theft, Phantom refused to assist the victim or share internal data. When Liam contacted the company's legal and support teams, Phantom disclaimed liability, stating, "you bear sole responsibility for any loss of your cryptocurrency."

### C.    Causation & Harm

406.    But for Phantom's and OKX's design, promotion, and operation of an anonymous, unmonitored trading system, the criminal actor would not have been able to liquidate Liam's assets without detection or resistance.

407.    The structure and integration of Phantom and OKX created the conditions necessary for the crime to occur: a consumer-facing platform that stores private keys in memory, routes trades without oversight, and invites novices to participate in volatile markets with no safeguards.

408.    Liam suffered the complete liquidation of over $500,000 of his virtual currency, the destruction of his first virtual currency project worth over $1,000,000, reputational damage to the Wiener Doge project, and severe emotional distress.  The asset's value was destroyed, and its user community disbanded after what appeared to be a rug pull.

409.    The same criminal continues to use Phantom to this day, according to blockchain analysis.  Neither Phantom nor OKX have implemented any changes to prevent recurrence or cooperated with law enforcement to identify the attacker.

410.    The harm suffered by Plaintiffs is the foreseeable and proximate result of Defendants' knowing facilitation of anonymous, untraceable trades via a jointly operated, fee-generating system with no compliance infrastructure.

411.    The harm suffered by Plaintiffs is the foreseeable and proximate result of Defendants' knowing facilitation of anonymous, untraceable trades via a jointly operated, fee-generating system with no compliance infrastructure.

## DEMAND FOR JURY TRIAL

412.    Plaintiffs respectfully demand a trial by jury on all causes of actions.

## PRAYER FOR RELIEF

413.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in their favor and against Defendants Phantom Technologies, Inc. ("Phantom") and Aux Cayes Fintech Co. Ltd. d/b/a OKX ("OKX"), and award the following relief:

a.    Actual damages in an amount to be proven at trial, but no less than $3.1 million, representing the full extent of Plaintiffs' financial losses, including the unauthorized liquidation of Wiener Doge tokens and the destruction of the token's market value.

b.    Property damages for the theft and destruction of Plaintiffs' digital assets, including the unique and irreplaceable value of the layer-two meme coin project developed and stored in Phantom wallets.

c.    Restitution and disgorgement of all fees, revenues, and ill-gotten gains obtained by Phantom and OKX as a result of their illegal, deceptive, and negligent conduct—including profits from swap transaction fees and unlicensed financial activity.

d.    Reputational damages to compensate for the substantial harm to Liam Murphy's professional and personal reputation caused by the unauthorized liquidation of his crypto project due to Phantom's security failures.

e.    Consequential and future damages for lost opportunities, business prospects, token valuation, and future earnings stemming from Defendants' misconduct, including the collapse of the Wiener Doge project.

f.    Equitable restitution requiring Phantom and OKX to restore all stolen or wrongfully converted assets, or their equivalent value, to affected users.

g.    Punitive damages to punish Defendants' willful evasion of regulatory requirements, reckless indifference to consumer safety, facilitation of anonymous criminal activity, and refusal to act despite notice of known cybersecurity exploitation and unlawful trading.

h.    Exemplary damages for Phantom's and OKX's aiding and abetting of cybercriminals, criminal conversion, money laundering, and flagrant

144

violations of the CEA, BSA, and New York's cybersecurity and virtual currency regulations.

i.    Reasonable attorneys' fees and costs incurred in prosecuting this action pursuant to all applicable laws, including but not limited to N.Y. Gen. Bus. Law § 349(h), the Lanham Act, and principles of equity.

j.    An order finding that OKX is jointly and severally liable with Phantom for all damages suffered by Plaintiffs due to their interdependent partnership, shared misconduct, and aiding and abetting of cybercrime and regulatory evasion.

k.    Such other and further relief as the Court may deem just, proper, and equitable, including pre-judgment and post-judgment interest at the maximum rate permitted by law.

Dated:        April 14, 2025

Respectfully submitted,

*/s/ Thomas Liam Murphy, Esq.*

Thomas Liam Murphy, Esq.
liam@murphyslawcrypto.com
(913) 575-0540

*Counsel for Plaintiffs*

Licensed to Practice in the Southern District of New York
Attorney Bar Code # 5853759