USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS LIAM MURPHY, et al.,
Plaintiffs,

-against-

PHANTOM TECHNOLOGIES, INC., et al.,
Defendants.

25-CV-03060 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs Thomas Liam Murphy and a number of Murphy's family and friends brought this lawsuit against Defendants Phantom Technologies, Inc. ("Phantom") and Michal Ireneusz Ryduchowski, alleging various theories by which the Defendants are legally responsible for a theft of cryptocurrency from Murphy. Before the Court are (1) Phantom's motion to compel Murphy to arbitrate and otherwise dismiss the Amended Complaint, Dkt. No. 31; and (2) Phantom's motion to disqualify Murphy as counsel for all Plaintiffs, Dkt. No. 19. For the reasons set forth below, Phantom's motion to compel and otherwise dismiss the Amended Complaint is GRANTED in part. Accordingly, the motion to disqualify Murphy is DENIED as moot, without prejudice to renewal should the need arise.

## BACKGROUND

### I. RELEVANT FACTS[1]

This action arises from Defendant Ryduchowski's alleged theft of over $500,000 in crypto funds from Murphy's virtual wallets, which ultimately caused the destruction of

[1] The following facts are taken from the Amended Complaint, Dkt. No. 25 ("AC" or "Complaint") and are assumed true solely for purposes of resolving Phantom's motion to compel and otherwise dismiss. Where appropriate and necessary to the motion to compel, the Court has also relied on the Declaration of Francesco Agosti and its attachments, Dkt. No. 32 ("Agosti Decl."), submitted in

Murphy's "million-dollar" crypto project coined "Wiener Doge." AC ¶¶ 7, 11. Prior to the theft, Murphy had gifted Wiener Doge coins to a number of his family members and friends, *id.* ¶ 119, and some had purchased Wiener Doge themselves, *id.* ¶ 27. Ryduchowski's theft from Murphy and subsequent swaps of the stolen Wiener Doge coins for another cryptocurrency, Solana ("SOL"), caused the value of all Wiener Doge coins to plummet to near-zero. *Id.* ¶ 8. Murphy's tokens were held in Phantom, a consumer cryptocurrency application marketed as a secure and user-friendly "wallet," and which, according to the Complaint, "perform[s] the core functions of a trading platform without regulatory oversight." AC ¶¶ 2–4. Phantom was designed to facilitate anonymous transactions: it is "private by design," with no identifying information needed to register, and advertises a hands-off approach to overseeing the platform, encouraging and highlighting "self-custody" of crypto wallets. *Id.* ¶¶ 68–70, 80. Phantom had a $3 billion valuation and stored $25 billion in crypto assets—one of "the world's biggest consumer finance platform[s]"—as of January 2025. *Id.* ¶¶ 57, 106.

Murphy began using Phantom on November 18, 2024, and shortly thereafter launched Wiener Doge. *Id.* ¶ 111; Agosti Decl. ¶ 15. With the ambition to grow Wiener Doge into a profit-generating endeavor, Murphy swapped over $66,000 worth of SOL into Wiener Doge and gave some of those Wiener Doge tokens as gifts to his friends and family ("Token Holder Plaintiffs"). AC ¶¶ 119, 126. Ryduchowski's cyberattack occurred on January 20, 2025, when he hacked into Murphy's computer; installed malware; exported Murphy's private key and imported it into his own Phantom application; executed a series of swaps of Wiener Doge back into SOL at a massive discount, plummeting the value of Wiener Doge; and then sent the

support of the motion to compel. The Court refers to the parties' memoranda in support of and in opposition to the motion to compel and dismiss as follows: Dkt. No. 33 as "Mot."; Dkt. No. 37 as "Opp"; and Dkt. No. 38 as "Reply."

resulting $37,537 in SOL coins to his own crypto wallet. *Id.* ¶¶ 127–138. After reporting the incident to state and federal authorities and Phantom customer support with no success, Murphy emailed Phantom's legal department on January 23, 2025, and January 24, 2025 to warn it of potential litigation. *Id.* ¶¶ 142–146.

Plaintiffs bring this action to recover $3.10 per token lost: the estimated total lost value for each individual Plaintiff ranges from $260 to $1,519,000, Murphy's purported lost value..[2] *Id.* ¶ 26. They argue that Phantom knew of vulnerabilities that exposed its users to malware and private key theft, but Phantom failed to warn customers of these vulnerabilities, including in user agreements. *Id.* ¶¶ 2–4, 67.

## II. THE PHANTOM TERMS OF SERVICE ARBITRATION PROVISION

As is common in internet-based business, Phantom requires users to accept its Terms of Service ("Terms" or "Agreement") before opening an account. *See* Agosti Decl. ¶¶ 8–13. Although there appears to be a factual dispute about when Murphy accepted the operative Terms, Murphy necessarily opened an account on Phantom prior to the cyberhacking and no later than November 30, 2024. AC ¶ 118. As required by Phantom, Murphy accepted the Terms when he first opened his account, by checking a box that stated "I agree to the Terms of Service." Agosti Decl. ¶¶ 8–13; *see also* Dkt. No. 32-2. Any user who clicked on the hyperlinked "Terms of Service," printed in purple font on a black backdrop, would be directed to the Terms in full. Agosti Decl. ¶ 9; Dkt. No. 32-1 ("Agreement").

Displayed prominently on page two, in all capital letters, the Agreement reads:

> ARBITRATION NOTICE: THESE TERMS CONTAIN AN ARBITRATION CLAUSE FOR USERS IN THE UNITED STATES AND CANADA, WHICH PROVISION IS CONTAINED BELOW UNDER THE HEADING "DISPUTE RESOLUTION". IF YOU ARE LOCATED

---

[2] A table of the estimated value lost by each Plaintiff is provided at AC ¶ 26.

> IN THE UNITED STATES OR CANADA, YOU AGREE THAT DISPUTES BETWEEN YOU AND PHANTOM WIL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND YOU WAIVE YOUR RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR OTHER REPRESENTATIVE PROCEEDING.

Agreement at 2.

As previewed, under the "Dispute Resolution" heading on page 25 of the Agreement, just under the all-caps warning: "PLEASE READ THIS 'MANDATORY ARBITRATION' PROVISION VERY CAREFULLY," is the Arbitration Provision. That provision reads:

> You and Phantom agree that any and all past, present and future disputes, claims, or causes of action arising out of or relating to your use of any of the Site or the Functionality, this Agreement, or any other controversies or disputes between you and Phantom (including, without limitation, disputes regarding the effectiveness, scope, validity or enforceability of this agreement to arbitrate) . . . shall be determined by arbitration . . ."

Agreement at 26 ("Arbitration Provision").

The Agreement outlines exceptions to binding arbitration. As relevant here, Phantom provides users with an opportunity to "opt out" of mandatory arbitration "by sending a written notice to Phantom at legal@phantom.app within thirty (30) days of **<u>first</u>** accepting this Agreement" which must include "your first and last name, address, and a clear statement that you do not wish to resolve disputes with Phantom through arbitration." Agreement at 28 ("Opt-Out Provision") (emphasis added).

## III. PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on April 14, 2025, and amended the Complaint on July 7, 2025 (mooting a previous motion to compel and dismiss). Dkt. Nos. 1, 25. Murphy individually brings claims against Ryduchowski for a number of violations of the Computer Fraud and Abuse Act and for conversion under New York state law, AC at 74–78, and brings one claim for deceptive trade practices and false advertising against Phantom, *id.* at 143–156. All Plaintiffs

bring claims against Phantom for violations of the Commodity Exchange Act for allegedly (1) operating an unregistered commodity trading platform, (2) acting as an unregistered Introducing Broker, (3) failing to supervise and monitor swap transactions, (4) engaging in fraudulent and deceptive conduct, and (5) willfully evading the Exchange Act's regulatory requirements. *Id.* at 78–114. Plaintiffs also bring claims against Phantom for *per se* negligence for allegedly failing to (1) maintain a sufficient cybersecurity program and risk-based policies, (2) monitor and test its cybersecurity program, (3) maintain audit trails to respond to cyber threat, (4) implement multi-factor authentication, (5) monitor users for suspicious behavior, (6) encrypt private keys, (7) establish an incident response plan. *Id.* at 114–131. Finally, Plaintiffs allege Phantom was grossly negligent in scaling a platform that "invited and enabled criminal exploitation" with "full knowledge of the risks," *id.* at 131–143, and aided and abetted Ryduchowski's cyber attack, *id.* at 156–158.

Defendants moved to compel Murphy to arbitration and otherwise dismiss the Amended Complaint, chiefly arguing that Murphy expressly consented to arbitrate any claims against Phantom, and that the Token Holder Plaintiffs lack standing to bring their claims. Dkt. Nos. 31–33. That motion is fully briefed and before the Court for decision. Dkt. Nos. 37, 38. Defendants also moved to disqualify Murphy as counsel for Token Holder Plaintiffs, invoking the advocate-witness rule. Dkt. Nos. 19, 20. That motion is also fully briefed and before the Court for decision. Dkt. No. 36.

Although a summons was requested and issued for Defendant Ryduchowski, Dkt. Nos. 28, 29, no proof of service has ever been filed and Defendant Ryduchowski has not appeared in this action.

## DISCUSSION

### I. MURPHY MUST ARBITRATE HIS CLAIMS AGAINST PHANTOM

The FAA "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017)..[3] "[T]his policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012). However, the FAA "does not require parties to arbitrate when they have not agreed to do so." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

In deciding a motion to compel, courts apply a "standard similar to that applicable for a motion for summary judgment," meaning courts must "consider all relevant, admissible evidence submitted by the parties." *Id.* "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). It may not satisfy this burden through "general denials of the facts on which the right to arbitration depends" and must instead "submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

Courts consider two factors when determining if a dispute is arbitrable: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015). Both factors are met here.

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

**A. Murphy Agreed to the Terms**

In considering whether a dispute must be arbitrated, the first question is whether there is an agreement to arbitrate between the relevant parties. *See id.*; *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). As the moving party, Phantom bears the burden of proving an arbitration agreement exists by a preponderance of the evidence. *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Federal courts apply state law to determine whether there is a valid agreement to arbitrate. *Nicosia*, 834 F.3d at 231.

The parties raise no dispute about which state's law applies (the only viable options being California or New York)—in either case, the result is the same..[4] For a contract to form, there must be a manifestation of mutual assent. *Meyer*, 868 F.3d at 74; *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019). "Parties may manifest assent through their conduct, however, the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024); Restatement (Second) of Contracts § 19(2). In light of rapid technological proliferation, courts have necessarily applied these traditional contract principles to novel forms of agreement. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855–56 (9th Cir. 2022) ("[E]lemental principles of contract formation apply with equal force to contracts formed online."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract").

---

[4] The Terms of Service contains a California choice of law provision. *See* Agreement at 25.

Internet contracts are generally classified "by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-wraps." *Keebaugh*, 100 F.4th at 1014. The classification determines the level of deference a court ought to give to any assent to the agreement at issue because it reflects the strength of any potential constructive notice of the terms purportedly agreed to. The "most straightforward manifestation" involves clickwrap agreements: agreements "in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman*, 30 F.4th at 856 (citing *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014)). Clickwrap agreements are routinely enforced as clear manifestations of intent. *See, e.g.*, *Meyer*, 868 F.3d at 75. Browsewrap agreements, "in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website," are on the opposite side of the spectrum, and courts are reluctant to enforce such agreements because they often use leave users "unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman*, 30 F.4th at 856.

Although Phantom posits (seemingly without dispute by Plaintiffs) that the Terms are a clickwrap agreement, they—at least under California law—more aptly fall somewhere between the two extremes, typically called a "modified" clickwrap agreement or "sign-in wrap" agreement. *See Moyer v. Chegg, Inc.*, No. 22-CV-09123-JSW, 2023 WL 4771181, at *4 (N.D. Cal. July 25, 2023). Users may only proceed with registration on Phantom's platform if they check a box indicating they agree with the "Terms of Service," but the Terms themselves are not displayed unless the user clicks the hyperlink. *See* Agosti Decl. ¶ 9; *see also Moyer*, 2023 WL 4771181, at *4 (describing such agreements as those in which "users are notified of the existence

of the website's terms of use and advises a user that by making some type of affirmative act, often by clicking a button, he is agreeing to the terms of service.")..[5]

Courts have found these types of agreements valid where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856; *see also Meyer*, 868 F.3d at 76 (collecting cases); *Crawford v. Beachbody, LLC*, No. 14-cv-1583-GPC (KSC), 2014 WL 6606563, at *3 (S.D. Cal. 2014) (terms were blue and hyperlinked); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (terms were underlined and hyperlinked); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (terms were blue and hyperlinked); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-CV-04825-JW, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005) (terms were underlined and hyperlinked).

By contrast, courts are less willing to find a user has constructive notice when the terms are less conspicuous. *See, e.g.*, *Berman*, 30 F.4th at 856–857 (invalidating an agreement where text disclosing the existence of the terms was printed in an inconspicuous and small gray font); *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 29 (Cal. Ct. App. 2021) (highlighting the insufficiency of merely underlining a hyperlink to an agreement, stating that it was "not set apart in any other way that may draw the attention of the customer, such as with blue text or capital letters."). Here, "Terms of Service" is clearly and prominently presented in purple bolded

[5] Such an agreement is likely a clickwrap agreement under New York law. *See e.g.*, *In re Celsius Network LLC*, 647 B.R. 631, 649 (S.D.N.Y. 2023) (framing as a clickwrap agreement one that requires a user to "manifest assent by clicking a button confirming that they accept the terms or a button that implies that they have accepted the terms," but which does not require the user to view the terms before accepting them). "In New York, clickwrap agreements are valid and enforceable contracts," and are consistently upheld. *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-CV-5463 (CM) (GWG), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) (collecting cases).

hyperlink text against a black backdrop, within the sentence that has a checkbox and says "I agree to the **Terms of Service**." Agosti Decl. ¶ 9..[6] A reasonably prudent Internet user would have seen it and understood that by checking the box next to "I agree to the Terms of Service," they were, indeed, agreeing to the Terms. Murphy consented to the Terms because he could not have used the Phantom platform without consenting, and the conditions of that use were clear and readily accessible to him.

Because Murphy was reasonably on notice of the Terms and expressly agreed to be bound by them, he is necessarily bound by the arbitration provision contained within..[7] Murphy's argument that he exercised his right to opt out of arbitration by emailing Phantom's legal department on January 23 and 24, 2025 that he intended to pursue litigation, also fails, for at least two reasons. *See* Opp. at 16–17. First, as explained in the Agreement, to opt out of the arbitration provision, users must send written notice to a pre-designated email address "within thirty (30) days of **first** accepting this Agreement." Agreement at 28 (emphasis added). It is undisputed that Murphy opened his account on Phantom and began using at least one of the relevant wallets no later than November 30, 2024, and Phantom has established that he could not have opened that account without agreeing to the Terms of Service. Murphy's argument that the 30-day period should somehow run from when he subsequently downloaded the Phantom

[6] Although the questions of constructive notice and mutual assent are, in some cases, questions of fact, whether a certain set of facts is sufficient to establish a contract is a question of law. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). Thus, the Court is entitled to resolve the question on the present motion and to rely on the screenshots embedded in the sworn Agosti Declaration: there is no genuine dispute that the webpages contained the agreement box, that the agreement linked to the Terms, and that the Terms contained the arbitration provision. *See id.* at 518 (finding that "the district court did not err in deciding the constructive notice issue as a matter of law").

[7] None of Murphy's other arguments regarding unconscionability and fraud are meritorious as to contract formation, in the face of the clear caselaw upholding agreements of this type, under these circumstances. *See also* Part I(B), below.

application onto a new device, Opp. at 16, is contrary to the record evidence and the clear language of the Agreement..[8] Second, even if the claimed written notice had been timely, the Opt-Out Provision requires that it contain, among other things, "a clear statement that you do not wish to resolve disputes with Phantom through arbitration." Agreement at 27–28. Murphy appears to claim he complied with the proper opt-out procedures, *see* Opp. at 17 ("Murphy opted out of arbitration on January 23, 2025. . . . [and] January 24 . . ." (citing to lines from the relevant emails between Murphy and Phantom's legal department), but these conditional emails—"I am contemplating potential litigation" and "I plan to commence litigation soon if I continue to receive no other way forward from Phantom"—plainly do not suffice for the required "clear statement" that Murphy did not want to resolve disputes through arbitration. *See* AC ¶¶ 145–146.

**B. The Delegation Provision Disposes of Murphy's Remaining Arguments**

Murphy and Phantom clearly and unmistakably agreed to arbitrate any "controversies or disputes. . . []including, without limitation, disputes regarding the effectiveness, scope, validity or enforceability of this agreement to arbitrate," subject to specific exceptions not relevant here. Agreement at 26 ("Delegation Provision"). "An agreement to arbitrate a gateway issue," or a delegation provision, "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). If

[8] In addition, the Court also does not credit Murphy's theory (asserted with no supporting evidence or case law) that because he purportedly "downloaded Phantom's web-browser application on a new MacBook that he bought as a post-Christmas present," that download "constituted a separate contract event—triggering a new opportunity to opt out." *See* Opp. at 16–17. Crediting this argument would green light any user to re-download the platform and re-start the opt-out clock at his leisure or whenever a new dispute arises—a proposition that cannot be reconciled with either the clear language of the Agreement or the strong preference in the law for enforcing valid arbitration agreements.

the parties do not "directly challenge[ ]" the delegation provision itself, "a challenge to the validity of an entire arbitration agreement . . . must be decided by the arbitrator," not the court. *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). Put differently, "a party must challenge the delegation provision specifically for a court to intervene." *Id.* at 1029; *see also Rent-A-Center*, 561 U.S. at 74 (affirming decision to compel arbitration where the plaintiff did not raise arguments "specific to the delegation provision").

Each of Murphy's remaining arguments are general threshold questions that must be decided by an arbitrator—including any dispute over effective vindication, unconscionability, fraudulent inducement, or the scope of the Agreement.[9] *See* Opp. at 9–13; *see also Caremark, LLC*, 43 F.4th at 1030 ("[I]f the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance."). Indeed, "[a] court has no business weighing the merits" of particular grievances because the "agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68–69 (2019).

Murphy willingly entered into a valid and enforceable agreement with a command to arbitrate all claims, and he did not opt out of that obligation consistent with the terms of the original agreement. The Court must therefore compel him to submit all his claims to arbitration.

## II. THE TOKEN HOLDER PLAINTIFFS LACK STANDING

Phantom separately moves to dismiss the Token Holder Plaintiffs' claims, arguing that they lack standing and, at best, engage in impermissible group pleading. The Court agrees.

---

[9] Murphy makes a passing challenge to the Delegation Provision as substantively unconscionable with little explanation. *See* Opp. at 14. Even if he had set forth a colorable challenge, the Court would decline to find that the Provision is so asymmetrical or harsh as to be substantively unconscionable.

Federal courts' jurisdiction is limited under Article III to "Cases and Controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). "That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing consists of three elements: "(1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Id.* at 273–74 (quoting *Lujan*, 504 U.S. at 560–61). Plaintiffs "bear[] the burden of establishing these elements," *Lujan*, 504 U.S. at 561, and they "must demonstrate standing for each claim that they press and for each form of relief that they seek," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Where a plaintiff lacks standing, a court has no subject matter jurisdiction to hear its claims. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

The procedural posture of a case determines the applicable burden, as standing must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, on a motion to dismiss for lack of standing, a district court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). But, as for any argument on a motion to dismiss, the Court "need not credit a complaint's conclusory statements without reference to its factual context." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145–46 (2d Cir. 2011)).

The Token Holder Plaintiffs have not alleged that they downloaded, interacted with, or engaged with Phantom, or that they suffered an injury-in-fact as a result of the cyberhack that is fairly traceable to any legally protected interests or the actions of Phantom. All that the Complaint alleges is that they received tokens from Murphy as a gift through some unspecified mechanism and that gift later declined in value. *Cf. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) (requiring plaintiffs to allege "actual damages" to confer standing under the CEA); *Anderson v. Tether Holdings Ltd.*, No. 21-CV-10613 (LTS), 2023 WL 5001074, at *2 (S.D.N.Y. Aug. 4, 2023) (finding purported injury to be too speculative where plaintiffs failed to "allege the price they paid for their [coins], whether and at what price they sold their [coins], or any corresponding loss in value that allegedly occurred."). Plaintiffs' bare allegation that they "deposited" their Wiener Doge tokens "on Phantom's application," AC ¶ 230, is no cure because "standing must be assessed as to each plaintiff and each plaintiff must demonstrate standing separately for each form of relief sought." *Seife v. U.S. Dep't of Health and Hum. Servs.*, 440 F. Supp. 3d 254, 272 (S.D.N.Y. 2020) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). The Complaint is devoid of any particularized (or, really, even group) allegations that could illustrate the elements of standing as to the Token Holder Plaintiffs to bring claims against Phantom (*e.g.* there is no indication that any Token Holder Plaintiff had an account or wallet at Phantom, that they relied in any way on Phantom's representations, that they engaged or intended to engage in any transactions through Phantom, that they had any reasonable expectation that the gift of Wiener Doge tokens had any inherent or fixed value, etc.). *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way.").

Because the allegations on behalf of the Token Holder Plaintiffs cannot satisfy the requirements of Article III standing, the Court has no jurisdiction to hear their claims.

**CONCLUSION**

For the reasons set forth above, Phantom's motion to compel arbitration or otherwise dismiss the Amended Complaint is GRANTED in part. As to Murphy, he must arbitrate all of his claims against Phantom, and so the Court declines to reach Phantom's arguments to dismiss on the merits. As to the Token Holder Plaintiffs, they lack standing to bring their claims as pled, and so again the Court need not reach Phantom's arguments to dismiss on the merits. Accordingly, the motion to disqualify counsel at Dkt. No. 19 is DENIED AS MOOT.

As part of the relief sought, Phantom requested a stay of the action pending arbitration. Section 3 of the FAA provides that "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration," the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been held in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) (The FAA "mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."). The Court will therefore stay this action pending the arbitration, and, once the stay is lifted, set an appropriate schedule for the Token Holder Plaintiffs to amend their Complaint if they believe they can demonstrate standing consistent with the analysis in this Opinion. The parties are hereby ORDERED to file a joint status letter within seven days of the arbitration occurring or by March 22, 2027, whichever is sooner, updating the Court on the status of arbitration.

Finally, Murphy is ORDERED to file a letter by no later than October 8, 2026 describing what efforts, if any, he has made to serve Defendant Ryduchowski. If that letter does not

establish efforts at service that suffice to show due diligence, the Court may dismiss Defendant Ryduchowski from this lawsuit for failure to serve. *See USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 133–34 (2d Cir. 2005).

The Clerk of Court is respectfully directed to (1) terminate Dkt. Nos. 19 and 31; (2) dismiss the claims of all Plaintiffs except Thomas Liam Murphy and terminate them from the docket; and (3) mark this case STAYED pending arbitration.

Dated: September 28, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge